**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

NATIVE VILLAGE OF HOOPER BAY, et al.,

Plaintiffs - Appellees,

v.

DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; et al.,

Defendants - Appellants,

KING COVE CORPORATION,

Defendant-Appellant,

STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,

Intervenor-Defendant-Appellant.

Case Nos. 26-6485, 26-6479

Case No. 3:25-cv-00316-SLG
District of Alaska, Anchorage
Sharon L. Gleason
Chief District Judge

---

FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,

Plaintiffs - Appellees,

v.

DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,

Defendants - Appellants,

KING COVE CORPORATION,

Defendant-Appellant,

Case Nos. 26-6487, 26-6481

Case No. 3:25-cv-00318-SLG
District of Alaska, Anchorage
Sharon L. Gleason
Chief District Judge

| | |
|---|---|
| STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant-Appellant. | |
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants-Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant,<br><br>STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant - Appellant. | Case Nos. 26-6490, 26-6484<br><br>Case No. 3:25-cv-00319-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |

## JOINT MOTION TO CONSOLIDATE AND EXPEDITE APPEALS

The State, King Cove Corporation, Doug Burgum, Kevin Pendergast, Sara Boario (in their official capacities), the U.S. Department of Interior, the U.S. Bureau of Land Management, and the U.S. Fish and Wildlife Service (collectively, the Appellants) jointly move for an expedited briefing schedule and oral argument pursuant to Circuit Rule 27-12. They seek a decision by April 1, 2027. A favorable decision by April 1 would make feasible the construction of a useable road by the

end of the 2027 construction season. *See* Lowell Decl. And in the interests of justice and efficiency, Appellants move to consolidate the above captioned cases.

There is good cause to expedite these appeals. Appellants appeal a final judgment that vacated a land exchange decision between the Secretary of the Interior and King Cove Corporation. 2025 Land Exchange Decision, LE_006. That decision conveyed a narrow corridor of federal land in the Izembek National Wildlife Refuge to King Cove Corporation, an Alaska Native Village corporation. *Id.*, LE_0018. The decision contemplated that King Cove Corporation would—pending acquisition of the required permits and approvals—construct a single-lane gravel road across the exchanged lands to access the nearby community of Cold Bay, which has an all-weather airport. *Id.*, LE_0018–22. Residents of King Cove have long sought road access because no other viable, safe, reliable, and affordable transport option exists for them to get to Anchorage for emergency medical care. Kochuten Decl. ¶26. The construction season in this region of Alaska is short and any delay in the start of construction will continue to keep the residents of King Cove without potentially life-saving infrastructure for further years. *Id.* ¶¶19–20. As part of the exchange, the United States acquired substantial acreage from King Cove Corporation, including essential fish habitat, habitat designated as important for bears, land for tundra swan nesting, and caribou wintering grounds. 2025 Land Exchange Decision, LE_0022–24; Kochuten Decl. ¶7.

Appellants respectfully request that this Court set a schedule for briefing and oral argument as follows: Appellants' opening brief(s) would be due on November 12, 2026; Plaintiffs' answering brief(s) would be due December 14, 2026; Appellants' reply brief(s) would be due January 6, 2027; and oral argument would be calendared for the week of February 8, 2027.

Undersigned counsel conferred with counsel for Plaintiffs-Appellees in *Native Village of Hooper Bay*, *Friends of Alaska National Wildlife Refuge*, and *Defenders of Wildlife*. Plaintiffs relayed that they will file a response within the time allotted by the rules (i.e., by October 16). *See* Wolff Affidavit.

## I. Delay causes irreparable injury to citizens of King Cove, who need a road to an all-weather airport for medical emergencies.

King Cove is a small community of less than 1,000 people, located at the base of, and surrounded by, steep mountains. 2025 Land Exchange Decision, LE__08. Severe wind, fog, and storms close the daylight-only gravel airstrip in King Cove frequently. *Id.*, LE__09; Kuzakin Decl. ¶8. King Cove is located only 18 miles from Cold Bay, which has an all-weather airport. 2025 Land Exchange Decision, LE__08. The communities are separated by the Izembek National Wildlife Refuge. *Id.*

For years, King Cove residents sought to connect the two communities by building a single-lane gravel road. *Id.*, LE__09; *see also* Kuzakin Decl., Kochuten Decl. A road would provide safe, reliable, and affordable access to the Cold Bay

airport, which would give King Cove residents access to quotidian necessities, like fresh groceries, which most of us take for granted. 2025 Land Exchange Decision, LE__09, 35, 37–38. But most relevant for this motion, the road would facilitate medical evacuations. *Id.*, LE__08; Kochuten Decl. ¶13. While King Cove is accessible by water, the state-operated ferry provides services only once per month during the summer. 2025 Land Exchange Decision, LE__09. Fishing vessels, which are regularly turned back by forbidding wind-driven waves during the winter, are ill equipped for safely transporting medical evacuees the 27 nautical miles—including 14 miles of open ocean—from King Cove to Cold Bay. *Id.*, LE__09, __36; Kochuten Decl. ¶16. And many fishing vessels will not even attempt the journey to Cold Bay due to liability and insurance concerns. Kochuten Decl. ¶16. When boats do successfully reach Cold Bay, patients must climb a steep, sometimes 20-foot ladder to get to the dock, which for some infirm patients is impossible. *Id.* ¶17.

King Cove Corporation has entered two past land exchanges with the Department of the Interior to enable construction of a road—in 2018 and 2019—only to see district courts vacate the exchanges. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019) (vacating 2018 exchange); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011 (D. Alaska 2020) (vacating 2019 exchange). A panel of this Court reversed

the district court's decision to vacate the 2019 land exchange. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432 (9th Cir. 2022). This Court then took the case en banc and vacated the panel majority's decision, 54 F.4th 608 (9th Cir. 2022), but while a decision was pending from the en banc court, then-Secretary Haaland withdrew the 2019 land exchange agreement and the Court dismissed the case as moot, 2023 WL 4066653 (9th Cir. June 15, 2023).

In October 2025, the Secretary of the Interior entered into a new land exchange agreement with King Cove Corporation. 2025 Land Exchange Agreement. The lands conveyed to the Corporation include land through the Izembek National Wildlife Refuge that form the corridor for an 18.9 mile single-lane gravel road between King Cove and Cold Bay. 2025 Land Exchange Agreement, LE_018–19. The road would consist of a 2.8-mile stretch on Corporation-owned land, a second segment traversing the lands recently exchanged from the federal government to the Corporation, and a final 0.5 mile stretch on lands outside the Refuge and not part of the exchange. *Id.*

Soon after the Department of the Interior and King Cove Corporation executed the exchange agreement, Plaintiffs commenced three separate cases challenging the land exchange under the Administrative Procedure Act, ANILCA, the Endangered Species Act, the National Environmental Policy Act, the National Wildlife Refuge System Administration Act, and the Wilderness Act. *See Native*

*Village of Hooper Bay v. Burgum*, No. 3:25-cv-00316 (D. Alaska); *Friends of Alaska National Wildlife Refuges. v. Burgum*, No. 3:25-cv-00318 (D. Alaska); *Defenders of Wildlife v. Burgum*, No. 3:25-cv-00319 (D. Alaska). Plaintiffs and the State of Alaska filed cross-motions for summary judgment. In a single order, the district court granted in part Plaintiffs' motions for summary judgment. *See Native Village of Hooper Bay v. Burgum*, 3:25-cv-316, 3:25-cv-318, 3:25-cv-319, 2026 WL 2409781, at *33 (D. Alaska Aug. 18, 2026). And it vacated the Secretary's decision approving the land exchange. *Id.* After final judgment was entered, the Federal Defendants, the State of Alaska, and King Cove Corporation appealed. *See* September 29, 2026, and October 1, 2026, Notices of Appeal.[1]

While the appeal is pending, King Cove residents still cannot reliably access critical medical care. From 2013 through 2025, there were over two hundred medical evacuations originating from King Cove, mostly going to Cold Bay (and from there, Anchorage). 2025 Land Exchange Agreement, LE__09. Dozens of these rescue missions were performed by the United States Coast Guard. *Id.*, LE__09. When evacuations do occur, they are subject to severe weather conditions, meaning people in King Cove are delayed or otherwise inhibited in getting prompt and appropriate medical care. *Id.*, LE__09. Delay in medical care

---

[1] KCC's notices of appeal have been docketed in the district court. This Court has not yet docketed and generated case numbers for KCC's appeals.

can affect patients' prognoses. *Id.*, LE__09. Plus, the air evacuations from King Cove are dangerous, putting patients, pilots, and helicopter staff at risk. *Id.*, LE__09. Indeed, there are numerous documented air crashes and near misses around the King Cove airport. *Id.*, LE__09. Once patients get to Cold Bay, extreme weather rarely prevents use of the all-weather airport, and patients can travel to Anchorage where broad medical services are available. *Id.*, LE__09.

Pursuant to Circuit Rule 27-12, good cause for expedited treatment includes "situations in which . . . irreparable harm may occur." Delaying resolution of the land exchange has already caused irreparable injury as measured in human lives. Further delay is bound to cause more irreparable harm.

## II. A favorable decision by April 1, 2027, would allow completion of a useable road that same year.

An expedited schedule is warranted to avoid yet another long delay. "Alaska is different from the rest of the country." *Sturgeon v. Frost*, 587 U.S. 28, 32 (2019) (internal quotation marks omitted). Winters are cold, dark, and icy. Winter construction is difficult, expensive and dangerous. Lowell Decl. ¶¶10–11. This means outdoor construction shuts down in November and picks up in the spring. *Id.* ¶9. The construction season is short, beginning April 1. *Id.* ¶9. Although it will take more than a single season to finish construction of the road, a single construction season should provide enough time to complete a useable pioneer road, which is the compacted road base without the top dense rock layer. *See id.*

But for that to happen, a decision is needed soon. *See id.* This unresolved litigation has prevented not only construction but also contracting. *See id.* ¶5. A decision by April 1, 2027, would allow the Alaska Department of Transportation to award a construction contract, mobilize materials and equipment, and complete a pioneer road using two shifts per day in a single season. *See id.*

To receive a decision by April 1, Appellants propose the following briefing schedule: Appellants' opening brief(s) to be filed by November 12, 2026, Plaintiffs' answering brief(s) to be filed by December 14, 2026, and Appellants' reply brief(s) to be filed by January 6, 2027.

Oral argument would benefit the Court's consideration of this appeal. Appellants request that this appeal be calendared for argument during any of its regular court sessions that are currently scheduled in Pasadena, San Francisco, Seattle, and Honolulu during the week of February 8 through 12, 2027. Under this proposed schedule, oral argument would occur roughly four weeks after the filing of Appellants' reply brief(s). Argument would occur almost two months before April 1, 2027, the start of the planned construction season in Alaska.

Notably, an expedited briefing schedule is not unduly burdensome on the parties. The Court has already scheduled opening briefs to be filed by November 12, 2026, and response briefs to be filed by December 14, 2026, in each case. In addition, the issues in these cases have been fully briefed below in this

case and similar issues were briefed by the same parties before the district court, a Ninth Circuit panel, and an en banc court several years ago. *See Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1144 (D. Alaska 2019) (vacating 2019 land exchange); *Friends of Alaska*, 29 F.4th 432 (reversing district court's vacatur of land exchange), 54 F.4th 608 (9th Cir. 2022) & 2023 WL 4066653 (9th Cir. June 15, 2023) (hearing appeal en banc, but then dismissing appeal as moot after a new Secretary withdrew from the land exchange agreement).

Granting this motion will not prejudice Plaintiffs. Plaintiffs joined a motion agreeing to an expedited summary judgment schedule that enabled briefing to finish before construction activity was originally set to begin (decreasing the need for emergency motion practice). *See* Dkt. 9, *Native Village of Hooper Bay v. Burgum*, 3:25-cv-316 (D. Alaska Jan. 5, 2026). Through this motion, Appellants similarly request prompt review of the appeal.

Consistent with Circuit Rule 27-12, Appellants note that no hearings were held in in district court and so no transcript needs to be prepared.

### III. The three cases challenging a single federal action should be consolidated in a single appeal.

Finally, the three cases on appeal should be consolidated. *See* Fed. R. App. P. 3(b)(2). Consolidation "may be ordered where the court in its discretion deems it appropriate and in the interests of justice." *United States v. Washington*, 573 F.2d 1121, 1123 (9th Cir. 1978). "Consolidated review . . . avoids inconsistency and

conflicts . . . while ensuring the timely and efficient resolution of administrative cases." *Ruud v. U.S. Dep't of Lab.*, 347 F.3d 1086, 1090 (9th Cir. 2003). "[I]t is more efficient for one three-judge panel to consider all the issues arising out of the same record than it is for two or more three-judge panels to review the same record in order to adjudicate the issues separately." *United States v. Reese*, 993 F.2d 254, 256 (D.C. Cir. 1993).

Each of the above-captioned cases challenge a single federal decision: the Department of the Interior's 2025 land exchange with King Cove Corporation. Many of the legal challenges in the three appeals overlap. *See Native Village of Hooper Bay v. Burgum*, Nos. 3:25-CV-00316-SLG, 3:25-CV-00318-SLG, 3:25-CV-00319-SLG, 2026 WL 2409781 (D. Alaska Aug. 18, 2026). A single district court judge heard all three cases together. *See id.* And that judge issued a single order resolving all the cases and issues therein. *Id*. Given the overlap between the cases, consolidation would promote judicial economy and avoid inconsistency.

RESPECTFULLY SUBMITTED October 6, 2026.

STATE OF ALASKA
CORI MILLS
ACTING ATTORNEY GENERAL

By: s/Laura Wolff
Laura Wolff
Assistant Attorney General
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
(907) 269-6612 phone

s/ Benjamin Gibson (with permission)
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT LUNDMAN
CYNTHIA TAUB
BENJAMIN GIBSON
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
999 18th Street, North Terrace, Suite 600
Denver, CO 80202
Benjamin.gibson2@usdoj.gov



James F. Clark, Alaska Bar #6907025
1109 C Street Juneau, Alaska 99801
Cellphone: (907) 723-6952
jfclarkiii@gmail.com
Attorney for King Cove Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 6, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Laura Wolff
Laura Wolff
Assistant Attorney General

# Decision of the Secretary

## Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation Involving Lands Within Izembek National Wildlife Refuge, Alaska

**Prepared by:**
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service, Region 7**

**October 2025**

# Table of Contents

1 Introduction .......... 1
2 Background .......... 1
2.1 History of the Izembek Refuge .......... 1
2.1.1 Indigenous Peoples' History .......... 1
2.1.2 World War II Military History .......... 2
2.2 Izembek Refuge .......... 2
2.2.1 Refuge Establishment .......... 2
2.2.2 Refuge Environment .......... 2
2.2.3 Refuge Purposes .......... 3
2.3 The Communities of King Cove and Cold Bay .......... 3
2.3.1 Public Health and Safety .......... 3
2.4 History of Actions Related to a Potential Land Exchange .......... 4
2.4.1 2013 Environmental Impact Statement and 2013 Record of Decision .......... 5
2.4.2 2015 Assessment of Non-Road Alternatives .......... 7
2.4.3 2018 Land Exchange Agreement .......... 8
2.4.4 2019 Land Exchange Agreement .......... 9
2.4.5 2024 SEIS and Preliminary ANILCA 810 Analysis .......... 9
2.4.6 2025 Executive Order 14153 | Secretary's Order 3422 .......... 11
2.4.7 Subsequent Actions .......... 11
3 The Proposed Land Exchange .......... 11
3.1 U.S. Exchange Lands and Proposed Road .......... 13
3.1.1 The U.S. Exchange Lands and Activities .......... 13
3.1.2 Design Criteria .......... 14
3.1.3 Construction .......... 16
3.1.4 Operations and Maintenance .......... 17
3.1.5 Other Lands Affected (Not Part of the Proposed Land Exchange) .......... 17
3.2 The KCC Exchange Lands and KCC Selected Lands .......... 17
3.2.1 The KCC Exchange Lands (Parcels with Rankings 2 and 13) .......... 18
3.2.2 KCC Selected Lands (Parcel with Ranking 1) .......... 18
3.3 Mitigation Measures .......... 19
3.3.1 KCC Minimization Measures .......... 20
3.3.2 Additional Avoidance and Minimization Measures .......... 20
4 Decision .......... 23
5 Decision Rationale .......... 23

5.1 ANILCA Section 1302(h) ... 24
5.2 Conservation ... 25
5.2.1 Conservation Values of the U.S. Exchange Lands ... 25
5.2.2 Conservation Values of the KCC Exchange Lands (and Selected Lands) ... 26
5.3 Subsistence ... 27
5.4 The Economic and Social Needs of the State of Alaska and its People ... 29
5.5 Balancing of ANILCA's Purposes ... 33
5.6 Alternatives Rejected ... 35
5.6.1 No Action and Changes from the 2013 Decision ... 35
5.6.2 Hovercraft and Ferry Options (Alternatives 4 and 5) ... 37
5.6.3 Southern and Central Road Alignments (Alternatives 2 and 3) ... 38
5.6.4 Alternative 6 in the 2024 Draft SEIS ... 39
6 Additional Information ... 39
6.1 National Environmental Policy Act ... 39
6.2 ANILCA Section 810 ... 40
6.2.1 Background ... 40
6.2.2 2013 ANILCA Section 810 Analysis ... 42
6.2.3 2024 Preliminary ANILCA Section 810 Analysis ... 42
6.2.4 2025 Preliminary ANILCA Section 810 Analysis ... 43
6.2.5 Notice and Hearings ... 43
6.2.6 Summary of Comments on 2025 Preliminary ANILCA Section 810 Analysis ... 43
6.2.7 2025 ANILCA Section 810 Tier 2 Determinations ... 45
6.2.8 Findings and Conclusions ... 45
6.3 Endangered Species Act Section 7 Consultation ... 46
6.3.1 Formal ESA Consultation with the Service ... 46
6.3.2 Informal ESA Consultation with NMFS ... 46
6.4 Essential Fish Habitat Consultation ... 47
6.5 Tribal Consultation/ANCSA Corporation Consultation ... 47
6.6 Co-Management and Interagency Cooperation ... 47
6.6.1 Alaska Migratory Bird Co-Management Council ... 48
6.7 National Historic Preservation Act Section 106 Consultation ... 48
6.8 Executive Order 11988 – Floodplain Management ... 48
6.9 Executive Order 11990 – Protection of Wetlands ... 49
6.10 National Wildlife Refuge System Improvement Act ... 49
6.11 Wilderness Act ... 50
6.12 ANILCA Title XI ... 51

7 Final Agency Action ..... 52
8 References ..... 53
Appendix A – Proposed Land Exchange Agreement ..... 1
Appendix B – Final Report: ANILCA Section 810 Analysis ..... 2
Appendix C – Comment Summary for 2024 Draft SEIS ..... 1

# Appendices

Appendix A – Proposed Land Exchange Agreement
Appendix B – Final Report: ANILCA Section 810 Analysis
Appendix C – Comment Summary for 2024 Draft SEIS

# List of Tables

Table 1: Public Meeting and ANILCA Section 810 Hearings ..... 10
Table 2: Stream Crossings ..... 16

# List of Figures

Figure 1. 2025 Proposed Land Exchange ..... 12
Figure 2. 2025 Proposed Road with Mileposts and Existing Roads and Trails ..... 15
Figure 3. Prioritized Land Suitability Rankings ..... 19

# Acronyms and Abbreviations

| | |
|---|---|
| 2009 Act | Omnibus Public Land Management Act of 2009 |
| 2013 EIS | *Izembek National Wildlife Refuge Land Exchange/Road Corridor Final Environmental Impact Statement* |
| 2024 Draft SEIS | *Izembek National Wildlife Refuge Land Exchange/Road Corridor Draft Supplemental Environmental Impact Statement* |
| ADOT&PF | Alaska Department of Transportation and Public Facilities |
| AMBCC | Alaska Migratory Bird Co-Management Council |
| ANCSA | Alaska Native Claims Settlement Act |
| ANILCA | Alaska National Interest Lands Conservation Act |
| CFR | Code of Federal Regulations |
| Department | United States Department of the Interior |
| DPS | distinct population segment |
| Ecological Services | United States Fish and Wildlife Service, Ecological Services Program |
| EFH | Essential Fish Habitat |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FR | Federal Register |
| Izembek Refuge | Izembek National Wildlife Refuge |
| KCC | King Cove Corporation |
| NEPA | National Environmental Policy Act |
| NMFS | National Oceanic and Atmospheric Administration, National Marine Fisheries Service |
| Refuge System | National Wildlife Refuge System |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| Service | United States Fish and Wildlife Service |
| TUS | transportation or utility system |
| USACE | United States Army Corps of Engineers |
| U.S.C. | United States Code |

# 1 INTRODUCTION

This Decision constitutes the United States (U.S.) Department of the Interior (Department) approval of a proposed land exchange between the Secretary of the Interior and King Cove Corporation (KCC) involving lands within Izembek National Wildlife Refuge, Alaska (Proposed Land Exchange). The purpose of the proposed land exchange is for the United States to acquire land interests within the Izembek National Wildlife Refuge (Izembek Refuge) from KCC that further the purposes of the Alaska National Interest Lands Conservation Act[1] (ANILCA) in exchange for providing KCC with lands that would allow KCC to pursue the construction and operation of a long-term, safe, reliable, and affordable year-round road from King Cove to the airport in Cold Bay. The authority for the proposed land exchange is Section 1302(h) of ANILCA.[2] This Decision provides relevant background, describes the land exchange decision made herein, and explains the rationale for the Decision.

# 2 BACKGROUND

## 2.1 History of the Izembek Refuge

The Izembek Refuge is located at the end of the Alaska Peninsula and managed by the U.S. Fish and Wildlife Service (Service) from its headquarters in Cold Bay, Alaska. King Cove and Cold Bay are the closest communities to the Izembek Refuge. The lands that now constitute the Izembek Refuge have a rich history summarized below, along with relevant background information on the communities of King Cove and Cold Bay.

### 2.1.1 Indigenous Peoples' History

What is currently known as the Izembek Refuge is a part of the homelands of the Unangax̂ people. The self-given term for this group of Native peoples is Unangan. The word Unangan loosely translates to "We, the People." Whereas "Aleut" is the word Russians used to describe the Unangan people during Russian colonization in the eighteenth century.

The Unangax̂ people have continuously lived in this area dating back to 7,000 BC, with villages near Cold Bay radiocarbon dating to around 5,000 to 6,000 years ago. The Unangax̂ people continue to live in several communities along the Peninsula, the Pribilof Islands, and the Aleutian Islands. Two federally recognized Tribes are based in King Cove—the Agdaagux Tribe of King Cove and the Native Village of Belkofski. KCC, an Alaska Native Village Corporation pursuant to the Alaska Native Claims Settlement Act (ANCSA),[3] is composed of and represents shareholders in King Cove.

The Unangax̂ people mastered the art of Iqyax̂ building (today known as kayaks) and harvested animals both from sea and from land with great success. The land and waters provided food, shelter, tools, and clothing; people lived in reciprocity with the land and prospered. Traditional Unangan dwellings, called ulax̂, blended in perfectly with their surroundings.

The importance of subsistence and of Indigenous peoples' ties to the land in Alaska cannot be overstated. It is a traditional way of life that is vital to cultural identity and spiritual connection to the land. Unangan people, traditions, and culture remain an important presence in the area today with ongoing efforts to revitalize and pass them on to the next generations.

[1] Pub. L. No. 96-487 (Dec. 2, 1980), 94 Stat. 2371 *et seq.*
[2] 16 U.S.C. § 3192(h).
[3] Pub. L. No. 92-203 (Dec. 18, 1971), 85 Stat. 688.

### 2.1.2 World War II Military History

In 1929, the area now known as Cold Bay was designated a Naval Reservation Area. As tensions mounted over World War II, the construction of an airplane runway began, and Fort Randall was commissioned in 1942. At its height, several thousand soldiers were stationed at Fort Randall. Infrastructure accompanied the troops: an airport runway, deep water dock, roads, housing and facilities, and ultimately military exercises. Troops withdrew at the end of the war, but the runway, deep water dock, and roads, are still in use today and are visible reminders of the military history of the area.

Additional evidence remains on the landscape: abandoned roads that have revegetated, dugouts and building materials from the barracks, buried equipment, and unexploded ordinances.

## 2.2 Izembek Refuge

### 2.2.1 Refuge Establishment

The Izembek National Wildlife Range, headquartered in Cold Bay, was established in December 1960 as "a refuge, breeding ground, and management area for all forms of wildlife."[4] Much of the range had been previously encompassed by the Aleutian Islands National Wildlife Refuge.

With the passage of ANILCA[5] in December 1980, the Izembek National Wildlife Range was redesignated the Izembek National Wildlife Refuge, and the boundaries were adjusted to encompass approximately 300,000 acres.[6] In addition, ANILCA designated approximately 95 percent of the Izembek Refuge as the Izembek Wilderness[7] to be part of the national wilderness preservation system provided for by the Wilderness Act of 1964.[8]

### 2.2.2 Refuge Environment

The Izembek Refuge contains approximately 310,000 acres, and approximately 308,000 acres of that are designated wilderness.[9] It offers vital habitat and supports many different species that are found in or near the Izembek Refuge, including several species listed as threatened or endangered under the Endangered Species Act (ESA) such as Steller's eiders, sea otters, sea lions, blue whales, endangered fin whales, humpback whales, beluga whales, and/or their critical habitat. The Izembek Refuge supports one of the most important migratory bird staging habitats in the world, likely due to inter-tidal eelgrass beds largely found in the adjacent Izembek Lagoon within the Izembek State Game Refuge. In addition, one of the highest densities of brown bear populations in Alaska is found within Izembek Refuge. The Izembek Refuge also has important year-round caribou habitat for wintering, calving, and a migration corridor. Izembek Refuge supports all five species of salmon—red, pink, silver, chum, and king. Additional information about the natural resources in the Izembek Refuge and their importance can be found in the Draft Supplemental Environmental Impact Statement prepared in 2024 (2024 Draft SEIS).[10]

Although Izembek Refuge and Izembek Wilderness have significant resource values, they are not pristine or untrammeled areas. There are approximately 35 miles of dirt and gravel roads within the Izembek Refuge, including some within a portion of the Izembek Wilderness.[11] In addition, portions of the Izembek Refuge lie within the Cold Bay/Fort Randall Formerly Used Defense Site with current and ongoing cleanup projects overseen by the U.S. Army Corps of Engineers (USACE) in collaboration with

---

[4] Public Land Order 2216, 25 FR 12599.
[5] Pub. L. No. 96-487 (Dec. 2, 1980), 94 Stat. 2371 *et seq.*
[6] *Id*. at § 303(3).
[7] *See* 16 U.S.C. § 1132, note.
[8] 16 U.S.C. § 1131 *et seq.*
[9] ANILCA § 303(3), 48 FR 7948 (Feb. 24, 1983); *see also* https://www.fws.gov/refuge/izembek/about-us (last visited October 1, 2025).
[10] 2024 Draft SEIS at Chapter 3.
[11] 2024 Draft SEIS at Section 3.3.3.1.

the Service.[12] A 2022 survey documented 141 miles of all-terrain vehicle trails, and imagery in 2023 indicated an on-going expansion of all-terrain vehicle trails.[13]

### 2.2.3 Refuge Purposes

Section 303(3)(8) of ANILCA set forth the following purposes for the Izembek Refuge:

> *"(i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonoids;*
>
> *(ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;*
>
> *(iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and*
>
> *(iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge."*

## 2.3 The Communities of King Cove and Cold Bay

King Cove and the city of Cold Bay lie 18 miles apart in southwestern Alaska. Both communities are accessible only by sea or by air. King Cove is an Unangax̂/Aleut fishing village near the tip of the Alaska Peninsula approximately 625 air miles from Anchorage. The community is located at the base of, and surrounded by, steep mountainous terrain to the east. It is also bounded by the Pacific Ocean to the west and south, and to the north by the Izembek Refuge and the Alaska Peninsula National Wildlife Refuge. King Cove has a population of approximately 800 people year-round, but the population historically would expand to approximately 1,300 people during the summer fishing season. While King Cove has the larger population, Cold Bay has the larger instrument-capable airport with a paved runway more than 10,000 feet long (one of the longest in the state) and a crosswind runway.

King Cove traces its origins to the late 1800s. It was incorporated as a first-class city in 1949. The largest salmon cannery in North America, operational since 1911, was located in King Cove until recently. It processed crab, bottom fish, herring, and other fish year-round. However, in January 2024, Peter Pan Seafoods closed their King Cove processing facility indefinitely. Other seafood processing companies have investigated acquiring the shuttered plant, but currently the facility in King Cove remains closed. The plant was a major economic driver for the community and according to the King Cove City Administrator, generated 70 percent of the city's revenue.

The community of King Cove relies on access to the Izembek Refuge and Cold Bay area, among other areas, to support subsistence harvests that help provide food security.

### 2.3.1 Public Health and Safety

The residents of the remote King Cove community have long sought reliable access to Cold Bay's all-weather airport to allow for emergency medical evacuations and other purposes. King Cove and the city of Cold Bay are separated not only by miles, but also by mountainous terrain. Cold Bay connects to King Cove via an isthmus separating the head of Cold Bay, the Izembek Refuge and Wilderness on the isthmus, and the Alaska Peninsula National Wildlife Refuge along the shoreline. The Cold Bay area is known for severe winds and waves, and infrequently for ice.

[12] 2024 Draft SEIS at Section 3.1.5.4.
[13] 2024 Draft SEIS at Figure 3.3-8h; Williams 2023e.

King Cove is an ocean-oriented community but lacks a dependable public marine connection between it and Cold Bay. A State-operated Alaska Marine Highway System ferry provides service once per month from May through September. The only other option available is to charter fishing vessels for travel to Cold Bay. Although fishing vessels are capable of operating in most weather conditions, they are ill-equipped for the safe transport of medical evacuees. The route from King Cove to Cold Bay is approximately 27 nautical miles, with roughly half that distance occurring in open seas. Marine transportation of medical evacuation (medevac) passengers is further complicated by the fact that individuals must travel up a 20-foot ladder to disembark at the Cold Bay dock. The dock in Cold Bay is nearing the end of its useful service life, and the Alaska Department of Transportation and Public Facilities (ADOT&PF) is planning to replace it with construction of a new pile-supported dock and an adjacent mooring dolphin with fendering around the perimeter of the new dock and demolition of the old facility.[14] This project is currently in the planning phase.

Air transportation has a perilous history in King Cove, whose airport has a 3,500-foot-long runway in a mountainous area. The existing terrain limits the available approaches, and the local meteorology (high winds coupled with low visibility) often leads to unsafe flying conditions. In 1994, ADOT&PF published the Alaska Intermodal Transportation Plan, which noted: "(1) A significant portion of the scheduled flights in and out of King Cove were canceled due to unsafe flying conditions; (2) in addition to documented air crashes in King Cove, numerous incidents and near-misses occurred during operations around the airport, associated principally with weather; and (3) canceled flights due to unsafe flying conditions caused medical complications and fatalities for patients awaiting evacuation from King Cove."

From December 23, 2013, to June 30, 2025, there were 217 medevacs from King Cove, mostly to Cold Bay. Of those 217 medevacs, 32 rescue missions have been by the U.S. Coast Guard operating out of Cold Bay, Kodiak, and St. Paul. In an emergency, time is of the essence and emergency medical treatment provided during the first hour after a traumatic injury is often the determining factor between life and death, or in less severe cases, a full recovery. In the community of King Cove, severe weather conditions often force patients to wait days for emergency evacuation transport by air or water, which not only affects the care they receive but also puts a strain on the clinic's limited supply of medication. Weather also delays routine delivery of prescription medications. A road allowing surface transport during severe weather conditions would remove that delay and mitigate the possibility of similar tragic outcomes.

Even in extreme weather conditions, the Cold Bay airport provides exceptional air access to Anchorage where acute emergency medical services are readily available. Due to the all-weather 10,000-foot runway, its fully operational instrument approach capabilities, and the only crosswind runway in the vicinity, residents who are successfully transported to the city of Cold Bay will likely be successful in traveling further on to Anchorage, regardless of weather conditions. However, residents cannot access emergency services in Anchorage without safe and reliable surface transportation from King Cove to the Cold Bay airport.

## 2.4 History of Actions Related to a Potential Land Exchange

The Izembek Refuge has been at the center of a decades-long debate around how to balance community access and conservation. Immediately following the passage of ANILCA, the cooperatively developed Bristol Bay Regional Management Plan—led by the Service and the Alaska Land Use Council—identified the desire for a transportation corridor between King Cove and Cold Bay and noted the challenges of doing so through designated wilderness. Health and safety are the primary purposes for this access: the small air strip for King Cove is often inaccessible during periods of bad weather, and the community has long documented the challenges for emergency medical evacuations.

Although the history of King Cove's efforts to pursue a more reliable transportation corridor spans many decades, it is important to note that in 1976, King Cove passed its first formal resolution in support of a

[14] Cold Bay AMHS Ferry Terminal Reconstruction, Southcoast Region Project.

road connection to the Cold Bay airport. The history of Congressional action, Departmental other actions, and planning and environmental reviews for potential land exchanges and transportation alternatives between the communities of King Cove and Cold Bay and land exchanges between the U.S. government and KCC is set forth in the 2024 Draft SEIS.[15]

### 2.4.1 2013 Environmental Impact Statement and 2013 Record of Decision

The Omnibus Public Land Management Act of 2009 (2009 Act) authorized the Secretary of the Interior to enter into a land exchange with the State of Alaska and KCC upon a finding that it was in the public interest. Under the exchange, the United States would have conveyed a corridor of land through the Izembek Refuge to construct a single lane gravel road connecting the communities of Cold Bay and King Cove in exchange for conveyance of land from the State of Alaska and KCC for inclusion in Izembek and Alaska Peninsula National Wildlife Refuges. The 2009 Act further required the Secretary of the Interior to prepare an Environmental Impact Statement (EIS) (initiated under Secretary Salazar) which was completed in 2013 (2013 EIS) (Service 2013a).

On December 23, 2013, then-Secretary Sally Jewell signed a Record of Decision (2013 ROD) in which she concluded that balance weighed in favor of the no action alternative and that the road would not be in the public interest because it "would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange . . . [and] . . . because reasonable and viable transportation alternatives exist to meet the important health and safety needs of the people of King Cove."[16] Secretary Jewell noted that "[w]hile Section 6402(a) of OPLMA provides the Secretary with the discretionary authority to undertake an exchange, it does not mandate an exchange nor does it set forth criteria that the Secretary must consider in reaching a decision not to proceed."[17] Ultimately, the Department need only "identify and consider fully the impacts of such an exchange," but the decision on whether to proceed is purely a "policy choice."[18] The 2013 ROD provided its findings and reasons for the decision that served to inform the balancing that Secretary Jewell engaged in prior to reaching her decision. The 2013 ROD articulated the following considerations: Wildlife and Habitat; Wilderness; Refuge Management; and Viable Transportation Alternatives.

**1. Wildlife and Habitat Considerations[19]**

The 2013 ROD concluded that "[b]y keeping the isthmus roadless, a no road alternative best protects the habitat and wildlife of the lzembek Refuge." It noted that the Izembek Refuge provides invaluable and potentially irreplaceable nesting and feeding areas for waterfowl and shorebirds. As part of this analysis, the ROD focused on several different species, including Pacific black brant, tundra swan, emperor geese, Steller' s eiders, brown bear, caribou, and wolves. Ninety-eight percent of the approximately 130,000 Pacific black brant feed in the Izembek Refuge. The Izembek Refuge possesses the only non-migratory population of tundra swans in the world, which number in the low hundreds, compared to the global population of over 190,000. The Izembek Refuge also represents an important staging, wintering, and migratory corridor for emperor geese, whose global population is approximately 100,000. A significant portion of the Steller's eiders winter in the Izembek Refuge. Finally, brown bear, caribou, and wolves pass through the Izembek Refuge as part of their range.

Secretary Jewell acknowledged that the lands offered for exchange contain important wildlife habitat, but that those lands would not compensate for the adverse effects associated with the construction of a road.[20]

---

[15] 2024 Draft SEIS at Section 1.1.1.
[16] 2013 ROD at p. 3.
[17] 2013 ROD at p. 6. The abbreviation OPLMA refers to the 2009 Act.
[18] 2013 ROD at pp. 7–9.
[19] 2013 ROD at pp. 7–9.
[20] 2013 ROD at p. 9. However, it is important to note that the Service had previously indicated that KCC owned lands within the lzembek Refuge are an area that the Service is interested in protecting "because of [its] important

The 2013 ROD concluded that the construction and use of a road corridor would be likely to have negative effects on each of the species referenced.

**2. Wilderness Considerations**[21]

The 2013 ROD briefly considered the impacts to wilderness of a potential road corridor, noting that the "no action alternative protects nearly 300,000 acres of Wilderness." It further noted that the proposed road corridors would jeopardize between 131 and 152 acres (or approximately 1/20th of 1 percent) in a manner entirely inconsistent with wilderness purposes.

**3. Refuge Management Considerations**[22]

The 2013 ROD discussed concerns that "[i]n addition to the direct impacts of construction and vehicle traffic associated with the proposed road, there is high potential for increased off-road access with the proposed construction of a maintained, all-season gravel-surface road." These concerns were articulated as follows:

> Cutting a road through the middle of Izembek Refuge would mean significant additional resources would be necessary to manage the resulting direct and indirect effects of a road to minimize habitat damage and wildlife disturbance. These resources would have to come at a time of decreasing National Wildlife Refuge System (Refuge System) budgets and would be at the expense of accomplishing work directed at the Service's core mission of wildlife and habitat management.

**4. Viable Transportation Alternatives**[23]

In considering the need for viable transportation alternatives, the 2013 ROD recognized that the nearest location to King Cove that can provide Level II trauma care services is in Anchorage, which is over 600 miles away. The 2013 ROD also acknowledged that the local King Cove clinic has been unable to attract full-time doctors with sufficient experience and, instead, physician's assistants, nurse practitioners, and health aides provide the majority of medical care. The 2013 ROD noted that the medical care transportation alternatives available in 2013 were flights from King Cove to Cold Bay (35 minutes), boat transportation (2 hours), and hovercraft transportation (over an hour). The 2013 ROD estimated that, even if a road corridor was constructed, it would be unavailable approximately 2 percent of the time. A key "transportation alternative" considered by Secretary Jewell leading to her decision was an indication that the Aleutians East Borough would "consider" developing a marine transportation link in the form of an aluminum landing craft if a road connection was not available.[24] The availability of this alternative was highly speculative at the time of the 2013 ROD.[25] That uncertainty was highlighted in the EIS itself, where the Service noted that it lacked "complete data regarding the reasonably predictable actions of the Aleutians East Borough to develop this mode of transportation if the land exchange does not occur."[26] Other alternatives to a road connection relied upon by Secretary Jewell included evacuation by air, fishing vessel shuttles, the Alaska Marine Highway ferry, and the now out-of-service hovercraft.[27] Finally, the 2013 ROD indicated that the life-cycle costs associated with the construction and maintenance of the road were $34.2 million.

---

fish and wildlife values." Izembek National Refuge Final Comprehensive Conservation Plan/Environmental Impact Statement/Wilderness, 1985.

[21] 2013 ROD at p. 9.

[22] *Id.*

[23] 2013 ROD at pp. 10–11.

[24] 2013 ROD at p. 11.

[25] Nor did the 2013 ROD acknowledge that any potential marine transport alternative would pass through designated critical habitat for the endangered Southwest Alaska DPS of northern sea otters.

[26] 2013 EIS at p. 4-12. Furthermore, the landing craft was not discussed in the socioeconomic section of the EIS.

[27] 2013 ROD at pp. 11–12, 20.

Secretary Jewell concluded the 2013 ROD by noting that the Izembek Refuge "is internationally recognized for its unique and ecologically significant wetlands and wildlife" and that denying a land exchange would "maintain[s] the integrity of designated wilderness." Secretary Jewell reiterated her belief that viable transportation alternatives were available to the community of King Cove.

### 2.4.2 2015 Assessment of Non-Road Alternatives

Decades of experience have established that the non-road alternatives have been consistently found by the community of King Cove to be infeasible or inadequate to provide for their health and safety. USACE completed a study in 2015 titled, "King Cove-Cold Bay: Assessment of Non-Road Alternatives" (USACE 2015). This report assessed the viability of non-road alternatives and considered variations related to three primary options: (1) Marine Alternative; (2) Airport Alternative; and (3) Helicopter Alternative. For those three alternatives, the report considered capital costs, operation costs, maintenance costs, medevac time, risk, and dependability. The alternative transportation routes considered in this document have proven to be prohibitively costly and/or insufficiently dependable, and both King Cove and the Aleutians East Borough have not found any of the alternatives considered in this report to be viable.

The Marine Alternative was a concept that included a vessel capable of transporting people and vehicles in virtually all-weather conditions and the necessary terminal facilities on both ends of its route. The report identified three alternative ferry routes, with each contemplating a dedicated terminal built onto the existing Cold Bay Dock and a new ferry terminal built near King Cove. The differences in the alternatives related to different combinations of ferry travel time versus driving time to reach the ferry. Therefore, although the routes would differ slightly, each ferry alternative would require the same type of vessel, a ferry terminal in Cold Bay, and a ferry terminal in King Cove. Ultimately, the report concluded that the capital costs associated with the Marine Alternative would range between approximately $30 and $42 million, with an annual operations and maintenance cost of approximately $1 million. The 75-year life-cycle costs ranged from approximately $57 to $72 million.[28]

The analysis also included quantifying the potential reliability and risks associated with the Marine Alternative. As to the former, the report considered a number of factors, including wind speed, snow conditions, and maintenance. With slight variations from month to month, the report concluded that the Marine Alternative's dependability exceeded 99 percent. As to the latter, the report determined the principal risks to the Marine Alternative were capital funding, operational funding, regulatory permitting, and lack of redundancy. The report concluded that the Marine Alternative risks were "medium-serious," particularly due to the excessive costs associated with capital and operational funding. Since the completion of this report, the Aleutians East Borough has also indicated that it no longer has any intention to develop an aluminum landing craft. Furthermore, the State of Alaska has also announced substantial cuts to funding for the marine ferry system since 2013.

The Airport Alternative concept considered constructing a new airport for the city of King Cove that would function better in poor weather conditions, including instrument capability. Analysis indicated that the one technically feasible site for a new airport that would effectively avoid mountain hazards and wind-channeling terrain without physically encroaching into the Izembek Refuge is located northwest of Mount Dutton. The Airport Alternative considered two options: a 5,000-foot paved runway and a 3,500-foot gravel runway.[29] The alternative contemplated designs that would effectively accommodate the typical aircraft used in the Aleutian region for medevac operations. Both airport designs included a runway, apron, and connecting taxiway. Travel time between the proposed King Cove airports and Anchorage would range between 144 and 180 minutes. The report concluded that the capital costs associated with the Airport Alternative would range between $47 and $84 million, with an annual

[28] All costs referenced in 2015 dollars.
[29] Both airport alternatives had design specifications that would accommodate aircrafts customarily used in the region: the Cessna 208 and Beechcraft King Air. However, a 5,000-foot paved runway could also serve to accommodate and support the more demanding needs of a Learjet 35.

operations and maintenance cost of between $225,000 and $675,000. The 75-year life-cycle costs ranged from $50 million to $97 million.

Again, the report quantified the potential dependability and risks associated with the Airport Alternative. As with the Marine Alternative, the most telling factor in determining dependability relates to local meteorology. As a result, the report concluded that wind speeds in excess of 40 knots would be considered too dangerous for airport utilization, and that such wind speeds are expected approximately 0.13 percent of the time on an annual basis. Additionally, snow events and avalanche-prone areas on the 21-mile access road to the airport may reduce dependability an additional 5 percent. Therefore, the report concluded that, with slight variations from month to month, the Airport Alternative's dependability ranged between 94 percent and 95 percent. In quantifying risks, the report considered sources describing the Aleutian Islands as the windiest and rainiest region in the United States and noted that the mountainous terrain causes dangerous turbulence and visibility issues. Ultimately, the report assessed the risks associated with the Airport Alternative as "medium-serious," also recognizing that the costs associated with the alternative were likely prohibitive.

Finally, the report considered the Helicopter Alternative, a concept that featured the following elements: a leased helicopter and crew; a lighted helicopter facility with a pad of 100 feet by 100 feet; a hanger of 40 feet by 80 feet; and road access to King Cove. The report also considered four possible locations for the heliport, ranging from in King Cove to up to over 22 miles away. Each of the proposed heliport locations has various benefits and concerns. The report concluded that the capital costs associated with the Helicopter Alternative would range between approximately $3 and $28 million, with an annual operations and maintenance cost of approximately $2.25 million. The 75-year life-cycle costs ranged from approximately $73 to $99 million. In assessing the dependability of the Helicopter Alternative, the report again identified local meteorology as the most volatile factor. Poor visibility and wind speeds serve to limit the dependability of helicopter utilization, and the report's conclusions indicated that in some months the dependability would be as low as 60 percent and the best case scenario never exceeded 85 percent. Coupling dependability concerns with the high costs associated with the Helicopter Alternative led the report to assess risk as "medium-serious."

While the report was tasked with only considering non-road alternatives, for comparison purposes, the 2013 EIS concluded that the life-cycle cost of the road alternatives ranged between $34 and $37 million. Furthermore, the weather conditions that complicate air and sea transportation corridors are less relevant to road transportation, and thus the dependability of a road corridor exceeds that of the alternatives discussed in the 2015 report. Currently, neither King Cove nor the Aleutians East Borough has found any of the alternatives considered in the 2015 report to be viable.

### 2.4.3 2018 Land Exchange Agreement

In May of 2017, KCC petitioned then-Secretary Ryan Zinke for a land exchange that would allow the corporation to construct a single-lane gravel road that would traverse the Izembek Refuge and end at Cold Bay’s airport. After further discussions and review, Secretary Zinke entered into a land exchange agreement with KCC on January 22, 2018 (2018 Land Exchange Agreement). The legal authority for the 2018 Land Exchange Agreement was ANILCA Section 1302(h) as the authority in the 2009 Act had expired in 2016. The 2018 Land Exchange Agreement provided for appraisals and other work to occur and for the United States to convey certain lands that would provide KCC with a potential road corridor in exchange for KCC interests in lands that were equal in value.

Secretary Zinke’s reasons for entering into the land exchange agreement consisted of: (1) King Cove’s continuing and persistent need for safe and reliable options for emergency medical evacuation; (2) the emerging evidence that Secretary Jewell’s reliance on various transportation alternatives was misplaced; (3) the benefits that would accrue to the United States in the form of increased total acreage and protected habitat in the Izembek and Alaska Peninsula Refuges; and (4) the failure of Secretary Jewell to consider in the 2013 ROD that any marine transport alternative would necessarily impinge on designated sea otter

critical habitat while a road would not traverse any critical habitat of threatened or endangered species at all. On March 29, 2019, the U.S. District Court for the District of Alaska vacated the agreement, finding that the Department violated the Administrative Procedure Act by failing to acknowledge the change in Department policy, failing to provide a reasoned explanation for changing course on the Department's prior determinations, and by ignoring its prior determinations about the road's environmental impacts on the Izembek Refuge.[30] The Department did not appeal.

### 2.4.4 2019 Land Exchange Agreement

On July 3, 2019, then-Secretary David Bernhardt signed a memorandum titled "Findings and Conclusions Concerning a Proposed Land Exchange Between the Secretary of the Interior and KCC for Lands Within Izembek National Wildlife Refuge, Alaska." That memorandum laid the foundation for the concurrent approval of a land exchange (2019 Land Exchange Agreement) between the Department and KCC. The 2019 Land Exchange Agreement also relied on the land exchange authority of Section 1302(h) of ANILCA. Specifically, the Department would convey to KCC the surface and subsurface estate of lands delineated in U.S Survey No. 14495, Alaska, that had been previously identified by KCC as being needed for construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport. In exchange, KCC agreed to provide an equal value exchange of lands located within the physical boundaries of the Izembek Refuge and Wilderness area that have been identified by the Service for future acquisition if such lands became available (referred to as the KCC Exchange Lands Pool). This exchange enabled commercial use of the road and authorized gravel mining within the Izembek Refuge.

On June 1, 2020, the U.S. District Court for the District of Alaska vacated the 2019 Land Exchange Agreement. The Department appealed, and a Ninth Circuit panel upheld the 2019 Land Exchange Agreement. However, the Ninth Circuit subsequently vacated the panel decision and granted a request for rehearing en banc.

On March 14, 2023, while a decision was pending from the en banc Ninth Circuit, then-Secretary Deb Haaland issued a new decision memorandum withdrawing the Department from the 2019 Land Exchange Agreement. The Secretary's decision cited a need for additional study of impacts to conservation and access to subsistence resources, additional public process, and further review under Section 7 of the ESA. On June 15, 2023, the Ninth Circuit dismissed the appeal as moot and vacated the District Court decision.

### 2.4.5 2024 SEIS and Preliminary ANILCA 810 Analysis

In June 2023, the Service published a *Federal Register* Notice of Intent to prepare an SEIS to consider the effects of a potential land exchange.[31] The Service prepared the 2024 Draft SEIS to address a potential exchange under Section 1302(h) of ANILCA, the same authority under which the 2018 and 2019 Land Exchange Agreements relied upon. The purpose of the proposed action in the 2024 Draft SEIS was to increase the overall conservation value of lands in the Refuge System and maintain or increase the opportunity for subsistence uses by rural Alaskans, while allowing for the construction of a single-lane gravel road for long-term, safe, and reliable year-round transportation for health, safety, and subsistence access. There was a particular emphasis on emergency medical evacuations in the discussion of the health and safety reasons for a road.

The 2024 Draft SEIS updated the 2013 EIS and evaluated a newly proposed potential land exchange alternative, Alternative 6, based on an offer from KCC. Alternative 6 was identified as the preferred alternative in the 2024 Draft SEIS. This alternative involved a land exchange agreement with KCC that would convey the lands identified in the southern route in the 2013 EIS, with minor changes, to KCC in exchange for 31,198 acres of land with significant conservation, subsistence, and habitat values to the refuge system. While most commercial uses of the road would be prohibited, the use of taxis, commercial

[30] *Friends of Alaska National Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1143 (D. Alaska 2019).
[31] 88 FR 31813.

vans for public transportation, and ridesharing services, when used for transportation for health, safety, or subsistence purposes, would not be considered a commercial use.

In November of 2024, the Service published the 2024 Draft SEIS (Service 2024). The public comment period for the 2024 Draft SEIS ran from November 15, 2024, through February 13, 2025. The Service also engaged in consultation with various Alaska Tribes and Tribal organizations. In conjunction with the 2024 Draft SEIS, the Service prepared a "preliminary evaluation" addressing the initial determinations required by Section 810 of ANILCA evaluating whether the proposed actions would result in a significant restriction of subsistence uses and needs on federal lands.

During the public comment period for the 2024 Draft SEIS, public meetings and ANILCA Section 810 hearings were held to inform and to solicit comments from the public on the 2024 Draft SEIS. The format for the public meetings and hearings consisted of a presentation, followed by an opportunity for the public to give oral comments. The Service held five in-person and three virtual public meetings (Table 1).

**Table 1: Public Meeting and ANILCA Section 810 Hearings**

| Community | Meeting Type | Date | Time (AK) | Venue | Number of Participants |
|---|---|---|---|---|---|
| King Cove | Public Meeting and Hearing | December 4, 2024 | 6:30–8:30 p.m. | Agdaagux Tribal Center | 34 |
| Cold Bay | Public Meeting and Hearing | December 5, 2024 | 6:30–8:30 p.m. | Cold Bay Community Center | 11 |
| Sand Point | Public Meeting and Hearing | December 6, 2024 | 4:00–6:00 p.m. | Aleutians East Borough Building | 9 |
| Anchorage | Public Meeting | December 9, 2024 | 6:00–8:00 p.m. | Wilda Marsten Theater, Loussac Library | 29 |
| Nelson Lagoon | Public Meeting and Hearing | December 11, 2024 | 3:00–5:00 p.m. | Virtual Zoom Meeting | 16 |
| Bethel | Public Meeting and Hearing | December 12, 2024 | 6:00–8:00 p.m. | Yupiit Piciryarait Cultural Center | 15 |
| Yukon-Kuskokwim Delta Communities | Public Meeting and Hearing | December 13, 2024 | 1:00–3:00 p.m. | Virtual Zoom Meeting | 33 |
| False Pass | Public Meeting and Hearing | December 16, 2024 | 4:00–6:00 p.m. | Virtual Zoom Meeting | 18 |

These meetings and hearings were attended by a variety of stakeholders, including federal agencies, Tribal governments, state agencies, local governments, Alaska Native organizations, businesses, special interest groups/non-governmental organization, and individuals.

Including the comments provided at the public meetings, ANILCA Section 810 hearings associated with the 2024 Draft SEIS, and the written comments submitted during the public comment period on the 2024 Draft SEIS, approximately 71,000 submissions were received on the docket. Group affiliations of those that submitted comments include federal agencies, Tribal governments, state agencies, local governments, Alaska Native organizations, businesses, special interest groups/non-governmental organizations, and individuals. Appendix C provides a summary of the common themes of substantive comments received on the 2024 Draft SEIS. Section 6.6.3 below summarizes the 2024 preliminary ANILCA Section 810 analysis and comments on it.

### 2.4.6 2025 Executive Order 14153 | Secretary's Order 3422

On January 20, 2025, President Donald Trump issued Executive Order 14153, titled "*Unleashing Alaska's Extraordinary Resource Potential*." Section 3(b) of this order directs the Secretary of the Interior to "exercise all lawful authority and discretion available to him and take all necessary steps" to "facilitate the expedited development of a road corridor between the community of King Cove and the all-weather airport located in Cold Bay."[32] Secretary's Order 3422 implements the provisions of Executive Order 14153. It directs the Assistant Secretary for Fish and Wildlife and Parks to develop an action plan to execute this direction.

### 2.4.7 Subsequent Actions

During 2025, the Service completed a new ANILCA Section 810 analysis and consultation under the ESA,[33] the Magnuson-Stevens Fishery Conservation and Management Act,[34] and the National Historic Preservation Act,[35] as detailed further in Section 6.

# 3 THE PROPOSED LAND EXCHANGE

Following consultations in May of 2025 with KCC, City of King Cove, Aleutians East Borough, the Agdaagux Tribe, and the Native Village of Belkofski, the Department and KCC mutually agreed to move forward with evaluating a proposed equal value land exchange agreement. The purpose of the proposed land exchange is for the United States to acquire from KCC land interests within the Izembek Refuge that further the purposes of ANILCA in exchange for lands that would allow KCC to pursue the construction and operation of a long-term, safe, reliable, and affordable year-round road from King Cove to the airport in Cold Bay. Specifically, the proposed land exchange being evaluated is as follows:

- Approximately 490 acres of public lands (the U.S. Exchange Lands), as delineated in U.S. Survey 14495, owned by the U.S. government would be conveyed to KCC by patent. Approximately 484 of the 490 acres are currently administered by the Service as a part of the Izembek Refuge and 336 acres of these acres are located within the Izembek Wilderness. Another approximately 6 acres within the outer boundaries of Izembek Refuge consists of the subsurface estate of lands with the surface estate owned by KCC in the location of a proposed material site (see Figure 1, 2025, Proposed Land Exchange). The Proposed Land Exchange does not authorize road construction. The Proposed Land Exchange would restrict construction of any road on these lands to a single-lane gravel road. While there has not yet been an application submitted for the construction of a road, the proposed plans for such a road used for analysis purposes are detailed in the subsections below.
- Approximately 1,739 acres of KCC-owned lands in the vicinity of Kinzarof Lagoon identified in Figure 1 (the KCC Exchange Lands) will be conveyed by KCC to the United States. The KCC Exchange Lands are located within the boundaries of the Izembek Refuge and within the Izembek Wilderness. KCC owns the surface estate of these lands, often referred to as the Kinzarof Lagoon bookends, and the United States owns the subsurface estate.
- The United States will make a payment to KCC to equalize the value of the U.S. Exchange Lands and the KCC Exchange Lands.
- KCC will relinquish its selection rights under ANCSA to 5,430 acres located within Izembek Refuge on the east side of Cold Bay, which are identified as "KCC Selected Lands" in Figure 1. The Parties agree the relinquishment has no monetary value because KCC will be entitled to identify alternative selected lands for conveyance that are located outside the Izembek Refuge.

---

[32] Executive Order 14143, Section 3(b)(xi).
[33] 16 U.S.C. §§ 1531–1544.
[34] 16 U.S.C. § 1801 *et seq*.
[35] 54 U.S.C. § 306108.

**Figure 1. 2025 Proposed Land Exchange**



The Proposed Land Exchange Agreement is included as Appendix A, and its terms are part of the proposed action.

The Proposed Land Exchange includes mitigation measures to avoid or minimize environmental harm and are identified in Section 3.3.

## 3.1 U.S. Exchange Lands and Proposed Road

### 3.1.1 The U.S. Exchange Lands and Activities

The U.S. Exchange Lands are identified on U.S. Survey 14495 and generally form a corridor-type linear path extending northeasterly from Blinn Lake around Kinzarof Lagoon before turning south toward the north end of the King Cove Access Road. The predominate width of the linear path ranges from approximately 100 feet to 240 feet. The westerly 4.25 miles of the U.S. Exchange Lands are crossed by Outpost Road at several points and contain several dirt roads and established trails. The eastern section has many all-terrain vehicle tracks.[36] Portions of the U.S. Exchange Lands lie within the Cold Bay / Fort Randall Formerly Used Defense Site area.[37]

The conveyance of the U.S. Exchange Lands to KCC will remove approximately 484 acres of surface estate from the Izembek Refuge; 336 of these acres are currently located within the Izembek Wilderness, which contains a total of approximately 308,000 acres (0.1 percent). The U.S. Exchange Lands are known to contain wetlands that are considered to have very high value for their hydrologic, biogeochemical, and habitat functions due to their strategic location in proximity to both Izembek and Kinzarof Lagoons.[38]

The remainder of this section describes KCC's proposed action for road design, construction, operations, and maintenance. However, it is important to note that the Proposed Land Exchange would not authorize any ground-disturbing activities, and road construction, if any, cannot proceed until a proposed project navigates a variety of hurdles, including land conveyances, funding, planning, federal and state approvals, and permitting approvals.

The U.S. Exchange Lands identified in U.S. Survey 14495 are for the same road route as the route identified in Alternative 2 in the 2013 EIS, with minor adjustments based on further refinement and design by ADOT&PF in 2021 (ADOT&PF 2021). It is also the same route as the 2024 Draft SEIS Alternative 6. The road alignment would begin at the terminus of the King Cove Access Road near the Northeast Terminal, extending in a northerly direction for approximately 2.8 miles before entering what is currently the Izembek Wilderness area. From there, the corridor would continue northerly for approximately 3.5 miles before turning west; continue westerly for approximately 7 miles before turning southwest; continue southwesterly for approximately 5.1 miles before exiting the Izembek Refuge; and continue for another 0.5 mile, where it would terminate at the intersection of Outer Marker Road and Blinn Lake Loop.

The proposed road would be 18.9 miles, most of which would be within the Izembek Refuge. The following provides additional details on the miles of proposed road construction, which makes use of existing roads and trails to the extent practicable:

- 13.3 miles of the road corridor would be new construction within the Izembek Refuge with a mix of disturbed and undisturbed lands (Mileposts 0 to 13.3); of this:
    - 2.8 miles are within the exterior boundaries of the Izembek Refuge on KCC-owned surface land that is not part of the proposed land exchange.
    - 10.5 miles are within the Izembek Refuge and are part of the proposed land exchange.

---

[36] 2024 Draft SEIS, Figure 3.3-8.
[37] 2024 Draft SEIS at Section 3.1.5.4.
[38] 2024 Draft SEIS at Section 3.1.2.6.

- 5.6 miles of the road corridor would be constructed on existing roads and trails (Mileposts 13.3 to 18.9); of this:
  - 5.1 miles are within Izembek Refuge and are part of the proposed land exchange.
  - 0.5 mile are on other lands (RCA Communications Inc. and Federal Aviation Administration) and are not part of the proposed land exchange.

See Figure 2, 2025 Proposed Road Corridor Mileage with Existing Roads and Trails.

### 3.1.2 Design Criteria

Design guidance was based on the American Association of State Highway and Transportation Officials Policy on Geometric Design of Highways and Streets (Green Book) and Guidelines for Geometric Design of Very Low Volume Roads (AASHTO 2001, 2004, *updated in 2019*), and the ADOT&PF Alaska Highway Pre-Construction Manual (ADOT&PF 2005). The road alignment was developed to a 35 percent design level and is based primarily on information contained in ADOT&PF's plan set dated 2021 [ADOT&PF 2021] and the 2020 right-of-way application submitted by the State of Alaska under ANILCA Section 1110(b) for Access to Inholdings at King Cove, Alaska (ADOT&PF 2020). A centerline survey, geotechnical investigations, or other detailed site surveys have not been completed. Detailed design, permitting, and consultation would be required prior to construction of the road. The road is expected to require a Department of the Army permit from USACE for placement of fill in wetlands.

The proposed road design for the single-lane gravel road is for a 13-foot-wide, single-lane road (11-foot driving lane with two 1-foot shoulders). Approximately 113 turnouts would be constructed along the road corridor for safe passage of approaching vehicles. Most extraction of material for the roadway would be accomplished via expansion of the cut limits in areas of competent material. The material sites along the proposed road corridor vary in size, with the largest being 800 feet long by 1,150 feet wide. The total footprint of new road construction, including material sites, would be 186 acres.

Based on reconnaissance-level design, drainage structures would include 1 bridge over a large stream near Milepoint 2.6, 7 culverts/pipe arches or small bridges to cross small streams, and 63 cross drainage culverts to maintain natural drainage patterns. Culverts would be designed for the 50-year storm event in final design (Alaska Highway Preconstruction Manual) and analyzed for the passage of the 100-year storm event where drainage structures are located in a flood zone. To the extent practicable, design of crossings over fish-bearing streams for fish passage design would follow U.S. Fish and Wildlife Service Culvert Design Guidelines for Ecological Function (Revision 10, 2025). Table 2 provides preliminary information regarding the stream crossings, including stream system numbers assigned by the Alaska Department of Fish and Game.

**Figure 2. 2025 Proposed Road with Mileposts and Existing Roads and Trails**



**Table 2: Stream Crossings**

| Road Location (Station) | Structure Type | Stream System # | Watershed Area (acres) | Q50 (cfs) | Q10 (cfs) | Span Length (in feet) | Slope (%) | Stream Footprint (acres) |
|---|---|---|---|---|---|---|---|---|
| 146+00 | Bridge | 283-34-10700 | 7,500 | 800 | 680 | 50 | 1 | N/A |
| 281+00 | Box Culvert, Pipe Arch, or Bridge | 283-34-10600 | 620 | 150 | 61 | 30 | 0.6 | 0.01 |
| 403+00 | Box Culvert, Pipe Arch, or Bridge | Unnumbered | 330 | 81 | 34 | 30 | 0.4 | 0.01 |
| 455+00 | Box Culvert, Pipe Arch, or Bridge | 283-34-10560 (crossing upstream of AWC segment) | 630 | 152 | 63 | 30 | 0.3 | 0.01 |
| 536+00 | Box Culvert, Pipe Arch, or Bridge | 283-34-10500 | 730 | 175 | 74 | 30 | 1.1 | 0.01 |
| 561+50 | Box Culvert, Pipe Arch, or Bridge | 283-34-10500-2031 | 805 | 192 | 81 | 30 | 0.3 | 0.01 |
| 591+50 | Box Culvert, Pipe Arch, or Bridge | Unnumbered | 1,440 | 258 | 184 | 30 | 0.3 | 0.01 |
| 622+00 | Box Culvert, Pipe Arch, or Bridge | 283-34-10430 | 740 | 180 | 78 | 30 | 1 | 0.01 |

Notes: AWC = Anadromous Waters Catalog; cfs = cubic feet per second

### 3.1.3 Construction

Material for construction of the road would be excavated from the proposed road corridor via expansion of the cut limits in areas of competent material (13 sites) and sourced from two dedicated material sites planned for development: one existing material site that would be expanded near the Northeast Terminal located on KCC lands and one new material site with an access road located near Milepoint 4.9 of the proposed road. Twelve of the proposed material sites are located within the Izembek Wilderness area.

Approximately 1.7 million cubic yards of material would be moved during cut and fill activities. Approximately 521,000 cubic yards of crushed rock is planned for road construction, and an additional 10,000 cubic yards would be processed and stockpiled at material sites for future road maintenance. Approximately 200,000 cubic yards of fill would be imported from the material site near the Northeast Terminal, impacting approximately 6 acres of KCC lands and federally owned subsurface lands. Organic soils disturbed during construction would be staged and stockpiled within the corridor, then reused for finishing graded backslopes and reclaiming abandoned sections of existing roads and trails.

The existing hovercraft ramps at the Northeast Terminal and Cross Wind Cove would be used for temporary construction-related barge landing sites. It is anticipated that the barge landing sites would be used to facilitate up to 10 deliveries of materials and equipment per site for each construction season (for a total of up to 40 barge trips over the two seasons).

Construction would likely extend over two seasons. The construction would likely occur between May and November, with specific construction windows and mitigation measures expected to be addressed in a USACE permit.

Quantities of water would be needed for embankment compaction and dust control. The road material should remain moist due to typically wet weather in the project area; therefore, water requirements would be relatively low. Preliminary water sources identified include two lakes (a 128-acre lake midway along the road alignment that is connected to Kinzarof North Stream and a 33-acre lake on the west end of the wilderness boundary) and one creek (Southeast Kinzarof Stream). Blinn Lake (a 150-acre lake located at the western terminus of the proposed road), which was previously identified as a potential water source, was removed due to potential per- and polyfluoroalkyl substances contamination.

Construction would require an estimated 30 construction and administration staff over the course of two construction seasons. Support facilities, including contractor job trailers and housing for personnel, cannot be staged on refuge lands. Possible staging sites for support facilities include the Northeast Terminal, Lenard Harbor, the city of King Cove, and the city of Cold Bay. The city of Cold Bay should be able to accommodate all the needed support facilities on the western end of the project, including camp facilities. The Northeast Terminal site on the eastern end of the project would be a likely location to place contractor job trailers, but limited space and amenities would probably require using the city of King Cove for staff housing or using the city of Cold Bay for housing.

### 3.1.4 Operations and Maintenance

The road project applicant, assumed to be the State of Alaska or the Aleutians East Borough, would be responsible for road maintenance and operation under their normal operational plans.

### 3.1.5 Other Lands Affected (Not Part of the Proposed Land Exchange)

The proposed road would be located on additional lands that are not part of the Proposed Land Exchange, as described below and shown in Figure 1.

- Approximately 12 acres of the proposed road would be located on lands administered by the U.S. Federal Aviation Administration as an Air Navigation Site (Withdrawal No. 176); this includes approximately 0.4 mile of the road corridor from Milepoint 18.5 to the end of the proposed road at the intersection with Outer Marker Road.
- A short section of the proposed road (less than 0.1 mile and approximately 2 acres) near the intersection of Outer Marker Road and Blinn Lake Loop is within a 22.95-acre parcel of private land. The fee title to the parcel was transferred in 1971 by the U.S. Federal Aviation Administration to RCA Alaska Communications, Inc., under authority created in Public Law 90-135, 40 U.S.C. 771-792. The deed transferring ownership reserves to "the Government the right to use, maintain and operate the VORTAC [Very High Frequency Omni-Directional Radio Range Tactical Air Navigation Aid] access road, as constructed and located, across said premises." Authorization for use of the road other than that reserved to the United States as stated above would have to be obtained from the current owner of the parcel.
- Approximately 40 acres of surface lands are owned by KCC; this includes 2.8 miles of new road construction and a material site at the eastern end of the project.

## 3.2 The KCC Exchange Lands and KCC Selected Lands

The Service developed a multi-criteria decision process during the 2024 Draft SEIS process to evaluate non-federal parcels of land, both within and outside of the Izembek and Alaska Peninsula National Wildlife Refuges, for Alternative 6. Parcels were considered for exchange based on their potential to contribute to Izembek Refuge purposes, the mission of the Refuge System, and their contribution to the National Wilderness Preservation System. As such, criteria were selected to assess 1) the unique

wilderness (natural, untrammeled, and undeveloped), wildlife, and habitat conservation attributes; 2) the human experience (solitude or primitive and unconfined recreation) attributes; 3) the opportunity to continue subsistence attributes; and 4) the Izembek Refuge purposes. The Service assigned ranks to the parcels, with the highest ranked parcel equal to 1 and the lowest 28. A summary of the rankings for the KCC parcels that are subject to the Decision herein for the interest to be managed as refuge lands are included below. Figure 3 illustrates the prioritized land suitability rankings (i.e., numbering of 1–8) and criteria score values (i.e., color scale shading). The KCC Exchange Lands were ranked as 2 and 13, and the KCC-Selected Lands were ranked as 1. Additional information is summarized below based on information from the 2024 Draft SEIS.

### 3.2.1 The KCC Exchange Lands (Parcels with Rankings 2 and 13)

The KCC Exchange Lands, referred to as the Kinzarof Lagoon parcels in the 2024 Draft SEIS, consist of the West Bookend parcel and the East Bookend parcel. These lands contain wetlands that are considered to have very high value for their hydrologic, biogeochemical, and habitat functions due to their location near Kinzarof Lagoon.[39] The wetland vegetation contributes to the streams identified as Essential Fish Habitat (EFH).[40] These lands are also within the area designated a Wetland of International Importance by the Ramsar Convention.[41] Kinzarof Lagoon is a high-density wintering habitat for Steller's eiders.[42] Kinzarof Lagoon is also an area with high-density sea otter concentrations, particularly near the entrance to Kinzarof Lagoon. The West Kinzarof Bookend parcel scored a high ranking of 2, because it is within the wilderness boundary of the Izembek Refuge, has documented Aleutian and Arctic tern colonies and seaduck use of the surrounding area, and has some support of subsistence fisheries. The East Kinzarof Bookend parcel is also within the wilderness boundary of the Izembek Refuge and has some potentially good habitat, but it scored a moderate ranking of 13, primarily due to existing all-terrain vehicle trails with potentially degraded habitat. However, roads and trails on federal lands along the proposed road corridor from Blinn Lake to the wilderness boundary do not appear to have impacted the value of those areas, calling me to question the appropriateness of the moderate ranking of 13 ranking for the east parcel.

### 3.2.2 KCC Selected Lands (Parcel with Ranking 1)

The KCC Selected Lands (Figure 1) lie entirely within the Izembek Refuge and are currently managed as designated wilderness. The KCC Selected Lands encompasses much of the Southeast Kinzarof Stream watershed.[43] The selected lands are known to have caribou during the winter, and the northern portion of this area is designated "high density – winter range/migration corridor" for caribou.[44] The selected lands also contain habitat designated as important spring habitat for bears.[45] More generally, as noted in Section 4.3.3.1 of the 2024 Draft SEIS, the KCC Selected Lands include notable resource values such as caribou winter use, high-density brown bear habitat, and tundra swan nesting. The tundra system wetlands located on the northern portion of this parcel are located within the area designated as a Wetland of International Importance by the Ramsar Convention and contain very high value wetlands considered to have very high value for their hydrologic, biogeochemical, and habitat functions.

The KCC Selected Lands parcel had the highest ranking of 1 primarily due to anadromous waters and protection against loss of additional wilderness acres. These lands lie inland from the Northeast Terminal site and do not border on any major waterbodies. This area is a mixture of wetland habitats in the northern

[39] 2024 Draft SEIS at Section 3.1.2.6.
[40] *Id*.
[41] *Id*.
[42] 2024 Draft SEIS at Section 3.2.7.
[43] 2024 Draft SEIS at Section 3.1.3.1.
[44] 2024 Draft SEIS at Section 3.1.5.5.
[45] 2024 Draft SEIS at Section 3.1.5.5.

half and upland habitats in the southern half. The parcel encompasses much of the Southeast Kinzarof Stream watershed with a network of lakes and tributaries that support anadromous fish.

**Figure 3. Prioritized Land Suitability Rankings**




## 3.3 Mitigation Measures

The sources of the measures adopted herein include the following:

- Final Proposed Action for the 2025 Proposed Izembek Land Exchange and Road Corridor (dated June 9, 2025) and the Addendum to the Final Proposed Action for the 2025 Proposed Izembek Land Exchange and Road Corridor (dated October 14, 2025)
- ADOT&PF Southcoast Region Routine Marine Project Vessel Use-No Effect Determination Memorandum (dated May 19, 2025)
- National Oceanic and Atmospheric Administration, National Marine Fisheries Service (NMFS) Letter of Concurrence, Reference No. AKRO-2025-01895 (dated August 7, 2025)
- The Service's Response to Recommended EFH Conservation Measures for the 2025 Proposed Izembek Land Exchange and Road Corridor, Reference No. AKRO-2025-01915 (dated July 25, 2025)

- NMFS EFH response letter, Reference No. AKRO-2025-01915 (dated August 13, 2025), supporting the Service's revised conservation recommendations and considering EFH consultation complete

### 3.3.1 KCC Minimization Measures

KCC has committed to the following measures as part of the proposed action for design, construction, operation, and maintenance of the road corridor.

#### 3.3.1.1 Design Features

The following design criteria were incorporated by ADOT&PF early on the design process to avoid and minimize impacts of the proposed road:

- The proposed road alignment maintains a distance of approximately 0.5 mile from the shores of Kinzarof and Izembek Lagoons, as practicable, to avoid impacts to shorebirds, waterfowl, and marine mammals. In most locations the alignment is 1 mile or more from the shorelines of each lagoon.
- The proposed road alignment traverses ridgetops or windward sides of hills to avoid snow drift—the phenomenon by which snow is scoured off the windward side and deposited in deeper drifts on the leeward side.
- The proposed road alignment uses existing roads, jeep trails, and disturbed areas to the extent practicable given the previous two design considerations and sound engineering practices.

#### 3.3.1.2 Minimize Invasives

To minimize the chance for introducing or spreading invasive species, the following will be done:

- A thorough inspection of borrow pit areas would be conducted by a trained botanist or specialist familiar with Alaskan species in order to prevent the spread of invasive species.
- A thorough cleaning of all heavy equipment and vehicles will be conducted to remove any seeds or invasive plant materials.
- Only native species will be used for revegetation of disturbed areas.

### 3.3.2 Additional Avoidance and Minimization Measures

The following additional measures have been identified through ESA consultations with the U.S. Fish and Wildlife Service, Ecological Services Program (Ecological Services), and NMFS under Section 7(a)(2) of the ESA and its implementing regulations,[46] as well as through EFH consultation with NMFS per the Magnuson-Stevens Fishery Conservation and Management Act. The Service coordinated with KCC on these measures during the consultation processes, which are considered to be an addendum to the original proposed action.

#### 3.3.2.1 NMFS ESA Mitigation Measures

*Project-Dedicated Vessels (vessel and crew safety should never be compromised)*

1. Project-related barges will typically travel at 8 knots or less.
2. Vessel operators will:
    a. maintain a watch for marine mammals at all times while underway;
    b. avoid changes in direction and speed when within 274 meters (300 yards) of a whale, unless doing so is necessary for maritime safety;
    c. not position vessel(s) in the path of a whale, and will not cut in front of a whale in a way or at a distance that causes the whales to change their direction of travel or behavior (including breathing/surfacing pattern);

[46] 50 CFR § 402.13.

d. check the waters immediately adjacent to the vessel(s) to ensure that no whales will be injured when the propellers are engaged;
e. reduce vessel speed to 8 knots or less when:
   i. weather conditions reduce visibility to 1.6 kilometers (1 mile) or less;
   ii. a whale's course and speed are such that it will likely cross in front of a vessel that is underway, or approach within 91 meters (100 yards) of the vessel, and if maritime conditions safely allow, the engine will be put in neutral and the whale will be allowed to pass beyond the vessel, except that vessels will remain 460 meters (500 yards) from North Pacific right whales;
f. take reasonable steps to alert other vessels in the vicinity of whale(s);
g. not allow lines to remain in the water unless both ends are under tension and affixed to vessels or gear; and
h. not throw trash or other debris overboard, to reduce the potential for marine mammal entanglement.

3. Vessel operators will adhere to the Alaska Humpback Whale Approach Regulations when vessels are transiting to and from the project site: (see 50 CFR 216.18, 223.214, and 224.103(b); these regulations apply to all humpback whales). Specifically, pilot and crew will not:
   a. approach, by any means, including by interception (i.e., placing a vessel in the path of an oncoming humpback whale), within 100 yards of any humpback whale;
   b. cause a vessel or other object to approach within 100 yards of any humpback whale; or
   c. disrupt the normal behavior or prior activity of a humpback whale by any other act or omission.

*Vessel Transit, North Pacific Right Whales, and their Designated Critical Habitat*

4. Vessels will:
   a. remain at least 460 meters (500 yards) from North Pacific right whales; and
   b. avoid transiting through designated North Pacific right whale critical habitat if practicable (50 CFR 226.215); or if traveling through North Pacific right whale critical habitat cannot be avoided, vessels will:
      i. travel through North Pacific right whale critical habitat at 5 knots or less; and
      ii. maintain a log indicating the time and geographic coordinates at which vessels enter and exit North Pacific right whale critical habitat.

*Vessel Transit, Western Distinct Population Segment (DPS) Steller Sea Lions, and their Designated Critical Habitat*

5. Vessels will not approach within 5.5 kilometers (3 nautical miles) of rookery sites listed in 50 CFR 224.103(d).
6. Vessels will not approach within 914 meters (3,000 feet) of any Steller sea lion haulout or rookery.

*Vessel Transit and Project Noise, Cook Inlet Beluga Whales, and their Designated Critical Habitat*

7. Project vessel(s) operating in or transiting through Cook Inlet will maintain a distance of at least 1.5 miles south of the mean lower low water line.

*Observers and Reporting*

8. To the greatest extent practicable, dedicated project barges that are under contractor control during construction will maintain a watch for marine mammals while underway.
9. Marine mammal information collected will be shared with NMFS.

#### 3.3.2.2 NMFS EFH Conservation Measures

1. Culverts should meet or exceed natural stream width and should be designed and installed according to the guidelines established in Culvert Design Guidelines for Ecological Function, which was written specifically for Alaska salmonids. Note that the Service and KCC have already agreed to this as part of the proposed design criteria, which applies to culverts in anadromous streams.
2. A desktop survey of potential fish habitat within the Izembek Refuge will be conducted in support of the KCC proposed land exchange and road corridor prior to construction. This survey will be informed by existing LiDAR [light detection and ranging] and topographic data obtained within the Izembek Refuge in addition to the results of the limited fish inventories and habitat surveys that are proposed to be conducted by ADOT&PF within the wilderness area.
3. Signage will be installed to inform the public of the law prohibiting vehicular access to anadromous streams. Signage will specifically cite Alaska Statute 41.14.870, 5 Alaska Administrative Code 195.010(a), and any federal regulations relating to vehicular access to fish streams.
4. Natural vegetation will be retained along anadromous streams to the greatest extent practicable. This will be accomplished by requiring contractors to salvage the vegetated mat along streambanks prior to ground disturbance. This vegetated mat will be maintained (usually via periodic watering) until the revegetation stage and staked in place for reestablishment. In addition, further mitigation of impacts such as willow staking and the placement of large woody debris will be analyzed for employment at these locations.
5. The deployment of riprap in anadromous streams will be limited and only installed where it is required for protection of infrastructure.
6. Bridge abutments in anadromous waters should be positioned so as not to restrict the flow and create a velocity barrier to migrating fish at the crossing site.

#### 3.3.2.3 Fish and Wildlife Service ESA Measures

*Sea Otter Best Management Practices for Vessel Operations*

1. For smaller vessels (<24 meters, <80 feet), vessels will maintain a minimum distance of 100 meters (328 feet) from single sea otters, 200 meters (656 feet) from female-pup sea otter pairs, and 500 meters (1,640 feet) from rafts of sea otters (groups of 10 sea otters or more) when safe and practicable.
2. For larger vessels (>24 meters, >80 feet), vessels will maintain a minimum distance of 300 meters (984 feet) from sea otters when safe and practicable.
3. If vessel operators observe sea otters consistently flushing in response to the vessel transiting at the minimum distance, then the vessel operator shall increase the minimum distance until sea otters are no longer flushing in response to the vessel.
4. Vessels shall maintain maximum distance practicable from areas of surface kelp.
5. If marine mammals approach a vessel, place engines in neutral and allow them to pass.
6. All operations shall take precautions to minimize the risk of spilling fuels.
7. While operating skiffs in nearshore areas, scan the water surface ahead of the boat vigilantly for otters. In choppy water conditions sea otters are difficult to spot. If you are boating with another person, place them in the bow to help search. You may encounter otters as individuals, a mother and a pup, or rafts of 10 or more.
8. When you see an otter(s), alter your course and slow down to avoid disturbance and collision. Once you have spotted an otter(s), you should not assume that the otter(s) will dive and get out of the way. Even if they are alert, capable, and do dive, your action of knowingly staying your course would be considered harassment.

9. Do not operate a skiff at any rate of speed heading directly at the otter(s). A good rule of thumb is that your buffer should be great enough that there is ample room for the otter(s) to swim away without startling them. It is your responsibility to minimize the stimulus and threat of a loud boat approaching quickly.

*Steller's Eider Best Management Practices for Vessel Operations*

10. If Steller's eiders are identified, vessel operators will follow procedures identical to those for sea otters to avoid disturbance or collision.

As explained in Section 6.3.1, there are no prescribed Reasonable and Prudent Measures or implementing Terms and Conditions in the Service's Biological Opinion. While the Biological Opinion did provide a series of discretionary Conservation Measures, in light of the mitigation measures already integrated, this Decision does not specifically adopt any of the Conservation Measures.

# 4 DECISION

I fully considered the events, arguments, and documents described above, including, but not limited to, the following:

- 2013 EIS and 2013 ROD of Secretary Jewell;
- Secretary Zinke's decision to enter a land exchange agreement in 2018;
- Secretary Bernardt's rationale and decision to enter a land exchange agreement in 2019;
- Secretary Haaland's decision to withdraw from the 2019 Land Exchange Agreement and initiate an SEIS to evaluate a new proposed land exchange;
- 2024 Draft SEIS, 2024 preliminary ANILCA Section 810 analysis, testimony and written materials on the 2024 Draft SEIS and 2024 preliminary ANILCA Section 810 analysis;
- 2025 Preliminary ANILCA Section 810 analysis, testimony and written materials on the 2025 preliminary ANILCA Section 810 analysis, the final ANILCA Section 810 analysis;
- The 2025 Service's Biological Opinion, NMFS Letter of Concurrence, and NMFS EFH consultation.

For the reasons discussed in Section 5 below, my Decision is to enter into the Proposed Land Exchange Agreement included in Appendix A and consistent with the proposed action described in Section 3, including the mitigation measures identified in Section 3.3.

While this Decision and the Proposed Land Exchange incorporate design and mitigation measures relating to the potential future construction of a road, they do not authorize construction of a road. Any subsequent decisions by KCC to pursue a road connection is separate and distinct from the land exchange authorized here. My decision merely provides KCC with lands that it can choose to use in the pursuit of a road. It will be up to KCC to obtain the necessary financing, engineering, and proper permits and authorizations, which is expected to include a permit from USACE, to construct and operate the proposed road.

# 5 DECISION RATIONALE

This Decision reflects statutory compliance and policy considerations. It is also based on review of the extensive environmental analysis related to the Izembek Refuge and past land exchange and road development scenarios, as summarized above in Section 2.4.

## 5.1 ANILCA Section 1302(h)

When it passed ANILCA, Congress included a provision, Section 1302(h), that authorized the Secretary of the Interior, when acquiring lands for the purposes of ANILCA, to exchange lands in wildlife refuges and other conservation system units with corporations organized by the Native Groups, Village Corporations, Regional Corporations, the State, and others.[47] Section 1302(h)(1) states:

> Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units and within the National Forest System) or interests therein (including Native selection rights) with the corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State (acting free of the restrictions of §6(i) of the Alaska Statehood Act), or any Federal agency. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the Secretary determines it is in the public interest, such exchanges may be made for other than equal value.

I have reviewed materials from the 2019 Land Exchange Agreement, litigation challenging the 2019 Land Exchange Agreement, Secretary Haaland's decision to withdraw from the 2019 Land Exchange Agreement, the 2024 Draft SEIS, and input and comments received on the 2024 Draft SEIS. One area of dispute involves the purposes of ANILCA that are applicable to an ANILCA Section 1302(h) land exchange. Secretary Bernhart relied on ANILCA Section 101(d),[48] which identifies one of Congress's purposes in enacting ANILCA as to obviate a need for future legislation by providing "sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." Thus, Secretary Bernhart used his discretion to balance environmental interests with the economic and social needs of Alaskans and weighed whether a land exchange under Section 1302(h) "strikes the proper balance between protection of scenic, natural, cultural and environmental values and provides opportunities for the long-term social and physical well-being of Alaska Native people." This approach was upheld by the majority of a three-judge panel of the Ninth Circuit Court of Appeals in a decision that was subsequently vacated when the Ninth Circuit granted en banc review.

In contrast, Secretary Haaland's decision memorandum and the 2024 Draft SEIS do not mention the economic and social needs of Alaskans as a factor in any decision about whether to enter into a land exchange. Instead, the 2024 Draft SEIS identifies two other provisions of ANILCA as the determining factors in whether an exchange under Section 1302(h) of ANILCA would further the purposes of ANILCA. The 2024 Draft SEIS states that "Any land exchange . . . must further the purposes of ANILCA (i.e., the conservation purpose as described in 16 U.S.C. § 3101(b)[49] and the subsistence purpose in 16 U.S.C. § 3101(c))[50] when considering the exchange as a whole, including known planned uses for the divested land, to determine whether the exchange would likely result in an overall conservation or subsistence benefit." Furthermore, the proposed land exchange was "intended to serve the purposes of increasing the overall conservation value of lands preserved in the National Wildlife Refuge System, and maintaining or increasing the opportunity for subsistence uses by rural Alaskans, while allowing for the construction of a long-term, safe, and reliable year-round transportation system for health and safety purposes."[51]

[47] 16 U.S.C. § 3192(h).
[48] 16 U.S.C. § 3101(d).
[49] 16 U.S.C. § 3101(b).
[50] 16 U.S.C. § 3101(c).
[51] 2024 Draft SEIS at p. ES-3.

Having reviewed the purposes of the proposed action in the 2024 Draft SEIS, I find that it misinterprets the requirements of ANILCA Section 1302(h) by focusing solely on furthering ANILCA's conservation and subsistence opportunities purposes in Section 101(b) and 101(c) and ignoring the Section 101(d) purpose of providing adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people. The purposes of ANILCA have been articulated by the Supreme Court as follows:

> ANILCA sought to "balance" two goals, often thought conflicting. The Act was designed to provide sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska. And at the same time, the Act was framed to provide adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people.[52]

The Section 1302(h) authority is an important tool provided by Congress to the Secretary to adjust broad conservation system unit designations to reflect the health, safety, and other interests of local people in concert with the national interest in conservation. In setting aside over 100 million acres of federal lands (nearly one-third of the State of Alaska) as parks, wildlife refuges, wilderness, monuments, and wild and scenic rivers, a promise was made to the affected local populations, and particularly the resource-dependent Alaska Native villages, that the Secretary of the Interior would have tools available to ensure national conservation goals were not achieved unfairly at the expense of the local people, many of whom live in remote areas not connected to the road system, and who face high costs for energy, food, and other goods and services. While different Secretaries may reach different balances among ANILCA's purposes in making a decision under Section 1302(h), that balancing cannot fully ignore a foundational purpose of ANILCA. My balancing of ANILCA's purposes in Section 5.5 below is therefore consistent with the balancing of ANILCA's purposes by Secretary Bernhardt and in contrast with the narrow approach taken under Secretary Haaland in the 2024 Draft SEIS that omitted the economic and social needs of the State of Alaska and its people as a purpose of ANILCA to consider when evaluating an exchange under Section 1302(h).

## 5.2 Conservation

Section 101(b) of ANILCA states:

> It is the intent of Congress in this Act to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities including but not limited to hiking, canoeing, fishing, and sport hunting, within large arctic and subarctic wildlands and on free flowing rivers; and to maintain opportunities for scientific research and undisturbed ecosystems.

### 5.2.1 Conservation Values of the U.S. Exchange Lands

The U.S. Exchange Lands have high quality resource conservation values (see Section 3.1). In addition, management of the U.S. Exchange Lands by the Service furthers the conservation values and mission of the entire Izembek Refuge as a whole, as well as the conservation of species that travel through or use nearby areas such as the eelgrass in the Alaska State Game Refuge. The Izembek Refuge contains approximately 310,000 acres with important resource values, as discussed in Section 2.2 above and Section 3.2 of the 2024 Draft SEIS. The conveyance of the U.S. Exchange Lands to KCC will remove

[52] *Sturgeon v. Frost*, 139 S. Ct. 1066, 1075 (2019) (internal quotations and citations omitted).

approximately 484 surface acres of land from the Izembek Refuge (approximately 0.16 percent of the total). Of these, 336 acres are currently located within designated wilderness, which contains a total of approximately 308,000 acres (approximately 0.11 percent of the total).

I recognize that the exchange and conveyance of the U.S. Exchange Lands would remove Service management and current protection of the conservation values in this corridor of land through the isthmus. The proposed road, if constructed, will have impacts on the conservation values of the Izembek Refuge and Izembek Wilderness both from its construction and from its operation and maintenance. The construction impacts are expected to be very similar as those described in the 2024 Draft SEIS for Alternative 6.[53] For example, 8.8 acres of wetlands would be filled if the proposed road is authorized and there are no changes during any USACE or other reviews, and 8.7 of those acres would be located in the Izembek Wilderness.[54] In addition, 12 of the proposed material sites are located within what is currently designated wilderness. The impacts upon Izembek Refuge resources and values related to the use of the road will be greater for the Proposed Land Exchange than those identified in the 2024 Draft SEIS for Alternative 6, because the Proposed Land Exchange does not restrict the use of the road to non-commercial purposes. Impacts to Izembek Refuge resources and values are also addressed in the ANILCA Section 810 analysis in Appendix B and the Biological Opinion in Section 6.3.1. Consultations pursuant to the ESA indicate that the Proposed Land Exchange will not result in jeopardy for any species listed under the ESA.

In contrast to Secretary Jewell's portrayal of this corridor of land in Izembek Refuge and Izembek Wilderness as pristine and untrammeled, the record reflects otherwise with a significant history of use of these lands for motorized transportation on roads and trails by the U.S. military and the local population before the enforcement of regulatory restrictions in the 1960s and subsequent wilderness designation in 1980. This history is summarized in Section 2.

### 5.2.2 Conservation Values of the KCC Exchange Lands (and Selected Lands)

The 2024 Draft SEIS did not analyze whether there would be any conservation benefits from the addition of approximately 1,739 acres of surface lands to the Izembek Refuge and Izembek Wilderness or of KCC's relinquishment of rights to an additional 5,430 acres. I find that there will be important conservation benefits to both of these components of the exchange.

In particular, I note that more acres will be managed as wilderness and refuge lands under the Proposed Land Exchange than if the Proposed Land Exchange does not occur and find that Service management of the KCC Exchange Lands after acquisition and continued Service management of the 5,430 acres of KCC-selected lands will further conservation values of the Izembek Refuge and Izembek Wilderness. As discussed above, both the KCC Exchange Lands and the KCC Selected Lands have substantial conservation values of their own. In addition, I find that Service management of those lands will further the conservation values of Izembek Refuge.

Section 103(c) of ANILCA provides that lands that are within the external boundaries of any conservation system unit, which includes units of designated wilderness, that are acquired shall become part of the unit and be administered accordingly. Thus, after acquisition, the KCC Exchange Lands will be administered as part of the Izembek Refuge and Izembek Wilderness as they are located within the external boundaries of Izembek Refuge and Izembek Wilderness. The KCC-Selected Lands will continue to be administered as part of the Izembek Refuge because they will not be conveyed.

Some have questioned the conservation benefit of acquiring the Kinzarof bookend parcels because these lands were conveyed to KCC subject to Section 22(g) of ANCSA.[55] ANCSA Section 22(g) provides the United States with a right of first refusal on the sale of former refuge lands conveyed to a Village

[53] 2024 Draft SEIS at p. ES-36 and Table ES-5 (for Alternative 6).
[54] 2024 Draft SEIS, Table ES-2.
[55] 43 U.S.C. § 1621(g).

Corporation and provides that former refuge lands remain subject to the laws and regulations governing the use and development of the refuge. The right of first refusal will do little to protect refuge resources unless funds are available for acquisition at the time that KCC may seek to sell them. The provision that makes laws and regulations governing the use and development of the refuge applicable to KCC's activities on the lands would require the Service to review a proposed use to determine if it is compatible with refuge purposes. There are many uses that could be found compatible with refuge purposes, such as cabins and lodges. Even all-terrain vehicle trails that provide greater access to resources within Izembek Refuge would likely be found compatible with refuge purposes. Furthermore, KCC would control use of the lands and could authorize unrestricted all-terrain vehicle use. In short, while Section 22(g) of ANCSA may provide the Service with some limited ability to restrict certain uses of the land, that is very different than having the sole responsibility to manage the lands, which is what the Service would gain if the United States acquires the lands.

Similarly, having the Service continue to manage the KCC-Selected Lands as part of the Izembek Refuge and Izembek Wilderness ensures that they would be managed in a way that furthers their conservation values and the mission of the Izembek Refuge. Based on the priority of these lands, they are very likely to be conveyed to KCC, if I do not approve of the Proposed Land Exchange. When that happens, KCC will control the use of the lands, subject to Section 22(g) of ANCSA.

## 5.3 Subsistence

Section 101(c) of ANILCA[56] states:

> It is further the intent and purpose of this Act consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded by or pursuant to this Act, to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.

The Service has done a thorough analysis of the impacts of the Proposed Land Exchange on subsistence uses, summarized in Section 6.6 below and attached to this Decision as Appendix B. The Service found that the direct and indirect effects of the Proposed Land Exchange, including the proposed road, would not significantly restrict subsistence uses for the five closest communities of King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point.[57] Among other things, it found that the direct and indirect effects of the Proposed Land Exchange:

- Are unlikely to result in a large reduction in the caribou abundance or availability for local subsistence users;
- Are unlikely to result in a large reduction in migratory bird abundance for local subsistence users largely because neither black brant nor emperor geese would experience substantial direct impacts to habitat due to the inland location of the road;
- Would be localized to the streams crossed by the project and would not result in a large reduction in the availability or abundance of fish, including salmon, because a majority of fishing for the local subsistence users occurs outside the project area;
- Are unlikely to result in large reductions in resource abundance for local subsistence users for caribou or migratory birds.[58]

Nevertheless, the Service concluded that the cumulative impacts of the 2025 Proposed Land Exchange, in conjunction with all past, present, and reasonably foreseeable future activities in or near the proposed land exchange parcels (the cumulative case), may significantly restrict subsistence uses for the communities of

[56] 16 U.S.C. § 3101(c).
[57] Appendix B, Final ANILCA Section 810 Report, Section 2.2.4.
[58] Appendix B, Final ANILCA Section 810 Report, Section 2.2.4 at pp. 50–51.

King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point through reduced harvesting opportunities and alterations in subsistence harvesting patterns.[59] Although I have reservations about this determination, discussed in Section 6.6 below, I note that the Service specifically considered impacts upon subsistence for Hooper Bay and other communities in the Yukon-Kuskokwim Delta and concluded that the cumulative case would not significantly restrict subsistence uses for their communities.[60] In particular, the Service found that the cumulative effects are not expected to result in a substantial loss of migratory birds for those communities.[61]

In addition, I note that the acquisition of the rights to the surface of the KCC Exchange Lands will result in the Service and Federal Subsistence Board managing the lands to provide the subsistence priority to rural residents (instead of having KCC manage access to the lands for hunting and fishing and having state hunting and fishing laws apply).

When considering ANILCA's purpose of providing the opportunity for rural residents engaged in a subsistence way of life to continue to do so, I paid particular attention to King Cove, Cold Bay, False Pass, Sand Point, and Nelson Lagoon, the communities that have the potential to be most directly impacted by the Proposed Land Exchange. Testimony largely supported the Proposed Land Exchange during the ANILCA Section 810 hearings in 2024 and 2025. A few examples follow:

> *"Talking about subsistence and ANILCA here with our availability and abundance. King Cove area and where we live here in this little valley is very vibrant with wildlife. With the road that's built now down to the northeast corner, we were able to access a few more acres of land to hunt, fish on. Although, that isn't the only areas where we harvest salmon or geese or caribou. King Cove folks here go hunting all the way down to Pavlof Bay to get their caribou. Some of them go over to Cold Bay to hunt for caribou. Some people go to hunt over in Morzhovoi Bay for caribou and over in the False Pass area for caribou. So we have to go a long way to get our subsistence in King Cove, which costs a lot of money." (Mayor Wilson, Testimony from December 4, 2024, ANILCA 810 Hearing in King Cove, Alaska).*

> *"So with the road, it will make accessibility way better for the people of King Cove where we are stuck in this valley here without access. With access now and with access in the future, I mean, our lives would -- to keep our culture, to keep our heritage, to keep the people living here to show them how to hunt and fish and provide for themselves and their families is key to survival out in Alaska Peninsula." (Mayor Wilson, Testimony from December 4, 2024, ANILCA 810 Hearing in King Cove, Alaska).*

> *"Yes, [the road is] going to open up a little more for us to be able to have access to be able to go hunting and fishing. Good Lord, I can't get by that dock over there and get a four-wheeler off on that dock, which we have to pay to go use and then pay to be able to be up there running around where all those hundreds of hunters come in every year and be able to hunt off of that land with all those guided services that are out there in Cold Bay." (Brenda Wilson, Testimony from December 4, 2024, ANILCA 810 Hearing in King Cove, Alaska).*

> *"However, us being locals just 20 miles away [from Cold Bay], it is really frustrating for me to go -- to live here in King Cove and know how difficult it is to go out hunting where we do have to go out miles and miles, you know, on the beaches or on the established roads and try to get resources for our families. And then you go over to Cold Bay and it's like, oh, you just hop in your minivan and drive down to Grant's Point or to Outer Marker, or wherever, and the birds are flying right over that road, and all you've got to do -- I mean, of course you can go anyplace and see everything, but you are -- you have an easier access to those resources, and it's really tough to see outside folks from all*

[59] Appendix B, Final ANILCA Section 810 Report, Sections 2.3.4 and 4.0.
[60] *Id.*
[61] Appendix B, Final ANILCA Section 810 Report, Section 2.3.4 at p. 64.

*over the world come and hunt those resources and then not use them for subsistence." (Fanny Jo Newton, Testimony from December 4, 2024, ANILCA 810 Hearing in King Cove, Alaska).*

*"And I've traveled over to Cold Bay after being personally invited by the U.S. Fish and Wildlife. And I firsthand have seen exactly what everyone else just previously mentioned. There's hundreds of hunters during that time of year, and it's crazy to see how many birds they're killing. And my grandfather is Agdaagux tribal hunter there in King Cove. He's almost 90 years old. And he's an avid hunter. He's up every morning at 4:00 in the morning. And he can't catch a bird, because there's no birds. We don't have access to these birds." (Dakota Walker, Testimony from December 4, 2024, ANILCA 810 Hearing in King Cove, Alaska).*

*"We're talking today about the 810, which is subsistence, which is a part of our life out here. We all live off the land. And one thing that this road will actually do is give us accessibility to the hunting grounds over in Cold Bay and the fish in our lagoons and the berries on the flats and the caribou." (Mayor Wilson, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"I may not have a Ph.D., but I have grandfathers, great-grandfathers, and great-great grandfathers of history. They lived down here for thousands of years. The Shonee [as heard] village over there had 1,000 people in it, but they didn't damage the world. I don't understand where we may damage things. I think we have kept care of our region a heck of a lot better than the military did. They left military sites that are still being cleaned up today. But we have continued with living our subsistence ways of life from our grandparents, our great grandparents, and before that. They carry down stories, they carry down history, they carry down hunting techniques, the different things we have to know to be able to go out and hunt and fish and trap our things that we eat…we have to look at our way of life for our children, our grandchildren, our great-grandchildren. And I think 810 (subsistence) for our region is only going to make it more accessible, because now if you go up to Cold Bay, you have to go by the dock, you have to be able to unload your materials and then get around up there. When we go on this road, you put your backpack on, you cross that little chain link fence that says no Natives are supposed to go past here. It doesn't really say that. I think it does. I think it's racist and it's discriminatory. Like, we are going to forget what we're supposed to do riding on the road. I mean, you go up to Cold Bay, there's none of those chain link fences everywhere telling them where they can go and where they can't go." (Brenda Wilson, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

## 5.4 The Economic and Social Needs of the State of Alaska and its People

Section 101(d) of ANILCA states:

> This Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, *and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people*; accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.[62]

The exchange would have major beneficial effects to the economic and social needs of the State of Alaska and the people of King Cove by improving public health and safety and transportation with the addition

[62] 16 U.S.C. § 3101(d) (emphasis added).

of surface transportation for people in King Cove to travel to the Cold Bay airport for access to advanced medical services and for other purposes.

The community's and medical experts' concerns regarding extreme weather conditions and the need for a safe and reliable method of access from King Cove to the Cold Bay airport have been well documented over the years. Recent testimony received from community members relays these concerns:

> *"It's exactly like it sounds. I'm getting real tired of these. Like, are you just going to keep having these once a year and pretending you're going to do this? I've been, like, writing letters to people since I was in grade school. And, of course, this would help us with access to things we need to survive. Like, we can't even afford to buy, like, a cart of produce here, and even when it does get here, it's just gross, it's way overpriced. And you want to know the best thing you could do for the land is give it back to the people who have been here for thousands of years." (Ginger Bear, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

> *"...I encourage you guys to take a look at the United Nations Declaration on the Rights of Indigenous Peoples and their right to self-determination…which also includes our traditional foods, access to traditional medicines, to safe passageway to health and health services, to recreate, to live our traditional ways as indigenous peoples. This is an indigenous community. So I'd like to further look into…how this is a human rights issue that we're fighting for this many years." (Nadine Kotchuten, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

> *Hello. My name is Marylee Yatchmeneff. I'm a mother of three beautiful girls. I am Unangan. I've lived in King Cove all my life. King Cove is where I grew up, where I raise my family – raising my family. My youngest daughter is Evelyn. She received the nickname two years ago "The Million Dollar Baby." Evelyn was healthy until about ten months old. Around ten months we caught a cold where she could not get rid of it. After fighting for over a little over a week, the clinic put her on medicine. For a couple days she started feeling better. Then one night she woke up screaming nonstop. She was a very colic baby so I brushed it off as that. That morning I took her in and was told allergies. We went on with the day. She kept on getting more cranky. After that, I got off work and picked her and her sisters up from my parents. My oldest was bad and wanted to play at the playground with her friends. I told her she can play for about 30 more minutes. In those 30 minutes, Evelyn stopped her normal crying to a high-pitched screaming and started to seize while fighting to breathe.· We rushed her to the clinic.· At this point, it was already 6:00 p.m. LifeMed and Guardian could not come into King Cove. They told us if we could get to Cold Bay, they could have the medevac plane waiting for us. At this point, the clinic was calling around every airline to get us out. Guy and Wanda braved the weather with their plane and was able to come get us. I'm beyond thankful for Guy and Wanda. Evelyn spent a total of 12 days in the NICU. I thought that was going to be the only time where we had to go through that. I was wrong. From the age of 11 months old to four and a half years old, Evelyn was medevacked 17 times. Out of those 17 times, Life-Med and Guardian was able to come get us four times in King Cove. 13 times we had to sit up there all night waiting to find a way to Cold Bay. Those waits never get easier -- sorry. Those waits never get easier as a mother watching your child fight to breathe while you have nothing to do. One of those episodes at the clinic, we got there around 8:00 p.m., was hoping to get to King Cove -- out of King Cove fast. We ended getting stuck in King Cove overnight due to the darkness where they could not land. The medevac plane was ready in Cold Bay waiting for us, but we had no way to get there. Last September, Evelyn started a year of preschool where she went a year without a medevac. That was pretty big. She went to school one day. That day she came home and she had started to get sick eyes. I started her on a medicine routine like I was trained to. By 3:00 a.m., I was doing round-the-clock nebulizers. By 6:00 a.m., we're at the clinic waiting to find a way out. LifeMed could not get here because of the fog. Theo was able to come and get us, and we made it to Anchorage around 4:00*

*p.m. that night. They told us if we didn't get up there, they don't know what would happen, because Evelyn ended up spending 14 days in the NICU. I can tell you about all the times we had to -- all the times she got medevacked out of here, all the times we waited, all the times we prayed, all the times I prayed for the road to Cold Bay, but it won't matter.· In some people's eyes, birds' lives matter more than ours." (Marylee Yatchmeneff, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"We've seen each other before. Not once, not twice, not three times, not four times, but more times than anybody here wants to talk about anymore. But, you know, we all still show up to every single one of these meetings and for one reason and one reason only. We don't want to have to tell stories like Marylee's. We don't want to have to tell stories like hers. We don't want to tell those stories anymore at all. We're not here to discuss anything else but life-saving -- just life-saving. I appreciate being able to go subsistence because that's how I live. Me and my family, we subsistence. We live off of everything that we can off the land. But that's really not why we're here. We're here so that one day, if my mom, who is going to be 81 here in three days, gets sick, I don't have to worry about her getting to Cold Bay. I don't have to worry about her dying in this clinic with those amazing people up there that have the most biggest hearts that God put on earth up there. They have been given what they can use up there, but sometimes it's not enough. And it's not okay that we have to keep coming here and keep saying the same things over and over again to protect and to say that we just want it for life-saving measures..." (Etta Kuzakin, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"We all know somebody who has passed away or died on the way to Cold Bay, and I know anywhere in the United States whenever anybody dies on a road for what reason, that road is fixed. People die flying over to Cold Bay." (Mayor Wilson, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"This is my fourth year coming up here to provide medical care for the community, and I have developed a lot of really wonderful relationships with the people here. And it breaks my heart when we can't get them out, when we've got someone very, very ill and we can't get them out. It's devastating, deaths, disabilities. And not just the really acute situations, but people who don't go out for preventative care because they don't want to get on that airplane. They're scared to death to get on it. So we need that road. We need it really badly." (Rebecca Sturdevant, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"...I can tell you about all the times we had to -- all the times she got medevacked out of here, all the times we waited, all the times we prayed, all the times I prayed for the road to Cold Bay, ..." (Marylee Yatchmeneff, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"My mom has been one of the most recent deaths due to the lack of transport out of King Cove, but she's not the first, and I can guarantee she won't be the last. [...] I'd like to point out the highlighted part [on my mother's death certificate] that says the underlying cause is transport delayed treatment. Me and my siblings have been left with no mother and my children will grow up with no grandmother, and a hole is there [...]." (Dakota Walker, Testimony from December 4, 2024, 2024 Draft SEIS Public Meeting in King Cove, Alaska).*

*"Part of the reason we don't have full-time providers at the clinic is because it's so difficult to have to deal with people dying while you're watching them, [...]. You don't have the ability to do what you need to do to save lives. And we've all been there, and it's really tough. [...] It's terrifying for the providers who are trying to save those lives. I can't tell you how many times I've wished for a road. And I can tell you that the water choices are not viable. If the weather is that bad, you can't get somebody on a boat. The waves are 20 feet high. It's just not going to work. Okay? We need that road. We really need that road." (Rebecca Studevant, Testimony from*

*December 4, 2024, 2024 Draft SEIS Public Meeting in King Cove, Alaska).*

*"Our EMS is strong and our providers that come out here on rotation are amazing. They're super strong also. So we have capabilities to safely move patients from King Cove to Cold Bay. We are prepared. We're ready. We have oxygen supplies that can take us from King Cove to Cold Bay. You know, if it is two hours, that's not a problem. We have extra oxygen supplies. We have trained people to take care of patients on their way over there. We're ready. We just need the access to that small gravel road that will get our patients to that all-weather airport." (Bonita Babcock, Testimony from December 4, 2024, 2024 Draft SEIS Public Meeting in King Cove, Alaska).*

King Cove has expressed social needs for the road such as opportunities for community children to be able to participate in a range of extracurricular activities with peers of other communities.

Recent testimony received from community members relay the economic and social needs for the road:

*"King Cove is going through a hard time right now with the plant being closed.·[…] That road will be a lifeline so we can actually get to and from King Cove to Anchorage if needed for a medevac or medical service and for freight that can actually bring food to our village from across the world to help us out." (Mayor Wilson, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"Sure would be nice to have the basketball teams go to -- or track team or volleyball team to be able to make it to a meet where they don't have to forfeit because the weather knocks them out here in King Cove with our runway where it's located. And going by boat nowadays is too expensive. It's just not worth it for somebody to be able to take anybody to Cold Bay on a boat due to insurance reasons. There's always a money problem all the time with anything." (Mayor Wilson, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"…this would help us with access to things we need to survive. Like, we can't even afford to buy, like, a cart of produce here, and even when it does get here, it's just gross, it's way overpriced." (Ginger Bear, Testimony from August 18, 2025, ANILCA 810 Hearing in King Cove, Alaska).*

*"So the land trade here is key to getting this done. The people will be able to have safe passage on that road to Cold Bay just to hunt and fish, if that's what they want to do, or to gather berries off the land. It's key to survival. That's what I'm trying to say here. And we need it. We need it really bad right now because we don't have a fish plant that's operating. So with the road even with not as much money coming in from our fisheries because the fishermen have to go so long [and] far away to unload their catch now, it costs a lot of money. There's not enough money left to be able to, you know, to think about flying to Cold Bay or flying to Anchorage for that matter." (Mayor Wilson, Testimony from December 4, 2024, ANILCA 810 Hearing in King Cove, Alaska).*

*"Our goods arrive bi-weekly vehicles to boats and our biggest challenge is to get [perishable items] to last until the next boat arrives so the community can have healthy options on a daily basis for their families. Unfortunately, from the time we order until arrival in King Cove, the perishable items have been sitting in refrigerated containers for over two weeks on average, and once they're available for sale, most fruits and vegetables only have a one- to two-day shelf life to be used before they have to be discarded. […] By having a road between King Cove and Cold Bay, [the Alaska Commercial Company grocery store] would be able to fly goods into Cold Bay on a noncoastal [indiscernible], allowing us to drive across to get goods for the community, which would allow for overall better healthy meal choices for all of our citizens." (Mark Thompson, Testimony from December 4, 2024, public meeting in King Cove, Alaska).*

*"From a personal viewpoint, our son Robert is a junior at the King Cove School, and like so many of his classmates, he participates in sports, which requires a lot of travel during the winter*

*months when the weather can be at its worst here. Every time he and his teammates get ready for a road trip, the stress level for us, as well as all parents of students traveling, skyrockets as we worry for their safety when flying in poor weather conditions, something that could be alleviated by having access to Cold Bay where they can fly in larger planes that are more suited for inclement weather." (Mark Thompson, Testimony from December 4, 2024, public meeting in King Cove, Alaska).*

The Proposed Land Exchange would bring fewer benefits to persons outside of the vicinity of the proposed road and for the State of Alaska, but there would still be some. There may be additional opportunities to travel to King Cove.

## 5.5 Balancing of ANILCA's Purposes

After reviewing the Proposed Land Exchange as a whole and assuming that KCC will be able to obtain authorizations and funding to build and operate a gravel road to the Cold Bay airport, balancing of the relevant factors has led me to the decision that the Department will enter into the Proposed Land Exchange as authorized by Section 1302(h) of ANILCA.[63] I find that the Proposed Land Exchange described in Section 3, including the mitigation measures specified there, furthers the purposes of ANILCA because it strikes the proper balance between protection of scenic, natural, cultural, and environmental values; provides opportunities for continued subsistence uses; and, more generally, for the long-term social and physical well-being of the State of Alaska and in particular the public health and safety and a broader set of economic and social needs of the Native and non-Native residents of King Cove.

In contrast to the decision Secretary Jewell made under a different statutory authority with a public interest determination required under the authority of a now-expired 2009 Act, Section 1302(h) only requires a public interest determination for land exchanges that are not equal value exchanges. The Proposed Land Exchange considered in this Decision is an equal value exchange, and therefore no public interest determination is required. Even if such a determination is required, in contrast to Secretary Jewell, in my view this land exchange is in the public interest, and if necessary to make a public interest determination, I would do so for the same reasons that I am deciding to enter into the Proposed Land Exchange.

There are many reasons for my Decision. At the forefront is that the Proposed Land Exchange will provide KCC with an opportunity to provide for the health and safety of its members and the community of King Cove by allowing KCC to pursue the construction and development of a road from King Cove to the airport in Cold Bay, Alaska. The Proposed Land Exchange would have major beneficial effects to public health and safety and transportation with the addition of reliable, affordable, all-season, and all-weather surface transportation for people in King Cove to travel to the Cold Bay airport for access to advanced medical services and for other purposes. As noted above, from December 23, 2013, to June 30, 2025, there were 217 medevacs from King Cove, mostly to Cold Bay. Of those 217 medevacs, 32 rescue missions have been by the U.S. Coast Guard.

In addition to benefits to public health and safety through improved access to health care and safe medical evacuations, a road from King Cove to the Cold Bay airport will further the economic and social needs of the members of KCC and the King Cove community by providing another means for them to obtain groceries and other supplies and goods in a more affordable manner. I gave significant weight to the comments from the Unangax̂ people and community of King Cove who largely testified and wrote in support of the Proposed Land Exchange and, previously, Alternative 6 in the 2024 Draft SEIS. They said that construction of the road to the Cold Bay airport is crucial for them to continue living in King Cove.

[63] 16 U.S.C. § 3192(h).

This decision recognizes the inherent rights of Alaska Native Tribes to self-governance and control over their lands and resources. The benefits of ANILCA have seemingly bypassed the Unangax̂ people of King Cove, who continue to fight for basic, safe, and reliable access to medical care. The two Alaska Native Tribes, KCC, and the residents of King Cove were not consulted during the creation of Izembek Refuge and its designation as wilderness. The refuge creation and wilderness designation cut local people off from access and availability of use of the lands and resources that had been used for generations in harmony with the abundance of fish and wildlife and other key resources without such restrictions.

Even if a road proves impassable at times as mentioned in the 2013 ROD, all indicators are that there will likely still be numerous other occasions when the access it gives to the airport at Cold Bay will make the difference between life and death for many residents. Secretary Jewell's promise that the Department would continue work with the King Cove community to "ensure continued transportation improvements" remains unfulfilled, and I have considered and intend to fulfill that long overdue commitment given the fact that the citizens of King Cove are still in their decades-long pursuit of a reliable and affordable transportation option. Almost 12 years later, the transportation alternatives imagined in the 2013 ROD that were part of Secretary Jewell's rationale for not approving the exchange have proven to be anything but viable, and it is clear that the residents of King Cove continue to lack both adequate transportation options and adequate access to local emergency medical care. A decision not to approve the Proposed Land Exchange would disregard the voices and needs of the people most affected by the decision.

Most notably, the 2015 report referenced above indicates that alternative transportation routes have been subsequently considered and proven to be prohibitively costly and/or insufficiently dependable. These issues have been compounded due to funding cuts to the marine ferry system. The lack of viable transportation alternatives results in maintaining a categorically unsatisfactory status quo for the region, as reliance on fishing vessels and small aircraft flying into the King Cove airport has proven, time and again, to be inadequate to meet the public health and safety needs of the community. It is my view that the health and safety access for the people of King Cove only worsens with time and that promises of help, accommodation, and transportation alternatives have been hollow statements to this community. The prior decision rejecting a land exchange that would provide KCC with land that it could use to provide for the welfare and well-being of the Native and non-Native people of King Cove frustrates the purposes of ANILCA.

A variety of alternative marine and air access methods have been evaluated over the years, as well as consideration and implementation of facility improvements, intended to provide local residents with safe and reliable access to the State of Alaska's transportation system for emergency health care (see Section 2.4). However, none of the alternative methods of access or facility improvements have proven to be adequate in meeting the communities' underlying needs, which is a safe and reliable method of access to and from the Cold Bay airport for a variety of basic "quality of life" purposes, including transport for emergency health care. I also note that while the 2013 EIS and ROD discussed the cost to the Service related to refuge management if a road is constructed, it ignored the countervailing high cost to the taxpayers of U.S. Coast Guard rescues from King Cove, of which there were 21 from January 2014 through June of 2019, at an average cost of approximately $50,000 per mission. Furthermore, the 2013 ROD failed to take into proper account that the marine transport alternatives relied upon therein would all pass through designated critical habitat for the endangered Southwest Alaska DPS of northern sea otters, while a road, if constructed, would not pass through any designated critical habitat.

While Secretary Jewell declined to enter into the land exchange "because of the unique and exceptional resources in the Izembek Refuge, the consequent degradation of resources that would result from construction and operation of a road, and the availability of other viable modes of transportation from King Cove to Cold Bay," Secretary Jewell also explicitly acknowledged that there have been at least four fatalities from air transport from King Cove to Cold Bay. Moreover, although the 2013 ROD rejected the idea that a road is the *only* safe, reliable, and affordable means of year-round medical services and that there are other viable and at times preferable methods of transport (conclusions that have been proved to

be incorrect with the passage of time), it notably did not conclude that a road is not a *viable* option for safe transport or even that it may sometimes be preferable.

Furthermore, I find that the habitat provided by the lands the Service would receive for addition to the refuge in the proposed land exchange is consistent with and will be acquired for the purposes of ANILCA. I find that federal ownership and a more permanent conservation status for the lands and land selection rights to be acquired would enhance the conservation purposes of the Izembek Refuge and Izembek Wilderness and would increase the Service's ability to provide for subsistence opportunities to federally qualified subsistence users by adding substantial acreage with high-quality habitat and abundant wildlife. In fact, as far back as the 1998 Izembek Land Protection Plan, the Service has identified lands owned by KCC within Izembek Refuge boundaries as containing valuable fish and wildlife habitat and prioritized this land for acquisition and protection.

I have considered that the acquisition of the rights to the surface of the KCC Exchange Lands will result in the Service and Federal Subsistence Board managing the lands to provide the subsistence priority to rural residents (instead of having KCC manage access to the lands for hunting and fishing and having state hunting and fishing laws apply). The balancing of ANILCA's purposes, and in particular its conservation purposes, is also enhanced through the adoption of the restriction on the nature of any road to single-lane gravel construction. In addition, the proposed action includes mitigation measures that will reduce the impact on Steller's eiders, sea otters, and other species listed under the ESA.

When Congress enacted Section 1302(h) of ANILCA, it delegated the authority for and the discretion over whether or not to enter into a land exchange agreement with KCC to the Secretary of the Interior.[64]

## 5.6 Alternatives Rejected

The 2013 EIS evaluated five alternatives, guided by the purpose and need as well as criteria set forth in the 2009 Act and the National Environmental Policy Act (NEPA). Those alternatives were as follows: (1) No Action Alternative; (2) Land Exchange and Southern Road Alignment; (3) Land Exchange and Central Road Alignment; (4) Hovercraft Operations from the Northeast Terminal to Cross Wind Cove; and (5) Lenard Harbor Ferry with Cold Bay Dock Improvements.[65] The 2024 Draft SEIS added a sixth alternative, described in Section 2.4.5.

### 5.6.1 No Action and Changes from the 2013 Decision

The no action alternative was Alternative 1 in the 2013 EIS and the 2024 Draft SEIS. Under the no action alternative, there would not be a land exchange, and current modes of transportation would continue to operate. This alternative was studied in the 2013 EIS and ultimately selected by Secretary Jewell. However, Secretary Haaland's decision to withdraw the Department from the 2019 Land Exchange Agreement and to start evaluating a new alternative under the authority of ANILCA reflected a decision to revisit Secretary Jewell's 2013 decision and to make a new decision based upon the authority in ANILCA (since the previous authority expired). So, while the approaches and terms have varied, every Secretary of the Interior since Secretary Jewell has pursued a land exchange with KCC under the authority of Section 1302(h) of ANILCA to allow KCC the opportunity to build a road. I also note that the 2024 Draft SEIS states that the no action alternative would not meet the purpose and need for the project.[66]

[64] 16 U.S.C. § 3192(h).
[65] As relevant here, the Department has the benefit of not only considering the analysis and facts associated with the respective alternatives as discussed in the 2013 EIS, but also the benefit of considering what has (or has not) transpired since the 2013 ROD. There are multiple instances where the latter can provide important context to the former.
[66] 2024 Draft SEIS at p. 2-22.

I have reviewed the 2013 EIS and Secretary Jewell's decision to select the no action alternative because of her concerns about impacts to the conservation values of Izembek Refuge. I acknowledge that the conveyance of the U.S. Exchange Lands may lead to the construction and operation of a single-lane gravel road, and that this would have an impact on the conservation and wilderness values of the remaining Izembek Refuge and Izembek Wilderness as detailed in the 2013 EIS and the 2024 Draft SEIS analysis of Alternatives 2 and 6, respectively.

Again, while the 2013 decision was made under an entirely different statutory authority and under a different standard involving different parties and lands under consideration for potential exchange, I conclude that the decision to authorize this proposed land exchange with KCC represents a change in policy position from the 2013 ROD. To the extent that I am required by law to explain why I am reaching a decision different than the one made by Secretary Jewell, I also find that a rebalancing of the factors involved, weighted by the responsibility to the Alaska Native people in the implementation of ANCSA and ANILCA, requires a different policy result for the ANILCA land exchange considered here than the policy conclusion drawn in the 2013 ROD pursued under the authority of the 2009 Act in light of:

(1) The acute necessity, underestimated in the 2013 EIS and ROD, for a road connecting King Cove and Cold Bay to serve the future emergency medical and other social needs of the Alaska Native residents of King Cove and the Alaskan people;

(2) Changed information concerning the viability and availability of alternative means of transportation that have since proven to be neither viable nor available;

(3) The failure in 2013 to take into consideration the high ongoing and future costs to the taxpayers of continuing emergency medical evacuations from King Cove by the U.S. Coast Guard;

(4) The substantial benefits to the citizens of the United States and residents of Alaska in increasing the total amount of acreage in the Izembek Refuge for the protection of scenic, natural, cultural, and environmental values by way of a land exchange with KCC; and

(5) My determination that, even if the facts are as stated in the 2013 ROD; that is, that a road is a viable alternative but (a) there are "viable, and at times preferable" transportation alternatives for medical services and (b) resources would be degraded by the road's construction—human life and safety must be the paramount concern in this instance. Nothing about construction of a road prevents the use of other alternatives (such as emergency U.S. Coast Guard evacuations) should the road be impassable or its use be otherwise inexpedient.

In my judgment, when weighing the competing considerations here, preservation of human life must be given great weight. Accordingly, even assuming all the facts as stated in the 2013 ROD, in the exercise of policy discretion, I find that executing the equal value exchange in a form substantially consistent with the Proposed Land Exchange Agreement attached as Appendix A is consistent with the public interest, the purposes of ANCSA and ANILCA, and our responsibility to the Alaska Native people.

Finally, I note that the no action alternative previously selected by Secretary Jewell would not likely preclude the development of a road in the U.S. lands. KCC or the State of Alaska would still be able to request a right-of-way under Title XI of ANILCA. The State did so previously, and Secretary Bernhardt determined that the community of King Cove was an inholding and entitled to construct a road, although no road permit was issued.

Although Secretary Jewell in the 2013 ROD suggested that "reasonable and viable transportation alternatives exist," that has not proven to be the case. From Secretary Jewell's decision in December of 2013, through June 30, 2025, there were 217 medevacs from King Cove, mostly to Cold Bay. Of those 217 medevacs, 32 rescue missions were by the U.S. Coast Guard operating out of Cold Bay, Kodiak, and St. Paul.

Although I make this determination under ANILCA—not the 2009 Act—I further find that to the extent an authorization under ANILCA constitutes a policy change from that described by Secretary Jewell in the 2013 ROD rejecting a similar, but not identical, land exchange under the 2009 Act, such change is warranted, necessary, and appropriate.

The Service prepared the 2013 EIS in accordance with the 2009 Act. The "basic project purpose," as described by the EIS, was to provide a long-term, safe, and reliable year-round transportation system between the city of King Cove and the Cold Bay airport.[67] The 2013 EIS continued by indicating that the "need for the proposed action is broader than the focused purpose," noting that the transportation system was vital to "health and safety,"[68] "quality of life,"[69] and "affordable transportation."[70]

I also disagree with the conclusion in the 2024 Draft SEIS that the land exchange must fulfill the conservation mission of the Refuge System and the purposes of the individual refuge. The conservation mission of the Refuge System is in conflict with Section 1302(h) of ANILCA. Congress placed a mission statement at the core of the 1997 amendments that defines the Refuge System as "a national network of lands and waters for the conservation, management, and where appropriate restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."[71] This mission establishes a policy of wildlife conservation as the primary purpose of the Refuge System. This mission is in direct conflict with ANILCA Section 1302(h), which requires me to consider the purposes of ANILCA in determining whether to enter into the proposed land exchange and authorizes the Secretary to enter into land exchanges with Native Corporations such as KCC in order to acquire lands for conservation system units as long as the purposes of ANILCA are furthered. In the event of a conflict between ANILCA and the Refuge Act, Section 9 of the Improvement Act states that ANILCA prevails.

### 5.6.2 Hovercraft and Ferry Options (Alternatives 4 and 5)

The 2013 EIS evaluated impacts from two alternatives that did not involve a road to the Cold Bay airport: (4) Hovercraft Operations from the Northeast Terminal to Cross Wind Cove; and (5) Lenard Harbor Ferry with Cold Bay Dock Improvements. One of the reasons that Secretary Jewell provided for her decision to select the no action alternative was that there were adequate means of access to the Cold Bay airport. Such options were explored and detailed in a 2015 report prepared for USACE that assessed the viability of non-road alternatives.[72] That report considered variations related to three primary options: (1) Marine Alternative; (2) Airport Alternative; and (3) Helicopter Alternative. For those three alternatives, the report

---

[67] 2013 EIS at p. 1-5.
[68] "Historically, for cases requiring emergency care exceeding that available at King Cove Clinic, medical evacuations from the King Cove community arrive first at the Cold Bay airport via aircraft and marine vessels, depending upon weather conditions and availability of transport modes." 2013 EIS at p. 1-7.
[69] "Road access would provide peace of mind, particularly during extended periods of inclement weather that prevent marine and air travel. In addition, access to the Cold Bay Airport would provide the students, school board, borough assembly members, and medical service providers residing in the City of King Cove with enhanced opportunities to travel out of their community. Residents would be able to receive mail more frequently, attend sporting events and fundraisers, participate in school field trips, schedule doctor's appointments, meet with government officials in Anchorage and Juneau more reliably, and to visit extended families living in other communities." 2013 EIS at p. 1-8.
[70] "The transportation system must be affordable by local families and be constructed, operated, and maintained at a cost that can be borne by local or state government. The transportation must be practical in the context of the Cold Bay and King Cove area, so that it can be operated and maintained without undue requirements for specially trained personnel or specialized equipment, and can provide safe, reliable, affordable transportation with the least amount of interruption by weather conditions." 2013 EIS at p. 1-9.
[71] 16 U.S.C. § 668dd(a)(2).
[72] *King Cove-Cold Bay: Assessment of Non-Road Alternatives,* prepared for U.S. Army Corps of Engineers, Alaska District (June 18, 2015).

considered capital costs, operation costs, maintenance costs, medevac time, risk, and dependability. Subsequently, Secretary Bernhardt concluded that none of these options was viable. I agree and find, consistent with Secretary Bernhardt's conclusion, that these alternatives are not viable and reject them as such.

### 5.6.3 Southern and Central Road Alignments (Alternatives 2 and 3)

Alternatives 2 and 3 in the 2024 Draft SEIS are both road alternatives that were developed under the authority of the 2009 Act, which expired in 2016. Both alternatives involved conveyances of land to the United States from the State of Alaska. The 2024 Draft SEIS indicates that the State of Alaska and KCC are no longer offering to enter into these proposed exchanges and these alternatives are not feasible.[73]

Alternative 2 in the 2024 Draft SEIS evaluated a land exchange that would provide KCC with lands substantially along the same route as the lands in Alternative 6 and the Proposed Land Exchange. Besides differences involving the lands to be acquired by the United States, the primary differences between Alternative 2 and both Alternative 6 and the Proposed Land Exchange are:

- Alternative 2 included a barrier along both sides of the roadway to prevent vehicles from accessing the Izembek Refuge and Izembek Wilderness lands adjacent to the road.[74]
- Alternative 2 did not include material sites within the road corridor. There would be material sites located outside the proposed road corridor.[75]
- Alternative 2 limited use of the proposed road to non-commercial traffic.

The southern road alignment in Alternatives 2 and 6 and the Proposed Land Exchange was intended to strike a compromise between minimizing disturbance to black brant through distance from Kinzarof Lagoon and disrupting caribou migration through the isthmus.[76] The route was designed to avoid or minimize impacts to wetlands, minimize stream crossings, and accommodate terrain considerations.[77]

Alternative 3 in the 2024 Draft SEIS was identical with respect to these provisions. Alternative 3 differed from Alternative 2 in that Alternative 3 involved lands to be conveyed to KCC that could be used for a road along a central alignment rather than the southern alignment in Alternatives 2 and 6 and the Proposed Land Exchange. The central road alignment would be co-located for a portion of the southern alignment and would otherwise be located north of the southern alignment. In summary, the road corridor lands conveyed to KCC would be similar to those described for the Proposed Land Exchange, though some of them would be shifted to the north. The road would be somewhat longer (20 miles instead of 18). A section of the Alternative 3 alignment passes through a 22.95-acre parcel of private land owned by RCA Alaska Communications Inc. This route was designed to avoid or minimize impacts to wetlands and high value habitat for breeding, nesting, and migrating waterbirds and to reduce disturbance or impacts to species and habitat in both Izembek and Kinzarof Lagoons, while also considering land mammal movement and habitat use of the isthmus. The alignment seeks to minimize impacts to wetlands and lake-dependent resources, avoid or minimize stream crossings, and accommodate terrain considerations.[78]

I agree with the statement in the 2024 Draft SEIS that Alternatives 2 and 3 are not feasible. However, I have considered whether to incorporate aspects of these alternatives as potential mitigation for the Proposed Land Exchange. Specifically, I have considered whether to limit use of the proposed road to non-commercial traffic and whether to insist on a boundary along any proposed road that would restrict

[73] 2024 Draft SEIS at p. 2-73.
[74] 2024 Draft SEIS at p. ES-16.
[75] 2024 Draft SEIS at p. 2-31.
[76] 2024 Draft SEIS at p. ES-16.
[77] *Id.*
[78] 2024 Draft SEIS at p. 2-44.

traffic from the road from entering adjacent Izembek Refuge lands, as discussed in my rationale for not selecting Alternative 6.

### 5.6.4 Alternative 6 in the 2024 Draft SEIS

The 2025 Proposed Land Exchange is similar to Alternative 6 in the 2024 Draft SEIS in that the United States would convey the same lands to KCC, would restrict KCC's ability to build a road on these lands to a single-lane gravel road, and would authorize the same sites for gravel mining for the construction and operation of the road. In addition, it would be an equal value exchange, and KCC's conveyance to the United States would be limited to its interests to approximately 1,739 acres in the vicinity of the Kinzarof Lagoon and to relinquishing its selection of about 5,430 acres to the east of Kinzarof Lagoon. Under Alternative 6, KCC would convey approximately 31,198 acres of lands to the United States. The 2024 Draft SEIS indicates that this would not be an equal value exchange, but that it could be accomplished if there were a determination that the exchange was in the public interest. I strongly believe that the public interest does not require a deal that so disproportionately favors the refuge system at the expense of KCC and the community of King Cove.

I conclude that the Proposed Land Exchange is superior to Alternative 6 in the 2024 Draft SEIS in serving the ANILCA purpose of providing an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska while still safeguarding the conservation purposes of the Izembek Refuge and opportunities for subsistence uses and select it for that reason.

In reaching this conclusion, I specifically considered that the Proposed Land Exchange would not limit the use of the road to non-commercial purposes. Under Alternative 6 in the 2024 Draft SEIS, the road traffic type of use, frequency, and timing would be restricted to non-commercial uses, and further restricted to those necessary for health and safety purposes and access to refuge resources by federally qualified subsistence users actively engaged in subsistence uses. The use of taxis, commercial vans for public transportation, and ridesharing services, when used for transportation for health and safety or subsistence purposes, is not considered a commercial use.[79] I find that the Proposed Land Exchange, with its lack of restrictions on the use of the road, does a better job than Alternative 6 in serving the ANILCA purpose of providing an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska. These needs may be more relevant now due to the closure of the seafood processing plant in King Cove in 2024.

I further conclude that the restriction of a potential road to a single-lane gravel road is sufficient to restrict the amount of traffic and use of the road so as to limit effects of the proposed road upon conservation and subsistence resources of the Izembek Refuge and the Izembek Wilderness. I also find that a barrier along the road that would restrict access to the Izembek Refuge would make it more difficult for federally qualified subsistence users to access subsistence resources and reject that proposed mitigation measure developed for Alternative 6.

# 6 ADDITIONAL INFORMATION

## 6.1 National Environmental Policy Act

Section 910 of ANILCA states that NEPA shall not be construed, in whole or in part, as requiring the preparation of an EIS for actions leading to conveyances to Native Corporations pursuant to ANCSA or ANILCA.[80] This Decision will result in a conveyance of the U.S. Exchange Lands under the authority of

---

[79] 2024 Draft SEIS at Section ES-1.2

[80] 43 U.S.C. § 1638 ("The National Environmental Policy Act of 1969 (83 Stat. 852) shall not be construed, in whole or in part, as requiring the preparation or submission of an environmental impact statement for withdrawals, conveyances, regulations, orders, easement determinations, or other actions which lead to the issuance of conveyances to Natives or Native Corporations, pursuant to the Alaska Native Claims Settlement Act, or this Act.").

ANILCA, and the conveyance of the U.S. Exchange Lands will be to KCC, a Native Corporation under ANCSA. Accordingly, Section 910 of ANILCA provides an express exemption from NEPA.[81]

In addition, I note that the 2024 Draft SEIS was not prepared as a result of a decision that NEPA compliance was required. Rather, Secretary Haaland stated:

> I am aware that Secretary Bernhardt was of the view that pursuant to Section 910 of ANILCA, no EIS is required for the 2019 Land Exchange. Regardless of the correctness of that conclusion as a matter of law, *in my policy judgment* the 2019 Land Exchange's substantial differences from the 2013 exchange relevant to environmental concerns should have been analyzed and subjected to public comment. *As a matter of policy*, I have concluded that some form of additional NEPA analysis should have been undertaken to inform the Secretary and the public about the decision.[82]

In my policy judgment, and that of Secretaries Zinke and Bernhardt previously, discretionary NEPA analysis and public comment were unnecessary to inform my decision on this land exchange. However, the differences from the 2013 exchange relevant to environmental concerns have now been analyzed and subjected to public comment through a 2024 Draft SEIS. While completing a Final SEIS is neither required by law nor, in my policy judgment, necessary to inform my decision, I have reviewed and considered the additional NEPA analysis, input, and comments from the 2024 Draft SEIS, recognizing both the similarities and differences between the preferred alternative (Alternative 6) and the current proposed land exchange.

## 6.2 ANILCA Section 810

### 6.2.1 Background

Section 810(a) of ANILCA requires that an evaluation of subsistence uses and needs be completed for any federal determination to "withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands."[83] An evaluation of potential impacts on subsistence under ANILCA Section 810(a) was completed for the 2013 EIS, the 2024 Draft SEIS, and for the Proposed Land Exchange. ANILCA Section 810 sets forth a procedure through which effects on Alaska subsistence resources are considered.[84] Section 810 does not prohibit all federal land use actions that would adversely affect subsistence resources.[85] Rather, the statute "sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[86]

The Section 810 analysis is two-fold. The first step, called the "Tier 1" determination, requires the agency to determine whether the proposed action "would significantly restrict subsistence uses" after consideration of three factors: (1) "the effect of [the proposed action] on subsistence uses and needs"; (2) "the availability of other lands for the purposes sought to be achieved"; and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[87] If the agency determines that its proposed action "would significantly restrict subsistence

[81] *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 39 (2023), Section 106(a)(3) (codified at 42 U.S.C. § 4336(a)(3)); 516 Departmental Manual 1 – U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures, Section 1.1(a)(2) ("The Responsible Official may document a determination that NEPA does not apply to a proposed action when … (2) The proposed action is expressly exempted from NEPA by law.").
[82] 2023 Decision Memo at p. 3 (emphasis added).
[83] 16 U.S.C. § 3120(a).
[84] *Id.*
[85] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1004 (9th Cir. 2025), citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987).
[86] *Id.*
[87] 16 U.S.C. § 3120(a).

uses," the agency is required to give notice to the appropriate State of Alaska agency and appropriate local and regional subsistence committees.[88] It is also required to give notice of, and hold, a hearing in the vicinity of the area involved.[89] The agency must then proceed to the second step, called the "Tier 2" determination.[90] Subsequently, the agency must make a set of specific findings before proceeding with the proposed agency action: (1) that the restriction on subsistence uses and needs is "necessary, consistent with sound [public lands] management," (2) that the "minimal amount of public lands necessary" will be used, and (3) that "reasonable steps will be taken to minimize the adverse impacts upon subsistence uses and resources."[91]

When making a Tier 1 determination, ANILCA does not define the phrase "would significantly restrict" subsistence uses. The Ninth Circuit Court of Appeals stated that an agency must provide notice and hold a hearing and make the additional determinations if the agency determines that a proposed action "may significantly restrict" subsistence uses.[92] In discussing the Tier 1 threshold for the first time in 1984, the Ninth Circuit restated the standard as "may significantly restrict" in the same paragraph where it correctly quoted the statutory language of "would significantly restrict." The Ninth Circuit ended the paragraph noting that "[t]his construction of the statute is a reasonable one, relying on the plain meaning of the words of the statute." The Ninth Circuit provided no explanation or analysis for its use of "may" versus "would" and may have simply used the words interchangeably. However, following the *Kunaknana* decision, the District Court for the District of Alaska[93] and agencies conducting analysis under Section 810 have cited *Kunakana* in applying a Tier 1 standard of "may significantly restrict," as the Service has done here. As noted above, the text of the statute uses the word "would" not "may," which the Ninth Circuit correctly cited in a case decided in June of this year, citing *Kunaknana*.[94] In the Department's view, *Center for Biological Diversity* correctly states the applicable law.

ANILCA also does not provide clear guidance on what is meant by a "significant restriction" other than to note the following three factors that need to be considered when determining if a significant restriction of subsistence uses and needs would result from the proposed action: (1) reduction in the abundance of harvestable resources used for subsistence purposes; (2) reduction in the availability of resources used for subsistence caused by alteration of their distribution, migration patterns, or location; and (3) legal or physical limitations on access of subsistence users to harvestable resources. There are few cases addressing agency Tier 1 determinations.[95] In general, due to their similarities, courts have analyzed the procedural requirements of ANILCA under the same standard as NEPA.[96]

---

[88] 16 U.S.C. § 3120(a)(1).
[89] 16 U.S.C. § 3120(a)(2).
[90] *Ctr. for Biological Diversity*, 141 F.4th at 1005, citing *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984); *see* 16 U.S.C. §§ 3120(a)(1)-(2).
[91] 16 U.S.C. § 3120(a)(3).
[92] *Kunaknana,* 742 F.2d at 1150.
[93] *See e.g., Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *ajf'd,* 857 F,2d 1307 (9th Cir. 1988); *Hanlon v. Barton*, 740 F. Supp. 1446, 1449 (D. Alaska 1988).
[94] *Ctr. for Biological Diversity*, 141 F.4th at 1004-5, citing *Kunaknana*, 742 F.2d at 1151 ("If the agency determines that its proposed action "would significantly restrict subsistence uses," then it must proceed to step two, which imposes "notice and hearing procedures" meant to inform affected communities about the proposed agency action.")
[95] *See, e.g.*, *Kunaknuna,* 742 F.2d at 1152 (upholding a Bureau of Land Management definition of "significant restriction" as involving more than slight reductions or disruption of resources or user access to subsistence resources was consistent with the purposes of ANILCA*); Penfold,* 664 F. Supp at 1307 (holding that the Bureau of Land Management was required to consider cumulative impacts); *Hanlon,* 740 F. Supp at 1449 *(*Forest Serice Tier 1 determination was inadequate); and *Orutsararmiut Native Council v. United States Army Corps of Eng'rs,* 751 F. Supp.3d 971, 987 (D. Alaska 2024) (Bureau of Land Management Tier 1 ANILCA 810 determination deficient because it did not analyze a larger mine tailings spill, which was a reasonably foreseeable effect of the action).
[96] *Orutsararmiut Native Council*, 751 F. Supp.3d at 987 (citations omitted).

ANILCA is also silent on whether cumulative effects must be considered. The U.S. District Court for the District of Alaska has analogized ANILCA to NEPA and found that agencies must analyze cumulative impacts in its significant restriction evaluation.[97] The cumulative impacts must include a review of future cumulative impacts.[98] The cumulative case includes past, present, and reasonably foreseeable future actions.[99] I note that the cumulative impacts concept in NEPA originated in regulations promulgated by the Council on Environmental Quality that have been rescinded.[100] Thus, it is unclear whether this component of the Section 810 analysis is still required.

### 6.2.2 2013 ANILCA Section 810 Analysis

For Alternative 2 (land exchange/southern road alignment), the alternative involving a similar road corridor to the Proposed Land Exchange, the 2013 ANILCA Section 810 analysis found:

> In summary, implementation of Alternative 2 would have minor direct and indirect impacts on subsistence uses, and would make a minor contribution to cumulative effects on subsistence resources or harvest patterns. No significant restriction to subsistence uses would occur under Alternative 2.[101]

### 6.2.3 2024 Preliminary ANILCA Section 810 Analysis[102]

In conjunction with the 2024 Draft SEIS, the Service prepared a "preliminary evaluation" addressing the Tier 1 determination on whether the proposed actions would result in a significant restriction of subsistence uses and needs on federal lands.[103] This evaluation includes preliminary findings that Alternative 6 and the cumulative case "may significantly restrict subsistence uses" for the five nearby communities of King Cove, Cold Bay, False Pass, Sand Point, and Nelson Lagoon.[104]

There were seven Section 810 hearings in December of 2024, in the communities of King Cove, Cold Bay, Sand Point, Nelson Lagoon, False Pass, Bethel, and Yukon-Kuskokwim Delta communities. Three of these were virtual zoom meetings. Twenty-five members of the public gave oral comments during the hearings. Comments provided by members of the communities in the vicinity of the proposed land exchange and road corridor were generally in support of Alternative 6 in the 2024 Draft SEIS. Many stated that Alternative 6 or the proposed road more generally would expand access to subsistence resources.

Seventy-six Tribes or Tribal organizations not in the vicinity of the proposed land exchange and road corridor passed 19 Tribal Resolutions of Opposition or authorized the Association of Village Council Presidents to do so on their behalf. The Native Village of Hooper Bay, for example, located over 450 air miles from King Cove/Cold Bay, contends that Alternative 6 in the 2024 Draft SEIS would negatively affect migratory bird species (black brant, emperor geese, cackling geese) that are key subsistence resources for its community and in turn cause severe and irreparable harm to its members and to others in the region. These Tribes and Tribal organizations urged the Department to consider the impacts upon their members and to further explore non-road alternatives such as a marine ferry.

[97] *Hanlon v. Barton*, 740 F. Supp at 1453, citing *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987).
[98] *Id.*, 740 F. Supp at 1454.
[99] *Id.*, 740 F. Supp at 1455.
[100] Removal of National Environmental Policy Act Implementing Regulations, 90 FR 10,610 (Feb. 25, 2025).
[101] 2013 EIS, Appendix D, ANILCA Section 810 Analysis of Subsistence Impacts, at p. D-11.
[102] 2024 Draft SEIS, Appendix D-2.
[103] 2024 Draft SEIS, Appendix D-2 at pp. 1, 6, 52.
[104] 2024 Draft SEIS, Appendix D-2, Section 2.5.4. at pp. 38–40 and Section 2.6.4 at pp. 49–52.

### 6.2.4 2025 Preliminary ANILCA Section 810 Analysis

Once the Proposed Land Exchange was developed in 2025, the Service undertook a new evaluation under ANILCA Section 810 for the Proposed Land Exchange. The evaluation of the effects of the Proposed Land Exchange included five villages associated with subsistence use of the proposed project area: King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point. These are the five communities with federally recognized customary and traditional or subsistence uses for key subsistence species in Game Management Unit 9D, which includes the Cold Bay area. When evaluating the cumulative effects of the Proposed Land Exchange, communities were also considered that are outside the immediate area but within the flyway of migratory birds—specifically, the Pacific black brant and the Bering Sea endemic emperor goose—because the Service recognizes that communities in other regions of Alaska, such as the Yukon-Kuskokwim Delta, rely on these resources for subsistence use. Findings for the direct/indirect case and the cumulative case are summarized in Section 5.3 above and explained in detail in the ANILCA Section 810 analysis, attached as Appendix B.

### 6.2.5 Notice and Hearings

On August 4, 2025, the Service provided the preliminary ANILCA Section 810 analysis and a notice of hearings to stakeholders in the vicinity of the area for which the Service preliminarily determined the Proposed Land Exchange may significantly restrict subsistence uses, including King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point. The Service also notified the State of Alaska, the Kodiak/Aleutians Regional Advisory Councils, the Bristol Bay Regional Advisory Council, and the Native Village of Hooper Bay of its ANILCA Section 810 analysis findings on August 4, 2025. Hearing dates, times, and locations were as follows:

King Cove: Monday, August 18, 6 p.m.
*Hearing Facility*: Agdaagux Tribal Center, 303 Squirrel Rd, King Cove, Alaska

Cold Bay: Wednesday, August 20, 7 p.m.
*Hearing Facility:* Cold Bay Lodge, 1000 Dias Ave, Cold Bay, Alaska

Virtual Hearing (For the Communities of Sand Point, Nelson Lagoon, and False Pass): Thursday, August 21, 6 p.m.
*Zoom Meeting*

### 6.2.6 Summary of Comments on 2025 Preliminary ANILCA Section 810 Analysis

The Service received oral testimony at the hearings and written materials which are summarized below:

- Access concerns: Residents of King Cove emphasized that subsistence is essential for survival, culture, and health, and that they have needed to rely more heavily on subsistence recently, yet access to resources such as birds, caribou, fish, and berries has been increasingly restricted while hunters from outside the local communities retain opportunities in Cold Bay. They described this inequity as discriminatory and a violation of Indigenous rights, noting that safe, reliable road access is critical for both subsistence and medical emergencies. While some worry about weakening wilderness protections, many believe a carefully managed road corridor could balance conservation with sustaining subsistence practices. They urged that the 2025 land exchange decision recognize subsistence as a matter of survival, equity, and human rights, while ensuring long-term protection of resources for future generations.
- Abundance and availability concerns: Residents stressed that while the availability and abundance of subsistence resources around Izembek and Cold Bay has not been much of a concern, accessing subsistence areas has become increasingly difficult due to water crossings and closed or poorly maintained roads, leaving some families without key subsistence foods. Black brant numbers have been especially high recently, but the Service continues to put restrictions on harvest. However, one

commenter stated that caribou has become scarce in the last year, which is a concern to residents. The commenters emphasized cultural values that support continued availability and abundance of resources, such as taking only what is needed, sharing with others, and protecting resources for future generations, in contrast to outside sport hunters. Commenters acknowledged conservation concerns but noted that decades of road use and military use in the area have not resulted in lasting harm to wildlife or habitats.

- Migratory birds and waterfowl: Commenters emphasized that migratory waterfowl such as Pacific black brant, emperor geese, and cackling geese are critical to subsistence, culture, and food security, not only for Cold Bay and King Cove but for Yukon-Kuskokwim Delta communities where most of these species breed and are harvested. Nearly the entire world population of black brant and emperor geese depends on Izembek Lagoon's eelgrass beds, meaning any habitat loss or disturbance has population-level consequences. Residents stressed that past military use and road activity have not diminished brant use of the area. With emperor goose hunting already closed statewide and Pacific black brant under new restrictions, further stress on these species would directly harm subsistence users who have already limited their harvests to protect bird populations. Commenters criticized the Service for downplaying impacts in the 2025 preliminary ANILCA Section 810 analysis, despite earlier findings that the project "may significantly restrict" bird harvests, particularly in Yukon-Kuskokwim Delta communities. They feel that the Tier 2 requirement to demonstrate necessity, minimum land use, and mitigation cannot be met.
- Change in finding: Commenters objected that the 2025 preliminary ANILCA Section 810 analysis differs from the findings in the 2024 preliminary ANILCA Section 810 analysis for the 2024 Draft SEIS that the project "may significantly restrict" subsistence uses from reduced bird abundance in the Yukon-Kuskokwim Delta communities. They argue the 2025 analysis fails to explain this change despite greater expected impacts from a road with no non-commercial use limits and fewer mitigation measures, and that all available evidence still points to significant restrictions for Yukon-Kuskokwim Delta communities.
- Methodology: Commenters criticized the Service's new quantitative approach for ranking subsistence impacts, arguing it oversimplifies and misrepresents traditional practices. They stated that measuring importance by number of users or dietary percentage overlooks cultural and seasonal significance, noting that species like black brant and emperor geese provide critical fat in spring even if they are not a large portion of the overall diet.
- General concerns: A road would fragment habitat, alter hydrology, and cause long-term ecological harm, especially to species like Pacific black brant that are vital for subsistence across Alaska. Testimony highlighted the cumulative impacts of habitat loss, migration disruption, and increased hunting access, and questioned why the Service reversed its 2024 finding that a road may significantly restrict subsistence uses despite removing prior mitigation measures. Testimony emphasized that Izembek Lagoon's eelgrass beds are globally significant for wildlife and carbon storage, and that Congress designated Izembek Refuge as wilderness precisely to protect these values.
- Yukon-Kuskokwim Delta impacts: Commenters argued that the preliminary ANILCA Section 810 analysis improperly limits review to only five local communities, excluding the Yukon-Kuskokwim Delta, Norton Sound, and other regions that also rely on migratory birds from Izembek Refuge. They emphasized that species like Pacific black brant and emperor geese are essential for food, culture, and community well-being, particularly as salmon declines and climate change intensify subsistence crises. They noted that the Service's own prior findings identified permanent habitat loss and population-level effects on these birds, meaning the road would cause long-term harm. Yukon-Kuskokwim Delta communities will not benefit from increased access and will only experience the reduced abundance, making them more likely—rather than less—to experience a significant restriction in subsistence uses.

- Caribou, fish, and bear impacts: The road will not have an impact on caribou, fish, or bear populations because federal regulations already protect them and the populations are habituated to human structures, including roads.

### 6.2.7 2025 ANILCA Section 810 Tier 2 Determinations

As described above, the Service determined that the Proposed Land Exchange, in combination with other past, present, and reasonably foreseeable future actions and climate change, may significantly restrict subsistence uses. Set forth in the 2025 Final ANILCA Section 810 Report (Appendix B) are the Tier 2 determinations under the requirements of ANILCA Section 810(a)(3)(A), (B), and (C):

A. that such a significant restriction of subsistence use is necessary, consistent with sound management principles for the utilization of the public lands,

B. that the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other such disposition, and

C. that reasonable steps will be taken to minimize adverse impacts to subsistence uses and resources resulting from such actions.

### 6.2.8 Findings and Conclusions

After review, I find the 2024 preliminary Tier 1 findings to be overly broad for Alternative 6; that is, it found that there may be a significant restriction when, properly evaluated, it should not have. The criteria used in the 2024 preliminary findings to determine whether the proposed action "may significantly restrict" was simply whether there would be *any* reduction in the abundance of harvestable resources or *any* reduction in the availability of resources used for subsistence or legal or physical limitations on access of subsistence users to harvestable resources. I also note that the preliminary 2024 finding that Alternative 6 may significantly restrict subsistence uses did not consider whether there would be any beneficial impacts to the abundance or availability or access to subsistence resources as a result of the additional acres that would be conveyed to, or retained by, the United States.

In 2025, as referenced above, the Service determined that the Proposed Land Exchange in conjunction with past, present, and reasonably likely future actions (the cumulative case) "may significantly restrict subsistence uses" for the five communities in the vicinity of the Proposed Land Exchange and held three public hearings and consulted with affected Tribes and Tribal organizations. While the Service evaluated whether there would be a substantial reduction in the opportunity to use subsistence resources caused by large reductions in resource abundance, a major redistribution of resources, extensive interference with access, or major increases in the use of those resources by non-subsistence users, I disagree with the assumptions about the past, present, and reasonably foreseeable future actions that supported the determination.

Therefore, I find that the record provides, at most, marginal support for the finding that the Proposed Land Exchange, in conjunction with past, present, and reasonably likely future actions (the cumulative case) "may significantly restrict subsistence uses" for the five communities in the vicinity of the Proposed Land Exchange. However, I find, under the statutory standard for Tier 1,[105] that the cumulative case of the Proposed Land Exchange, to the extent the cumulative case is even required, *would not* significantly restrict subsistence uses.

Because I find that the Proposed Land Exchange *would not* result in a significant restriction on subsistence uses, no additional steps are necessary under Section 810 for the Proposed Land Exchange. In particular, the determinations under Section 810(a)(3) are not necessary. In the event a reviewing court

[105] *Ctr. for Biological Diversity*, 141 F.4th at 1004-5 ("would significantly restrict subsistence uses"), citing *Kunaknana*, 742 F.2d at 1151.

were to disagree, particularly in light of caselaw suggesting a lower threshold under Tier 1, I have also reviewed and concur with the Section 810(a)(3) determinations made by the Service.

## 6.3 Endangered Species Act Section 7 Consultation

Before taking any action, the Department is required to review its proposed action, which, in this matter, is the Proposed Land Exchange, and determine whether ESA consultation is required. Although the proposed land exchange agreement and the conveyances and relinquishment of selection rights do not authorize any ground-disturbing activities and are not anticipated to have any effect on listed species or critical habitat by themselves, recognizing that a purpose of the exchange is to provide a road corridor and considering the likelihood of such a road being completed, the Service consulted on the construction and operation of the proposed road as well as on the land exchange. However, it is important to acknowledge that road construction, if any, cannot proceed until a proposed project navigates a variety of hurdles, including land conveyances, funding, planning, an application for road construction, federal and state approvals, and permitting approvals. The Service's Biological Opinion, NMFS' Letter of Concurrence, and this Decision do not limit any federal agency from appropriately considering the effect of the action on listed species and critical habitat in the future if they are asked to authorize, fund, or carry out a discretionary action.

### 6.3.1 Formal ESA Consultation with the Service

The Service initiated formal consultation with Ecological Services under Section 7 of the ESA with submittal of a Biological Assessment on June 30, 2025. Subsequently, the proposed action was updated to reflect that the United States will acquire all of the KCC Exchange Lands, which is not expected to negatively impact listed species. The Section 7 consultation with Ecological Services concluded with a Biological Opinion issued on October 14, 2025.

After reviewing the current status of the species and critical habitat, the environmental baseline in the action area, the effects of the proposed action, and the cumulative effects, the Service's biological opinion is that the proposed action is not likely to jeopardize the continued existence of the Alaska-breeding Steller's eider or the southwest distinct population segment (DPS) of the northern sea otter, and is not likely to result in the destruction or adverse modification of critical habitat of the Alaska-breeding Steller's eider or the southwest DPS of northern sea otter.

The Service determined the proposed action will not result in incidental take of Alaska-breeding Steller's eider or southwest DPS northern sea otters. Consequently, there are no prescribed Reasonable and Prudent Measures or implementing Terms and Conditions. The Service did provide a series of discretionary Conservation Measures.

### 6.3.2 Informal ESA Consultation with NMFS

The Service requested informal consultation with NMFS under Section 7(a)(2) of the ESA[106] on July 1, 2025. The Service's informal consultation document requested written concurrence that the proposed action may affect, but is not likely to adversely affect, the endangered blue whale (*Balaenoptera musculus*), endangered fin whale (*Balaenoptera physalus*), endangered Western North Pacific, Central America, or threatened Mexico DPS humpback whale (*Megaptera novaeangliae*) or their critical habitats, endangered North Pacific right whale (*Eubalaena japonica*) or its critical habitat, endangered sperm whale (*Physeter macrocephalus*), endangered Western North Pacific DPS gray whale (*Eschrichtius robustus*), endangered sei whale (*Balaenoptera borealis*), endangered Eastern North Pacific Southern Resident killer whale (*Orcinus orca*) or its critical habitat, endangered Cook Inlet beluga whale (*Delphinapterus leucas*) or its critical habitat, or endangered Western DPS Steller sea lion (*Eumetopias jubatus*) or its critical habitat. In addition, the Service requested a discretionary conference on the

[106] 16 U.S.C. § 1536.

sunflower sea star (88 FR 16212, March 16, 2023) in the consultation and requested concurrence with a may affect, but not likely to adversely affect determination.

NMFS requested more information about the project via email on July 7 and 9, 2025. On July 18, 2025, the Service provided NMFS with additional information regarding the proposed mitigation measures. NMFS initiated informal consultation on July 18, 2025. The Service met with NMFS to discuss the scope of the proposed action and provided an update to NMFS via email on July 28, 2025, with a modification to the originally proposed action. The modification removed placement of fill in marine waters for expansion of two construction-related barge landing sites at the Northeast Terminal and Cross Wind Cove from the proposed action because KCC determined that the existing hovercraft ramps would be sufficient for use as temporary barge landing sites.

Informal consultation concluded with a letter of concurrence issued by the NMFS to the Service on August 7, 2025 (Reference No. AKRO-2025-01895). The letter of concurrence included additional mitigation measures which are identified in Section 3.3. Based on the information provided to NMFS, and additional literature cited in the letter of concurrence, NMFS concurred with the Service's findings. This consultation only covers the land exchange and the barge traffic that will overlap with ESA-listed species and their critical habitat.

## 6.4 Essential Fish Habitat Consultation

The Service initiated EFH consultation with NMFS pursuant to the Magnuson-Stevens Fishery Conservation and Management Act of 1972, as amended by the Sustainable Fisheries Act of 1996,[107] with submittal of an EFH Assessment on July 1, 2025. The EFH regulations define an adverse effect as "any impact that reduces the quality and/or quantity of EFH"[108] The Service's EFH Assessment concluded that the proposed project activity, including the land exchange and road corridor, may adversely affect EFH in the project area.

NMFS provided a written response on July 10, 2025 (Reference No. AKRO-2025-01915) agreeing with the Service's conclusion of effects with implementation of additional conservation recommendations to minimize the potential adverse effects. The Service provided a written response to NMFS's conservation recommendations on July 25, 2025. Where the Service's response was inconsistent with NMFS's recommendations, the Service explained the reasons and/or justification for the modified measures. with justification for revisions to some of the measures. NMFS issued a response letter to the Service on August 13, 2025 (Reference No. AKRO-2025-01915) supporting the Services' revised conservation measures and considering EFH consultation complete. The final conservation measures are adopted herein (see Section 3.3) and included as a part of the proposed land exchange agreement.

## 6.5 Tribal Consultation/ANCSA Corporation Consultation

Consultations with KCC, the Agadaagux Tribe, the Native Village of Belkofski, and their invited representatives regarding a new proposed land exchange agreement commenced in May 2025 and occurred regularly through the finalization of this Decision.

## 6.6 Co-Management and Interagency Cooperation

The Service prioritizes improving cooperation and knowledge-sharing as a part of the management of the Izembek Refuge and the proposed land exchange agreement commits, in good faith, to negotiating an agreement to ensure that the Agdaagux Tribe, the Native Village of Belkofski, and KCC's expertise, traditional Indigenous knowledge, and cultural and spiritual interests are meaningfully integrated into the stewardship of these ancestral homelands.

[107] 16 U.S.C § 1801 *et seq*.
[108] 50 CFR § 600.810(a).

Additionally, this commitment respects Tribal trust and ensures that decisions are made in collaboration with the local Tribal governments through a government-to-government relationship. The exchange enables more effective management and alignment with the social and economic well-being of Tribal citizens.

### 6.6.1 Alaska Migratory Bird Co-Management Council

The Alaska Migratory Bird Co-Management Council (AMBCC), formed in 2000, consists of the Service, the Alaska Department of Fish and Game, and representatives of Alaska's Native population. AMBCC is designed for direct involvement by Alaska Native peoples and other qualified individuals living and subsisting in many remote communities in Alaska. The AMBCC's primary purpose is to conserve migratory birds through development of recommendations for the subsistence spring/summer harvest in Alaska. Subsistence regulations were first published in 2003. The AMBCC will be critical to assist in future mitigation and educational efforts.

## 6.7 National Historic Preservation Act Section 106 Consultation

The Service has a responsibility to consider the effects of an undertaking on historic properties, which are properties listed on or eligible for listing on the National Register of Historic Places. The undertaking consists of the land exchange, and the consultation conducted pursuant to Section 106 of the National Historic Preservation Act[109] for this undertaking does not include any future action or use of the exchanged lands nor consideration of effects to historic properties resulting from future use or development.

The Service has determined that the undertaking has the potential to adversely affect historic properties since Service lands would transfer out of federal ownership. The Service has consulted with the Alaska State Historic Preservation Officer pursuant to the regulations implementing Section 106 of the National Historic Preservation Act[110] and proposes to resolve the undertaking's adverse effects to historic properties through: 1) Identifying segments of a World War II road between Cold Bay and King Cove, and 2) conducting a cultural resource survey on approximately 500 acres of lands within the KCC Exchange Lands. A memorandum of agreement between the Service and Alaska State Historic Preservation Officer has been executed to document the mitigation stipulations to resolve the adverse effects of the undertaking on historic properties.

The Service notified the Advisory Council on Historic Preservation of its adverse effect determination pursuant to Section 106 and its implementing regulations,[111] and the Advisory Council on Historic Preservation chose not to participate in the consultation.

The Service has also consulted with the Agadaagux Tribe, Native Village of Belkofski, KCC, City of King Cove, Aleut Corporation, and interested members of the public.

## 6.8 Executive Order 11988 – Floodplain Management

Executive Order 11988, concerning the protection of floodplains, requires federal agencies to lead and take action to reduce the risk of flood loss; to minimize the impact of floods on human safety, health, and welfare; and to restore and preserve the natural and beneficial values served by floodplains in carrying out its responsibilities for acquiring, managing, and disposing of federal lands. This requires agencies to evaluate the potential effects of actions it may take in a floodplain. This determination is made using a Department of Housing and Urban Development floodplain map or a more detailed map of an area, if available. If such maps are not available, the agency shall make a determination of the location of the floodplain based on the best available information. When property in floodplains is proposed for lease,

[109] 54 U.S.C. § 306108.
[110] 36 CFR § 800.
[111] 36 CFR § 800.6 (a)(1).

easement, right-of-way, or disposal to non-federal public or private parties, the federal agency shall (1) reference in the conveyance those uses that are restricted under identified federal, state, or local floodplain regulations; and (2) attach other appropriate restrictions to the uses of properties by the grantee or purchaser and any successors, except where prohibited by law; or (3) withhold such properties from conveyance.

No direct effects to floodplains have been identified that would result from the land exchange itself.

## 6.9 Executive Order 11990 – Protection of Wetlands

Executive Order 11990, concerning the protection of wetlands, requires that the Bureau of Land Management consider factors relevant to the proposal's effect on the survival and quality of wetlands. Factors to be considered include the following:

1. Public health, safety, and welfare, including water supply, quality, recharge and discharge, pollution, flood and storm hazards, and sediment and erosion;
2. Maintenance of natural systems, including conservation and long-term productivity of existing flora and fauna, species and habitat diversity and stability, hydrologic utility, fish, wildlife, timber, and food and fiber resources; and
3. Other uses of wetlands in the public interest, including recreation, scientific, and cultural uses.

Furthermore, the agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds:

1. There is no practicable alternative to such construction; and
2. The proposed action includes all practicable measures to minimize harm to wetlands which may result from such use. In making this finding the head of the agency may take into account economic, environmental, and other pertinent factors.

No direct effects on wetland resources have been identified that would result from the proposed land exchange itself. The wetland functions and values, as described in the affected environment section (Chapter 3) of the 2024 Draft SEIS, would remain the same before and after the proposed land exchange. Wetlands, regardless of ownership, are protected by the Clean Water Act.

As noted above, the road corridor has been selected in part to minimize effects to streams, ponds, and wetlands, and construction of a road is expected to require subsequent permitting under the USACE regulatory program, pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899. Compliance with Executive Order 11990 will be undertaken at these subsequent stages through consideration of all practicable alternatives and mitigation measures to ensure that harm to wetland functions and values is minimized.

## 6.10 National Wildlife Refuge System Improvement Act

In reaching my decision, I have not made the determination identified in the 2024 Draft SEIS as being required by the provisions of the National Wildlife Refuge System Improvement Act of 1997[112] (Improvement Act), which amended the National Wildlife Refuge System Administration Act of 1966[113] (Administration Act) (collectively the Refuge Act). Among other things, the Improvement Act added a mission statement that establishes a policy of wildlife conservation as the primary purpose of the Refuge

[112] Pub. L. No. 105-57, 111 Stat. 1252 (1997) (codified at 16 U.S.C. §§ 668dd-ee).
[113] Pub. L. No. 89-669, 80 Stat. 926 (1966).

System.[114] I disagree with the provision in the 2024 Draft SEIS that states that the land exchange must further the missions of the Izembek Refuge and the Refuge System.[115]

In ANILCA, Congress authorized the Secretary, "consistent with other applicable law in order to carry out the purposes of [ANILCA]," the authority to execute land exchanges.[116] Where ANILCA and the Refuge Act do not conflict, both authorities apply concurrently. However, in the event a conflict exists between ANILCA and Refuge Act, Section 9 of the Improvement Act states that ANILCA prevails.[117] The conservation mission set forth in the Improvement Act is in conflict with Section 1302(h) of ANILCA. ANILCA Section 1302(h) governs the administration of Refuge System lands in Alaska, allowing the Secretary to enter into land exchanges with Native Corporations if the purposes of ANILCA are satisfied. These purposes are broader than the mission of the Izembek Refuge and the mission of the Refuge System, as discussed above. Based on my determination that the approximately 490 acres of lands within the exterior boundary of the Izembek Refuge proposed for conveyance to KCC are suitable for disposition pursuant to ANILCA, and that the Proposed Land Exchange furthers the purposes of ANILCA, I have determined that a conflict exists between ANILCA and the requirements of the Improvement Act.

## 6.11 Wilderness Act

Under the Wilderness Act, Congress designates "wilderness areas" that are to be "administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness[.]"[118] This includes making wilderness areas accessible to people "devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use."[119] The Wilderness Act prohibits permanent roads within a wilderness area.[120] However, this Decision to enter into the Proposed Land Exchange will result in the conveyance of the U.S. Exchange Lands to KCC and out of the Izembek Wilderness.[121]

There are approximately 308,000 acres of refuge lands that are within the Izembek Wilderness. The proposed exchange would convey approximately 336 acres of Izembek Wilderness out of federal ownership (approximately 1/10 of one percent of the total). In exchange, KCC will convey approximately 1,739 acres of land that will subsequently be managed as part of the Izembek Wilderness and relinquish its selection rights to approximately 5,430 acres of lands, that are currently managed as part of the Izembek Wilderness. The KCC Exchange lands and KCC-selected lands have similar wilderness characteristics as the U.S. Exchange Lands.

The 1,739 acres of KCC Exchange Lands to be acquired by the United States, located inside the Izembek Wilderness Unit boundary, will be added to the Izembek Wilderness Unit as part of the Izembek Refuge by operation of ANILCA Section 103(c).[122] This exchange is expected to result in a net increase of 1,403 acres of Izembek Wilderness. The resulting approximately 309,403 acres will be managed as wilderness. Additionally, the 5,430 acres of lands that KCC has selected within Izembek Wilderness are prioritized

[114] 16 U.S.C. § 668dd(a)(3)(A).
[115] The previous Solicitor acknowledged that land exchanges in Alaska are different in M-Opinion 37078 (currently under a suspension review).
[116] See 2024 Draft SEIS at pp. 1-8 to 1-9.
[117] Pub. L. No. 105-97, § 9(b), 111 Stat. 1252 (1997) (statutory construction note regarding 16 U.S.C. § 668dd with respect to Alaska.
[118] 16 U.S.C. § 1131(a).
[119] 16 U.S.C. § 1131(b).
[120] 16 U.S.C. § 1133(c).
[121] Additionally, the exchange authority in Section 1302(h) is specifically granted "[n]otwithstanding any other provision of law." 16 U.S.C. § 3192(h).
[122] 16 U.S.C. § 3170(b).

such that they are highly likely to be conveyed to KCC, and no longer part of the Wilderness unit, if the proposed land exchange agreement is not approved.

If the proposed road is constructed and operated, there will be some additional impacts on the wilderness characteristics of the adjoining areas that remain wilderness. However, those impacts will be limited because any road will be constrained to a single-lane gravel road and associated material sites are largely associated only with the construction of the road.

## 6.12 ANILCA Title XI

Title XI of ANILCA provides a process for obtaining federal authorizations associated with a "transportation or utility system" (TUS), which includes roads, when any portion of the proposed route is located on public lands within any conservation system unit, national recreation area, or national conservation area in Alaska.[123] Pursuant to Section 1104 of ANILCA, each applicant for a TUS must file a single consolidated application with each appropriate federal agency having jurisdiction to grant any authorization without which the system cannot be established or operated.[124] All appropriate federal agencies are required to work together to jointly process the TUS application.[125] The Department does not have a pending application for a TUS before it.

[123] *See* 16 U.S.C. §§ 3161-73.
[124] 16 U.S.C. § 3164.
[125] *Id.*

## 7 FINAL AGENCY ACTION

For the reasons set forth above, I hereby decide to enter into an equal value exchange agreement with KCC under Section 1302(h) of ANILCA as set out in Appendix A. My decision constitutes the final decision of the Department.

Approved by:

Doug Burgum
Secretary of the Interior

October 21, 2025
Date

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| NATIVE VILLAGE OF HOOPER BAY, et al.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; et al.,<br><br>Defendants - Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant,<br><br>STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant-Appellant. | Case Nos. 26-6485, 26-6479<br><br>Case No. 3:25-cv-00316-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants - Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant, | Case Nos. 26-6487, 26-6481<br><br>Case No. 3:25-cv-00318-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |

STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,

Intervenor-Defendant-Appellant.

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants-Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant,<br><br>STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant - Appellant. | Case Nos. 26-6490, 26-6484<br><br>Case No. 3:25-cv-00319-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |

**DECLARATION OF CHANTAE KOCHUTEN**

Under penalty of perjury I, Chantae Kochuten, state and declare the following:

1. My name is Chantae Kochuten. I am the Chief Executive Officer (CEO) of the King Cove Native Corporation, (hereinafter KCC). I was voted CEO by the KCC board in February 2024. I have served as CEO of KCC since then.

2. KCC is an Alaska Native Village Corporation formed pursuant to the Alaska Native Claims Settlement Act of 1971 (hereinafter ANCSA). KCC is the village corporation for the Aleut people of the King Cove area of the Aleutians East Region which is located near the end of the Alaska Peninsula.

3. ANCSA required that every certified Alaska Native village by the Bureau of Indian Affairs organize as a "for profit" or nonprofit corporation under Alaska State law and that each original shareholder receive 100 shares of stock. KCC was formed under Alaska law on September 12, 1972, as a for profit corporation.

4. Each original shareholder received 100 shares of stock. Only original shareholders, like my grandparents and their family members and descendants can hold stock except in specific circumstances. So KCC is essentially a closely held corporation with its duties directly related to the good of its almost entirely Aleut/King Cove shareholders.

5. In 1990, the United States issued patent 50-90-0653 to KCC that included a conveyance of lands within the boundaries of the Izembek Refuge within sections 6, 7, 8 and 17 of Township 57 south, Range 87 west, which were identified in the patent as lands within the Izembek National Wildlife Refuge. KCC's land entitlement consisted of three townships, totaling 69,320 acres in the core township and other lands around King Cove.

6. Although KCC is a for-profit corporation, its mission extends far beyond business. Our responsibility is to the people who own this corporation: the Aleut families of King Cove and their descendants. Every share represents a connection to this community, its history, and its future. For generations, our people have endured isolation, dangerous travel conditions, and barriers to accessing essential services. One of KCC's highest priorities is providing safe, reliable, and affordable access between King Cove and the Cold Bay Airport, Alaska's fourth-longest paved, all-weather runway. For our shareholders, this is not a matter of convenience, it is a matter of safety, opportunity, and dignity.

7. As CEO of KCC, I am responsible for protecting and advancing the interests of our shareholders. In October 2025, with the full authorization and support of the KCC Board of Directors, I executed a land exchange agreement with the Department of the Interior. Through this agreement, KCC agreed to relinquish a portion of its ancestral lands in exchange for an 18.9-mile transportation corridor connecting King Cove and Cold Bay (the majority of which is on exchange land). This was not a decision made lightly. The land involved carries cultural, historical, and personal significance for our people. We agreed to the exchange because we believe it offered a long-awaited solution to a transportation crisis that has affected our community for decades.

8. KCC's management and our shareholders remain unwavering in our commitment to this land exchange. The Court's August 18, 2026, decision vacating the exchange was devastating to many in our community. For decades, our people have waited, negotiated, compromised, and sacrificed in pursuit of a reliable transportation link. Many shareholders believed we were finally moving toward a solution. The decision has left many feeling discouraged, unheard, and once again forced to watch a critical opportunity slip away.

9. As I understand it, the Court's decision to vacate the Land Exchange did not impact the approximately 2.8-mile portion of the proposed road that is currently being constructed. This section of the road is located entirely on KCC-owned land conveyed under ANCSA and does not affect wetlands (hereinafter "KCC Private Land").

10. The 2.8-mile road segment currently being constructed on the KCC private land is deeply important to our shareholders and the people of King Cove. It will improve access to traditional subsistence areas that have sustained our people for generations. It will also consolidate ATV traffic to a single route within land that already belongs to KCC and its shareholders. These lands were conveyed to us pursuant to ANCSA and have been part of our homeland for generations. The people opposing this project do not live on these lands, do not depend on them for their survival, and do not bear the daily hardships faced by the people of King Cove.

11. A major purpose of the 2.8-mile road being constructed on KCC's private land is to improve access to subsistence resources and to consolidate All Terrain Vehicle (ATV) traffic on that road.

12. As I understand it, the remaining 16.1 miles could be constructed in the 2027 construction season if the litigation were completed and if sufficient effort and money were made available to do so. This would make a tremendous difference to the people of King Cove for the following reasons:

13. First and foremost, this road would save lives. For decades, the people of King Cove have lived with the knowledge that a medical emergency can quickly become a tragedy because of geography and weather. When a loved one suffers a heart attack, stroke, traumatic injury, pregnancy complication, or other serious medical condition, there is often no dependable way to reach advanced medical care. Every family in King Cove understands this reality. Every family has worried whether a parent, spouse, child, or friend would survive long enough to reach help. The road offers a solution that generations of residents have hoped for and fought for.

14. There were 217 medevacs from King Cove between December 2013 and October 2025, including 32 by the U.S. Coast Guard because commercial medevac carriers determined that it was too dangerous to fly into King Cove. Behind each evacuation is a human being, a family, and a community holding its breath. Each Coast Guard evacuation costs more than $50,000.

15. There have been many occasions when residents needed medical care, but weather conditions prevented timely travel. There are those who do not make annual hospital or other medical visits because of fear of flying from King Cove. This prevents folks from catching medical problems early when doing so saves lives.

16. Although fishing boats can occasionally transport emergency patients across the 14 miles of open ocean between King Cove and Cold Bay during favorable summer weather, that option becomes perilous and often impossible during much of the year. Today, many vessel owners decline to carry passengers due to insurance and liability concerns, leaving residents with even fewer options when a medical emergency strikes. During the fall and winter, powerful winds routinely generate waves exceeding eight feet, forcing vessels to turn back and leaving residents cut off from urgently needed medical care.

17. Even when a boat successfully reaches the Cold Bay dock, the journey is far from over. Patients must often climb a steep ladder rising as much as twenty feet from the vessel to the dock in order to continue on to emergency transportation bound for the airport. For patients who are seriously injured, gravely ill, unconscious, or otherwise fully incapacitated, that climb may be impossible. There is no safe or reliable means of transferring such patients from the vessel to the dock when they cannot ascend under their own power. In these circumstances, geography, weather, and infrastructure combine to create a barrier to medical care that can place lives in immediate jeopardy. No community should be forced to depend on a fishing vessel battling dangerous seas and a physically demanding dock transfer as its primary means of accessing life-saving emergency treatment. In these emergencies, every minute matters. Yet residents of King Cove may be required to cross a storm-tossed sea and then confront a dock transfer that some patients are physically incapable of making. For the unconscious, severely injured, elderly, or medically fragile, there is simply no safe path forward. When weather prevents air service and marine transport becomes hazardous, the consequences are not measured in inconvenience, but in human lives.

18. Elders, expectant mothers, and those suffering from serious illness are often forced to endure dangerous and uncertain journeys. Even when travel by boat to Cold Bay is possible, passengers may still be required to climb a twenty-foot ladder to reach the dock before continuing to the Cold Bay Airport. For elderly residents, small children, those with disabilities, and individuals experiencing medical emergencies, this is not only difficult, but it can also be frightening and dangerous.

19. Time is not an abstract concern for our community. In King Cove, the onset of fall weather is a very real and predictable constraint. By late fall, deteriorating weather conditions frequently make air travel unreliable and create significant logistical barriers to the movement of workers, equipment, and materials. Once these conditions set in, the opportunity to carry out construction work can be severely diminished or lost altogether. Given our short and weather-dependent construction season, each delay materially reduces the time available to complete critical work. An expedited decision is therefore necessary to preserve the remaining construction window and avoid the risk that another season of progress will be lost.

20. The continued delay or permanent loss of a road connection between King Cove and Cold Bay would have profound consequences for KCC shareholders and the broader King Cove community. It would maintain a barrier that has separated families, limited opportunities, and restricted access to resources and services available elsewhere. Most Americans can get into a vehicle and drive to visit loved ones, access medical services, or reach transportation hubs. The people of King Cove do not have that same opportunity. The road represents more than transportation. It represents connection, self-determination, and the ability to participate more fully in everyday life alongside our neighbors in Cold Bay. Delay or loss of a road connecting King Cove to Cold Bay would be a continuing barrier to more communication between the citizens of King Cove and KCC shareholders with Cold Bay.

21. I am Aleut. The lands at issue in this case are not merely parcels on a map to me or to the shareholders I represent. They are part of our identity, our history, and our survival as a people. Based on traditional knowledge passed down through generations and local knowledge shared within our community, my ancestors occupied and used these lands for subsistence hunting, fishing, gathering, and travel for thousands of years. They established trails and subsistence cabins connecting King Cove and Cold Bay long before the United States "bought" Alaska from Russia in 1867; before the refuge was a military base and artillery range during World War II; before it was designated as a Wildlife Range in 1960; before KCC received its land entitlement under ANCSA in the 1970's, before cabins along the trails between

King Cove and Cold Bay were destroyed in the 1970's, and before it was designated as a National Wildlife Refuge and Wilderness by ANILCA in 1980 that split King Cove from Cold Bay. Those historic connections to the land have never disappeared. Our people continue to depend on them today.

22. Many other Aleut people who were born and raised in King Cove share these feelings. We have spent decades watching decisions about our homeland be made by people who do not live here and who do not experience the consequences of those decisions. We continue to hope that the land exchange and road project will finally reconnect portions of our ancestral homeland and provide opportunities for future generations that have been denied to us for far too long.

23. Congress enacted ANCSA with the understanding that Alaska Native people should have meaningful participation in decisions affecting their lands, rights, and futures. Section 2 of ANSCA provides that Alaska Native land claims should conform "with the real economic and social needs of Natives and "with maximum participation by Natives in decisions affecting their rights and property," Yet the decades-long delays surrounding the King Cove-Cold Bay connection have left many shareholders feeling their voices, concerns, and lived experiences have been repeatedly set aside and ultimately the goals of ANCSA from being fully achieved.

24. ANILCA Section 101 (b) makes protection of subsistence resources a purpose of ANILCA and ANILCA Section 101 (c) makes "provid[ing] the opportunity for rural residents engaged in a subsistence way of life to continue to do so" a purpose of ANILCA.

25. Article 7 of the United Nations Declaration on the Rights of Indigenous Peoples states, "Indigenous peoples have the collective right to live in freedom, peace and security as distinct peoples."

26. For generations, the people of King Cove have asked for a safe and reliable road connection to Cold Bay. This request is not motivated by convenience. It is motivated by the desire to protect human life, preserve our subsistence way of life, strengthen our communities, and maintain our connection to our ancestral homelands. The people of King Cove have waited decades for a solution that most communities would consider basic infrastructure. The impacts of continued delays are felt not in policy papers or court filings, but in the daily lives of our elders, families, and children. I respectfully submit this declaration so that the Court understands what is truly at stake for the people I serve and for the community I call home.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted on this 5th day of October 2026.

Chantae Kochuten, CEO of King Cove Corporation

Steven W. Silver AK Bar # 7606089
Robertson, Monagle, and
Eastaugh, PC 1810 Samuel Morse
Drive
Suite 202
Reston VA 20191
(703) 527-4414
(703) 313-1793 (fax)
ssilver628@aol.com

James F. Clark, III AK Bar # 6907025
Law Office of James F.
Clark 1109 C Street
Juneau, AK 99801
(907) 586-0122
(907) 586-1093 (fax)
jfclarkiii@gmail.
com
Attorneys for Defendant—Intervenors

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, THE WILDERNESS SOCIETY, WILDERNESS WATCH, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, NATIONAL WILDLIFE REFUGE ASSOCIATION, ALASKA WILDERNESS LEAGUE and SIERRA CLUB<br><br>Plaintiffs,<br><br>v.<br><br>RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the INTERIOR, U.S. DEPARTMENT OF THE INTERIOR, AND U.S.FISH AND WILDLIFE SERVICE<br><br>Defendants, | **Case No 3:18-cv 00029-TMB**<br><br>**EXHIBIT C**<br><br>**DECLARATION OF ETTA KUZAKIN** |

KING COVE NATIVE CORPORATION, )
AGDAAGUX TRIBE, NATIVE VILLAGE )
OF BELKOFSKI, ALEUTIANS EAST )
BOROUGH, CITY OF KING COVE, and )
CITY OF COLD BAY )
)
Proposed Defendant-Intervenors )

**DECLARATION OF ETTA KUZAKIN**

Under penalty of perjury. I, Etta Kuzakin, state, and declare the following:

1. My name is Etta Kuzakin. I am a lifelong resident of King Cove. My parents and grandparents are also lifelong residents of King Cove.

2. There are two tribes in King Cove certified by the Department of Interior, the Agdaagux Tribe and the Native Village of Belkofski. Both are tribes made up of Aleuts and both have ancestral, historical, and archaeological ties to the Izembek Refuge area. Our tribal members have hunted, fished, and subsisted in the Izembek area for thousands of years. Our ties to the area of the land exchange that is the subject of this case is longtime and eternal.

3. I am also a shareholder in the King Cove Corporation, but my declaration deals with my duties and responsibility as President of my tribe, the Agdaagux. My principal duty is to look out for the welfare of the 772 tribal members. This is a legal requirement under federal tribal law, and I take this responsibility very seriously.

4. The most important issue to the Agdaagux and Belkofski tribal members is the health and safety of their families, friends, and themselves. That is why our tribe's top priority is to work with the KCC and the Department of Interior to accomplish this land exchange which is the subject of this litigation. The Land Exchange is the first step in the process toward constructing

an all-weather road between King Cove and Cold Bay to allow emergency medevacs to Anchorage for treatment during periods of bad weather in the region.

5. There is not a member of my tribe who has not been personally affected by the unsafe travel situation between King Cove and the Cold Bay airport. My own personal experience is a case in point. In 2013, I was pregnant with my third child Sunnie Rae when I went into premature labor at thirty five weeks. Normally, I would leave to go to Anchorage to deliver Sunnie Rae about 6 weeks before my delivery date, but my labor began before then.

6. Our local clinic cannot deliver babies. We have no doctor on permanent staff. Since this was an emergency, there is no neonatal care in King Cove. So, I needed an emergency medical evacuation, a medevac. The weather on that date was too bad for a normal emergency medevac. No private medevac carrier could get into King Cove by air to pick me up.

7. Luckily for me and my unborn Sunnie Rae, a US Coast Guard helicopter from Kodiak was nearby on another mission. At the extreme risk to the US Coast Guard personnel, they were able to pick me up while hovering in extreme wind conditions which prevented a safe landing and I was able to deliver my baby in Anchorage. However, before this successful rescue mission, I was asked to choose that if emergency conditions required a choice, whether I or my unborn Sunnie Rae should be the one of us to survive. I chose Sunnie Rae, but that awful situation never came to happen.

8. While this may be an extreme example, this is not that unusual. Many of my tribal members have similar stories either about themselves and family or friends. Many of these members are afraid to fly from the gravel strip which is the King Cove airstrip. It is so dangerous because it is located in a mountainous valley with extreme wind conditions that closes the daylight only airport up to 30 percent of the time.

9. This land exchange begins the process. After the decision of then Secretary of Interior Jewell to reject a prior land exchange proposal in 2013, the Agdaagux and our supporters in King Cove have continued to work for this solution.

10. Specifically, KCC and the members of the King Cove/Cold Bay Group including the Aleutians Borough, the City of King Cove, the Agdaagux Tribe and the Native Village of Belkofski all have the same goal which is health and safety for our people and which is facilitated by this land exchange. While our ultimate goal is the establishment of a road between King Cove and the Cold Bay Airport, KCC owns the land that will facilitate this exchange. KCC knows that the road itself will require additional permitting and unfortunately a possible lawsuit to be filed then by the same Plaintiffs that have filed this lawsuit. But the process must begin with this exchange.

11. So, my goal as tribal President is to achieve a safe, affordable solution for my tribal members, other tribal members of the Belkofski tribe and other residents of King Cove. That can only happen if this land exchange can be completed. My tribal members understand that this exchange, if successfully completed, is just the first step in a long process. But to succeed, the Agdaagux and Belkofski tribes need to be Defendant-Intervenors in this case. While KCC land ownership is critical to the eventual solution to my tribal members' needs are the most important thing to me.

12. While the government and the Agdaagux Tribe are both interested in defending the land exchange, the Agdaagux Tribe's interest in protecting the interests of its tribal members are far more extensive and not the same as the federal government in this case.

Respectfully Submitted the 10 th day of April, 2018

Etta Kuzakin

Etta Kuzakin

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| NATIVE VILLAGE OF HOOPER BAY, et al.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; et al.,<br><br>Defendants - Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant,<br><br>STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant-Appellant. | Case Nos. 26-6485, 26-6479<br><br>Case No. 3:25-cv-00316-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants - Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant, | Case Nos. 26-6487, 26-6481<br><br>Case No. 3:25-cv-00318-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |

| | |
|---|---|
| STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant-Appellant. | |
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants-Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant,<br><br>STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant - Appellant. | Case Nos. 26-6490, 26-6484<br><br>Case No. 3:25-cv-00319-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |

## DECLARATION

I, David H. Lowell, declare as follows:

1. I am employed by the State of Alaska, Department of Transportation and Public Facilities ("DOT&PF"), as the Construction Engineer for the Southcoast Region. I oversee DOT&PF's construction administration for the King Cove to Cold Bay Road project ("Project"). In that role, I am responsible for ensuring that construction complies with the contract documents, approved construction limits, environmental commitments, and applicable permit conditions.

2. I make this declaration based on my personal knowledge, my responsibilities for construction administration, and my review of the Project's construction information and proposed schedule. The production figures below are planning estimates for the

construction approach described here. I could competently testify to these matters if called upon to do so.

3. The construction objective addressed here is a continuous frontier road connecting the existing roadway on the King Cove side with the existing roadway on the Cold Bay side. A pioneer road is an initial roadway embankment with a compacted running surface, before placement of the final aggregate surfacing. A continuous connection also requires the necessary bridge and drainage crossings. Completion of a frontier road would be an intermediate construction milestone; additional work would remain before completion of the full Project.

4. For the 2027 scheduling scenario, the remaining roadway is the full Project alignment less the 2.8 miles being constructed during the 2026 season on King Cove Corporation lands. Using the currently described approximately 18.9-mile Project segment, that leaves approximately 16.1 miles, or about 85,000 linear feet, to connect with the existing roadway on the Cold Bay end. This scenario assumes completion of the 2.8-mile segment during the current season.

5. The litigation affects the schedule before construction begins. DOT&PF cannot award the construction contract for the remaining roadway while unresolved litigation leaves uncertainty about whether the contracted work can proceed. A delay in resolving that uncertainty therefore delays the contract-award process and the steps needed to place the contractor, equipment, and materials at the site.

6. The contracting process requires time for bid solicitation and preparation, receipt and evaluation of bids, verification of pricing and bid validity, and completion of award and contract-execution requirements. Required performance and payment bonds must be secured. Preparing bid documents or receiving bids does not itself place an executed construction contract in effect. These steps must be reflected in the schedule, including any work that can be completed before a court decision and the steps that must follow it.

7. The contractor must also secure barge space and other transportation for the equipment and materials needed at this remote location. Those arrangements depend on available vessels, loading slots, and transport schedules. A delayed award can affect access to a sailing and can postpone delivery beyond the length of the award delay itself. The schedule cannot assume that all required transportation will be available immediately when the contract is ready.

8. Inbound mobilization includes assembling and preparing equipment and materials, transporting them to the departure point, loading, marine transportation, unloading, and moving them to the work areas. The contractor must then establish the equipment and support needed for sustained production. The roadway production estimates in this

declaration begin after the resources needed for that production are available on site. They do not include these mobilization activities.

9. The seasonal planning window extends from approximately April 1 through November 15, 2027. That window is an outer limit for planning, not a representation that full roadway production can begin immediately upon a court decision. Any contract award and mobilization activities still outstanding when the window opens consume part of it. The schedule must also leave time for required stabilization, material-site reclamation, and equipment demobilization before winter.

10. The corridor is exposed to strong winds, precipitation, snow, and icing. Those conditions affect visibility, equipment operation, hauling, and the placement and compaction of roadway material. Shorter winter daylight requires additional lighting for outdoor work. Frozen or excessively wet material and unsuitable ground conditions can interrupt production or require additional handling. These constraints increase costs and safety risks and reduce the amount of roadway that can be completed in a shift.

11. The Project requires stabilization of disturbed soils as part of its stormwater controls. Stabilization must follow the progress of construction, including on completed slopes and other disturbed areas. Areas remaining through winter must have the temporary or final stabilization and erosion controls required for seasonal shutdown. The arrival of freezing weather does not itself satisfy the need to protect disturbed ground against erosion and runoff.

12. Where the stabilization or reclamation plan relies on vegetation, the schedule must allow time for soil preparation, seeding, and establishment of protective growth while seasonal conditions remain suitable. Placing seed near the end of the construction season cannot be assumed to produce established vegetation before winter. Those areas therefore need an earlier grading and planting milestone, or other authorized stabilization measures sufficient to protect them until vegetation becomes established.

13. The Project also requires reclamation of material sites. As extraction is completed in an area, the schedule must provide for the required final shaping, drainage, surface treatment, and stabilization. The last areas used to supply roadway material cannot receive their final reclamation treatment until the relevant extraction and handling activities are finished. Where a site remains in use for a later phase, the schedule must provide the required interim stabilization and protection. This work requires crews and equipment and must be coordinated with their departure from the region.

14. Equipment demobilization is also constrained by the season. Barge transportation serving this work ceases in November because of extreme weather. Equipment scheduled for removal must therefore be released from construction and reclamation, prepared for

transport, and delivered to the loading location in time for an available fall sailing. A schedule cannot rely on obtaining winter barge transportation if that sailing is missed. Missing the transportation window can require equipment to remain in the region through winter, with added holding and protection costs.

15. The accelerated production estimate assumes a roadway section using geotextile fabric over the existing tundra and approximately three feet of suitable embankment material, placed and compacted to form the pioneer road. The estimate depends on using that approach where ground conditions and the approved design allow it. It does not include substantial removal and replacement of unsuitable material beneath the roadway. If that excavation is required, the production estimate and completion schedule would need to be revised.

16. For preliminary planning, I estimate that approximately 300 linear feet of pioneer-road embankment can be constructed during one productive shift using the approach described above. A productive shift means a shift in which the necessary crew, equipment, and suitable material are available and conditions permit that work. This estimate should not be treated as a guaranteed average for every calendar day.

17. At approximately 300 linear feet per productive shift, the remaining approximately 16.1 miles represent about 284 productive shifts of embankment work. For scheduling purposes, I use approximately 300 productive shifts as a rounded preliminary allowance. This allowance excludes the time needed for contract award, inbound mobilization, and work outside the embankment operation. It does not establish the duration of the entire construction effort.

18. Two comparably productive shifts per day would provide approximately 600 linear feet of embankment production per productive workday. The simple length calculation would require about 142 such workdays; the rounded 300-shift allowance would require approximately 150 productive workdays. Achieving that output requires enough staffing, equipment, material production, hauling, and support for both shifts, including work at night. It cannot be achieved merely by extending the hours of one crew.

19. There are 229 calendar days from April 1 through November 15, 2027. The preliminary allowance of 150 productive workdays leaves only 79 calendar days for all other time that cannot overlap that production. Outstanding award and mobilization activities must be accounted for within the remaining calendar, along with weather interruptions, maintenance, crossing work, and seasonal closeout. If award and mobilization follow an April 1 decision, fewer than 229 days would remain for work on site. Those activities cannot be omitted by treating the decision date as the first day of full production.

20. The bridge and required stream and drainage crossings must be ready when needed to support a continuous connection. Embankment production alone therefore does not establish the date on which the pioneer road could be used from end to end. The construction sequence must account for delivery and installation of those structures and any restrictions on the timing of that work.

21. A continuous pioneer connection in 2027 would require the award, mobilization, embankment production, crossing work, and seasonal closeout to fit within one coordinated schedule. Resolving the litigation promptly would allow DOT&PF to advance the award and mobilization sequence and preserve the greatest remaining opportunity to achieve that milestone. The approximately 150 productive workdays for embankment construction alone do not establish that a decision on April 1 would leave enough time to complete every required activity that season. Completion of the finished road would require additional work.

22. A delayed decision can postpone contract award and access to transportation capacity before any additional roadway is built. Once the field season begins, that delay also reduces the time available before seasonal closeout. Loss of 30 days that could otherwise support two productive shifts per day would represent approximately 18,000 linear feet of forgone embankment production at the estimated rate. Additional shifts cannot extend the growing season or the availability of fall barge transportation. Work that cannot be completed and appropriately stabilized before seasonal shutdown would have to continue in a later construction season.

23. From a construction scheduling perspective, a decision is needed no later than April 1, 2027, so that unresolved litigation does not continue to prevent contract award as the seasonal window opens. An earlier decision would provide additional time to complete award and mobilization activities before that window. A decision by April 1 would address the litigation-related uncertainty; it would not eliminate the time needed to award and execute the contract, mobilize, construct the remaining connection, stabilize disturbed ground, reclaim completed material-site areas, and remove equipment before winter transportation becomes unavailable. Further delay increases the risk that the remaining work will extend into a later construction season.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 5, 2026, at Juneau, Alaska.

David Lowell Digitally signed by David Lowell
Date: 2026.10.05 17:06:08 -08'00'

David H. Lowell
Construction Engineer
Southcoast Region
Alaska Department of Transportation and Public Facilities

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| NATIVE VILLAGE OF HOOPER BAY, et al.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; et al.,<br><br>Defendants - Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant,<br><br>STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,<br><br>Intervenor-Defendant-Appellant. | Case Nos. 26-6485, 26-6479<br><br>Case No. 3:25-cv-00316-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants - Appellants,<br><br>KING COVE CORPORATION,<br><br>Defendant-Appellant, | Case Nos. 26-6487, 26-6481<br><br>Case No. 3:25-cv-00318-SLG<br>District of Alaska, Anchorage<br>Sharon L. Gleason<br>Chief District Judge |

STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,

Intervenor-Defendant-Appellant.

DEFENDERS OF WILDLIFE,

Plaintiff - Appellee,

v.

DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, et al.,

Defendants-Appellants,

KING COVE CORPORATION,

Defendant-Appellant,

STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILITIES,

Intervenor-Defendant - Appellant.

Case Nos. 26-6490, 26-6484

Case No. 3:25-cv-00319-SLG
District of Alaska, Anchorage
Sharon L. Gleason
Chief District Judge

**AFFIDAVIT OF LAURA WOLFF**

STATE OF ALASKA )
) ss.
JUDICIAL DISTRICT )

Laura Wolff, being duly sworn, states as follows:

1. I am the Assistant Attorney General assigned to the above-captioned matter and I have personal knowledge of the matters stated in this affidavit.

2. Per Rule 27-1(2), I reached out to opposing counsel in the three cases below yesterday morning (October 5), asking if they oppose the expedited schedule discussed in this joint motion and asking if they opposed consolidation of the appeals. Because the joint motion seeks expedited relief, I conveyed that we intended to file on October 6.

3. The attorney for Trustees promptly responded on behalf of all the Appellees that they would respond to the joint motion within the time allotted under the rules.

Laura Wolff

SUBSCRIBED AND SWORN TO before me this 6th day of October, 2026.

ANGELA J. HOBBS
NOTARY PUBLIC
STATE OF ALASKA
MY COMMISSION EXPIRES WITH OFFICE

Notary Public in and for Alaska
My Commission Expires: with office