**Nos. 26-6479, 26-6481, 26-6484, 26-6485, 26-6487, 26-6490, 26-6551, 26-6554, 26-6570, 26-6997, 26-7055**

**IN THE U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT**

NATIVE VILLAGE OF HOOPER BAY, et al.,
*Plaintiffs – Appellees*, *Cross-Appellants*.

FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,
*Plaintiffs – Appellees, Cross-Appellants*.

DEFENDERS OF WILDLIFE; et al.,
*Plaintiffs – Appellees*, and

v.

DOUG BURGUM; et al.,
*Appellants-Defendants*,

KING COVE CORPORATION, an Alaska Native Village Corporation,
*Appellants-Defendants*,

STATE OF ALASKA DEPARTMENT OF TRANSPORTATION & PUBLIC FACILIITES,
*Appellant- Intervenor*.

On appeal from the U.S. District Court for the District of Alaska, Anchorage
3:25-cv-00316, 3:25-cv-00318, 3:25-cv-00319 (Hon. Sharon L. Gleason)

# STATE OF ALASKA'S FIRST BRIEF ON CROSS-APPEAL

Laura Wolff
Assistant Attorney General
Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK 99501
(907) 269-6612
laura.wolff@alaska.gov

*Attorney for Intervenor-Appellant*
STATE OF ALASKA

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 2

ISSUES PRESENTED .......... 2

PERTINENT AUTHORITIES .......... 4

STATEMENT OF THE CASE .......... 5

I. Congress divided Alaska's lands among three principal owners and expected land to move among them. .......... 5

II. Congress anticipated that lands would leave conservation system units, and it provided that non-federal lands within unit boundaries are not part of those units. .......... 7

III. Congress gave the Secretary different tools to cure the access problem for inholdings. .......... 9

IV. For decades, political shifts and the slow grind of litigation have prevented the community of King Cove from gaining its right of access. .......... 15

V. In 2025, the Secretary entered into a land exchange agreement with King Cove Corporation and these suits followed. .......... 15

SUMMARY OF THE ARGUMENT .......... 16

STANDARD OF REVIEW .......... 17

ARGUMENT .......... 18

I. ANILCA's structure and history confirm that Title XI does not apply to land exchange decisions. .......... 18

II. ANILCA's Alaska-specific land exchange provision overrides any conflicting directives from the generally applicable nationwide Refuge Act and Wilderness Act. .......... 23

A. Section 1302(h) governs Alaska-specific land exchanges and displaces any conflicting land exchange provision in the Refuge Act. .......... 25

B. The Secretary's land exchange authority is not limited by the substantive management provisions in the Refuge and Wilderness Acts. 28

1. The land exchange provision only works if federal land conveyed does not continue to be managed as a refuge. 29

2. The land exchange provision only works if federal land conveyed does not continue to be managed as a wilderness. 33

III. Vacatur of the land exchange is inappropriate. 36

CONCLUSION 38

STATEMENT OF RELATED CASES 39

CERTIFICATE OF SERVICE 39

CERTIFICATE OF COMPLIANCE

APPENDIX

# TABLE OF AUTHORITIES

## Cases

*Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118 (9th Cir. 1997) ........ 38

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ........ 25

*City of Angoon v. Hodel (Angoon II)*, 803 F.2d 1016 (9th Cir. 1986) ........ 35

*City of Angoon v. Marsh (Angoon I)*, 749 F.2d 1413 (9th Cir. 1984) ........ 32, 34

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976 (9th Cir. 2025) ........ 37, 38

*Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 443 (9th Cir. 2022) ........ 18

*Galaza v. Mayorkas*, 61 F.4th 669 (9th Cir. 2023) ........ 25

*Grand Canyon Tr. v. Bureau of Reclamation*, 691 F.3d 1008 (9th Cir. 2012) ........ 37

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550 (9th Cir. 2016) ........ 25

*Montana Wilderness Ass'n, Nine Quarter Circle Ranch v. U. S. Forest Serv.*, 655 F.2d 951 (9th Cir. 1981) ........ 13

*Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100 (9th Cir. 2020) ........ 28

*Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096 (10th Cir. 2010) ........ 38

*Sturgeon v. Frost*, 587 U.S. 28 (2019) ........ *passim*

## Federal Statutes

5 U.S.C. § 706(2) ........ 17

16 U.S.C. § 668dd(b)(3)(A) ........ 3, 26, 27

16 U.S.C. § 1131(c) ........ 33, 34, 35

16 U.S.C. § 1133(c) ....................................................................................33, 34
16 U.S.C. § 3101(d) ......................................................................................6, 30
16 U.S.C. § 3102 ........................................................................................20, 21
16 U.S.C. § 3103(b) ........................................................................................7, 9
16 U.S.C. § 3103(c) (ANILCA, § 103(c)) ..............................................*passim*
16 U.S.C. § 3161 ...............................................................................14, 16, 18, 20
16 U.S.C. § 3162 ...........................................................................14, 16, 18, 20, 21
16 U.S.C. § 3164 ........................................................................................14, 20
16 U.S.C. § 3166 ...............................................................................................14
16 U.S.C. § 3170(b) (ANILCA, § 1110(b))....................................10, 12, 13, 14, 15
16 U.S.C. § 3192 (ANILCA, § 1302) ..................................................*passim*
16 U.S.C. § 3210 (ANILCA, § 1323).................................................................10, 12
28 U.S.C. § 1291 ..................................................................................................2
28 U.S.C. § 1331 ..................................................................................................2
43 U.S.C. § 1601 ..........................................................................................5, 32, 34
43 U.S.C. § 1603 ................................................................................................32
43 U.S.C. § 1605 ...........................................................................................5, 32
43 U.S.C. § 1616(d)(2)...........................................................................................5
43 U.S.C. § 1621(f) (ANCSA, § 22(f)) ..............................................6, 8, 11, 34
43 U.S.C. § 1635(o) (ANILCA, § 906(o))..............................................*passim*
ANILCA, Pub. L. No. 96-487, 94 Stat. 2371 (1980) ..................................*passim*
National Wildlife Refuge System Administrative Act of 1966, Pub. L. 89-669.....27
National Wildlife Refuge System Improvement Act, Pub. L. 105-57, (1997), 111 Stat 1252 ..........................................................................27
Pub. L. 100-395 (1988), 102 Stat. 981...............................................................35

**Federal Regulations**

43 C.F.R. § 36.10 ...............................................................................................15

**Legislative History**

125 Cong. Rec. 11158 (1979) ....................7

Hearing Before the Senate Energy & Natural Resources Committee, 95th Cong., (Aug. 3, 1978). ....................23

H. Rep. No. 95-1045, Part I (1978) ....................9, 10

H. Rep. No. 96-97, Part I (1979) ....................8, 24, 34

H.R. 39, 95th Cong. ....................9, 10, 12

S. Rep. No. 95-1300 (1978) ....................14

S. Rep. No. 96-413 (1979) ....................12, 13

**Court Rules**

Fed. R. App. P. 4(a)(1)(B) ....................2

# INTRODUCTION

When Congress set aside vast swaths of land in Alaska as federally protected conservation system units, it knew that the boundaries of those units would include millions of acres of State, Native, and private land. And it knew that the non-federal owners would need access to and from their lands. Congress therefore entrusted the Secretary with different tools to provide access to non-federal landowners. The Secretary used one of them here. The Secretary exchanged a narrow corridor of federal land for highly valuable King Cove Corporation land. The conveyance of federal land provided KCC with access to its otherwise isolated community. And the acquisition of KCC land added over 1,700 acres to the Izembek Refuge.

The district court framed this land exchange as a circumvention of congressional intent. It's not. Using ANILCA's land exchange provision to open up isolated inholdings is a feature of the law, not a bug.

The district court's errors stem from ignoring this feature. Land exchanges allow the Secretary to cure access issues for owners of inholdings. And because the exchanged land is no longer federal public land, it does not implicate Title XI or other laws applicable to public land.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the plaintiffs' claims arose under the Administrative Procedure Act, ANILCA, the Refuge Act, the National Environmental Policy Act, the Endangered Species Act, and the Wilderness Act. 1-ER-14. The district court issued a final judgment in each of the three cases on appeal on August 19, 2026. 1-ER-91–93. The State of Alaska timely appealed on September 29, 2026. 4-ER-618–19, 4-ER-638–39, 4-ER-655–66; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. *Title XI.* Title XI of ANILCA governs authorizations for transportation systems whose route "will be within" a conservation system unit. Did the district court err in holding that the Secretary had to comply with Title XI before exchanging Refuge lands under § 1302(h), when the exchange conveyed those lands out of the Refuge and did not itself authorize a road?

2. *Section 1302(h)'s notwithstanding clause.* ANILCA authorizes the Secretary to exchange lands, including lands within conservation system units, "notwithstanding any other provision of law." 16 U.S.C. § 3192(h).

   a. *Refuge Act's land exchange provision.* The Refuge Act permits the exchange of refuge lands the Secretary finds "suitable for disposition." 16 U.S.C.

§ 668dd(b)(3)(A). The Secretary found that the lands were suitable for disposition pursuant to ANILCA. 2-ER-149. He determined that incorporating the refuge's narrow mission into his determination would conflict with the broader purposes of ANILCA. 2-ER-148–49. Did the district court err in holding that the Secretary failed to make the required "suitable for disposition" determination under the Refuge Act? Or, does ANILCA's land exchange provision override the Refuge Act's potentially conflicting land exchange provision?

b. *Refuge Act's management directives*. The district court did not reach the plaintiffs' claim that the exchange violates the Refuge Act because the conveyed lands would not further the Refuge's purposes. In the exchange, the United States received about 1,739 acres, and King Cove Corporation relinquished its selection rights to about 5,430 more. 2-ER-110. Should this Court resolve this purely legal question and hold that § 1302(h) authorized the exchange regardless of whether the conveyance of 490 acres of refuge land furthers the Refuge's purposes?

c. *Wilderness Act*. The district court also did not reach the plaintiffs' Wilderness Act claim. Should this Court resolve that purely legal question and hold that the Wilderness Act does not bar the Secretary from conveying

wilderness lands under § 1302(h) because the recipient intends to build a road on them?

3. *Remedy*. The district court vacated the exchange on the premise that every defect it found was incurable and that, under Title XI, the exchange had no "force or effect." 1-ER-87. If Title XI does not apply and if the Secretary made no error in its suitability determination, the remaining defects under the Endangered Species Act will be cured and mooted by a superseding Biological Opinion that accounts for a calculation error and an incidental take statement. Even if this Court concludes that the Secretary failed to make a Refuge Act suitability determination, that too can be cured on remand. Is vacatur of the land exchange no longer equitable?

## PERTINENT AUTHORITIES

This brief does not duplicate pertinent authorities in the United States' opening brief. The appendix to this brief includes relevant legislative history.

## STATEMENT OF THE CASE

### I. Congress divided Alaska's lands among three principal owners and expected land to move among them.

Alaska's patchwork of land ownership begins with statehood. Before statehood, the federal government owned nearly all the Alaska territory's 365 million acres. *Sturgeon v. Frost*, 587 U.S. 28, 33 (2019). The Statehood Act authorized the newly formed State to select 103 million acres of land, giving it a tax base, state-owned resources, and the opportunity for economic development. *Id.* at 34. As the State began to claim land, Alaska Natives—whose ancestors had lived in Alaska for millennia—asserted conflicting aboriginal title. *Id.* at 35.

Congress resolved those claims in 1971 in the Alaska Native Claims Settlement Act. 43 U.S.C. § 1601 *et seq.* ANCSA extinguished all aboriginal claims in exchange for providing newly created Alaska Native Corporations with approximately $960 million and 40 million acres of land. 43 U.S.C. §§ 1605, 1610–15. Like the Statehood Act, ANCSA used land grants to provide economic and social benefits for Native Corporations (and their Native shareholders). *Id.* § 1601(b). ANCSA also directed the Secretary to withdraw up to 80 million acres for federal preservation. *Id.* § 1616(d)(2).

Congress anticipated that the resulting patchwork would need adjustment. It authorized exchanges among the United States, the State, and Alaska Native Corporations "for the purpose of effecting land consolidations or to facilitate the

management or development of the land, or for other public purposes." *Id.* § 1621(f) (ANCSA, § 22(f)).

The Secretary selected lands for federal preservation, but Congress did not ratify them, as ANCSA required. *Sturgeon*, 587 U.S. at 35. In response to congressional inaction, President Carter used a different law to designate millions of acres as national monuments, a move many Alaskans opposed. *Id.* at 35–36.

In 1980, Congress passed the Alaska National Interest Lands Conservation Act to settle the land ownership conflict between the State, Native Corporations, and the federal government. *Id.* at 36, 58. ANILCA balanced two, sometimes conflicting goals: to "provid[e] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska" and to "provid[e] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." *Id.* at 36 (citing 16 U.S.C. § 3101(d)).

To advance the first goal, Congress set aside millions of acres of federally owned land for preservation purposes. *Sturgeon*, 587 U.S. at 36. These lands—encompassing new and expanded parks, preserves, refuges, and monuments—are collectively called conservation system units. *Id.* at 36–37. The Izembek National Wildlife Refuge is one such CSU. Through ANILCA, Congress redefined the previously designated Izembek National Wildlife Range as the Izembek National

Wildlife Refuge and designated much of the Refuge as Wilderness. ANILCA, Pub. L. No. 96-487, §§ 303(3)(A), 702(6), 94 Stat. 2371 (1980).

Alaska's CSUs differ from parks elsewhere in a critical way. Their boundaries follow "topographic or natural features," rather than enclosing only federally owned lands. *Sturgeon,* 587 U.S. at 37 (quoting, 16 U.S.C. § 3103(b)). As a result, Alaska's CSUs encompass more than 18 million acres of state, Native, and private land. *Id.* at 38. These 18 million acres of non-federal land are known as inholdings and are surrounded by federally protected lands. *Id.*

## II. Congress anticipated that lands would leave conservation system units, and it provided that non-federal lands within unit boundaries are not part of those units.

To advance ANILCA's second goal, Congress protected the status of non-federal lands within CSU boundaries. Section 103(c) provides that "[o]nly those lands within the boundaries of any conservation system unit which are public lands . . . shall be deemed to be included as a portion of such unit." 16 U.S.C. § 3103(c). Put differently, just because Congress drew boundaries around inholdings, "does not in any way change the status of that State, native, or private land or make it subject to any of the laws or regulations that pertain to U.S. public lands." 125 Cong. Rec. 11158 (1979) (App'x 1) (Representative Seiberling explaining to the House the amendment that became § 103(c)); *see also Sturgeon*, 587 U.S. at 54 (citing same).

Section 103(c) speaks to the future as well as the present. 16 U.S.C. § 3103(c). It applies to lands conveyed "to the State, to any Native Corporation, or to any private party" "before, on, or after" ANILCA's enactment. *Id.* Those lands are not subject to the "regulations applicable solely to public lands within such units." *Id.* And the flow runs both ways—lands the Secretary acquires from the State, a Native Corporation, or another owner "shall become part of the unit." *Id.* Section 906(o) likewise proves that lands within CSU boundaries that are conveyed to the State and Native corporations *in the future* do not remain part of CSUs and are no longer "administered in accordance with the laws applicable to such unit." ANILCA, Pub. L. 96-487 § 906(o) (1980), 94 Stat. 2371 (codified at 43 U.S.C. § 1635(o)).

Because Congress expected land to continue changing hands, it included in ANILCA land exchange authority like the one in ANCSA. 16 U.S.C. § 3192(h). Section 1302(h) was "[m]odelled on section 22(f) of the Alaska Native Claims Settlement Act." H. Rep. No. 96-97, Part I, at 246 (1979) (App'x 13). It is "intended to provide the Secretary with great flexibility in acquiring lands by permitting him to enter into exchanges. This flexibility extends to making exchanges within conservation system units." *Id.*

Nor were the outer boundaries of CSUs set in stone. Congress drew initial boundaries of CSUs, generally following natural features and topographic divides.

16 U.S.C. § 3103(b). But Congress also authorized the Secretary to make "minor boundary adjustments" by increasing or decreasing a CSU by less than 23,000 acres. *Id.* § 3103(b). This authority could be used "to avoid unnecessary conflicts with State selection interests and Native and other private lands." H. Rep. No. 95-1045, Part I, at 219–20 (1978) (App'x 10–11) (explaining the 95th Congress's H.R. 39's § 1210 regarding maps and boundaries, which was amended and moved into ANILCA's § 103(b)).[1]

In short, ANILCA set aside millions of acres in Alaska for conservation purposes, while simultaneously establishing a framework to safeguard the current and future property rights of non-federal landowners within CSU boundaries.

### III. Congress gave the Secretary different tools to cure the access problem for inholdings.

Congress knew that drawing CSU boundaries around millions of acres of State and Native land would leave those lands isolated, and it gave the Secretary two alternative tools to provide access to the newly isolated inholdings. First, the Secretary could engage in a land exchange pursuant to § 1302(h). 16 U.S.C. § 3192(h)(1). With a land exchange, the owner of the inholding could either gain

---

[1] Congress called an adjustment of less than 23,000 acres "minor." 16 U.S.C. § 3103(b). For perspective, the 2025 Land Exchange at issue here conveyed less than 500 acres of public land in exchange for acquiring nearly 2,000 acres of KCC-owned land and over 5,000 acres of lands KCC selected and is entitled to under ANCSA. 2-ER-210.

title to land adjacent to its inholding and create its own means of access over its now non-federal land. Or the owner of the inholding could trade its inholding for title to land that did not have an access problem. Second, the Secretary could grant non-federal owners an easement for access across federal land. *See* ANILCA, §§ 1110(b), 1323(b) (codified at 16 U.S.C. §§ 3170(b), 3210(b)).

When discussing H.R. 39, the bill that became ANILCA, the House Committee on Interior and Insular Affairs similarly described these alternatives to cure the access problem for inholdings: land exchanges and easements across federal lands. H. Rep. No. 95-1045, part I, at 210–13 (1978) (App'x 6–9). Initially, these alternatives were both housed next to each other in the Title called "Administrative Provisions." H.R. 39, 95th Cong. § 1201 ("Land Acquisition and Exchanges"), § 1202 ("Access") (1977) (App'x 20–25).

In the section of its report explaining "Land Acquisitions and Exchanges," the Committee on Interior and Insular Affairs "recognize[d] that many of the units will contain State and Native inholdings." H. Rep. No. 95-1045, part I, at 211 (1978) (App'x 7). To resolve such issues, the Committee anticipated that the Secretary would use his authority "to make exchanges of lands."[2] *Id.* The

---

[2] The Committee noted that the Secretary would use his authority under "Title XI" and "section 1201(f)." Title XI in this version of the bill is the precursor to ANILCA's Title XII, which promotes voluntary, cooperative land management

Committee noted that the "'exchange' portion of the general 'acquisition' provision [was m]odelled on section 22(f) of the Alaska Native Claims Settlement Act." *Id.* at 211–12 (App'x 7–8). The Committee explained that the land exchange provision provides the Secretary with "great flexibility in acquiring lands, by permitting him to enter into exchanges"—that "flexibility extends to making exchanges of land within conservation system units." *Id.* at 212 (App'x 8). The Committee expected—but did not statutorily mandate—that this "great flexibility" would not be used "to undermine the essential integrity of any conservation system unit or to frustrate the purpose of any such unit." *Id.* The Committee noted that this authority could be used to swap lands with a Native Corporation when both the conveyed and acquired lands were within the boundaries of a CSU. *Id.*

Alternatively, the Committee contemplated that owners of inholdings would be provided access to, within, and across CSUs without changing the federal land ownership structure. In describing the section labeled "Access," the Committee again discussed the problems for current and future owners of inholdings that are "effectively surrounded" by public lands within one or more CSUs. *Id*. The Committee explained how its access provisions should be "liberally construed in favor of those seeking access." *Id.* at 213 (App'x 9).

---

and set up a federal-state council for that purpose. And § 1201(f) is the earlier version of the land exchange provision now codified at 16 U.S.C. § 3192(h).

H.R. 39, as modified by the Committee on Interior and Insular Affairs, passed the House in May 1979 and was referred to the Senate Committee on Energy and Natural Resources. S. Rep. No. 96-413, at 134 (1979) (App'x 117). That Committee amended and reorganized the bill, but the substance of these two provisions remained intact.

In the final version of the bill that became ANILCA, the Secretary maintained broad and flexible land exchange authority to acquire lands for the purpose of ANILCA. ANILCA, Pub. L. 96-487, § 1302(h) (1980) (codified at 16 U.S.C. § 3192(h)). But unlike earlier versions of the bill, Congress made sure that the Secretary had this authority "[n]otwithstanding any other provision of law." *Compare* H.R. 39, 95th Cong., § 1201(e) (App'x 22–23), *with* 16 U.S.C. § 3192(h). And if the Secretary chose not to use the land exchange process to resolve access issues, the Secretary was required to provide an inholding owner with "adequate and feasible access" across federal lands so the owner could use the land "for economic and other purposes." ANILCA, § 1110(b); 16 U.S.C. § 3170(b).

The Senate Committee on Energy and Natural Resources added one other access provision, § 1323, that complements § 1110(b). ANILCA, Pub. L. 96-487, § 1323 (1980) (codified at 16 U.S.C. § 3210). Whereas § 1110(b) guarantees owners of inholdings "such rights as may be necessary to assure adequate and

feasible access for economic and other purposes," § 1323 guarantees owners of inholdings access that the Secretary of Interior or Agriculture deem "adequate to secure to the owner the reasonable use and enjoyment" of the land. 16 U.S.C. §§ 3170(b), 3210; *see* S. Rep. No. 96-413, at 310 (1979) (App'x 18) (explaining that the Committee added this provision to abrogate a then recent court decision and clarify that an inholding owner's right of access across public lands is guaranteed, even across wilderness). And whereas § 1110(b) applies only in Alaska, § 1323 applies nationwide. *Montana Wilderness Ass'n, Nine Quarter Circle Ranch v. U. S. Forest Serv.*, 655 F.2d 951, 955 (9th Cir. 1981) (concluding the access provision applies nationwide).

In sum, recognizing that millions of acres of State and Alaska Native Corporation lands were surrounded by federal land within CSUs, Congress gave the Secretary two tools to provide non-federal landowners legitimate access to their lands: the Secretary could authorize access across federal lands or the Secretary could engage in land exchanges. From the perspective of owners of inholdings, they have these same two options to resolve access issues. If they have land within the boundaries of a CSU, they can negotiate with the Secretary for a land exchange. *See* 16 U.S.C. § 3192(h)(1). Or they can seek an easement by invoking their right to adequate and feasible access to their lands for economic and other purposes. 16 U.S.C. § 3170(b).

* * *

In Title XI, Congress created a framework for approving transportation and utility systems in and across CSUs. *See* 16 U.S.C. §§ 3162(4), 3164. Congress understood that Alaska would need transportation and utility systems, but it could not foresee where such systems would be needed. *See* S. Rep. No. 95-1300, at 205 (1978) (App'x 15) (discussing how transportation corridors could not yet be designated with any degree of certainty because the "location, timing, type and magnitude of resource development is unknown, market destinations for the produced resources are unknown," and because technology in resources and transportation could change). As such, Congress provided a streamlined, uniform procedure for approving or disapproving transportation and utility systems that will be built through CSUs. 16 U.S.C. §§ 3161, 3164.

Congress provided more protection for wilderness, requiring presidential and congressional approval of systems going through these areas. *Id.* § 3166(b)–(c). For instance, if a company wanted to construct a telecommunication system from point A to point B, it would either have to route the line around wilderness or gain presidential and congressional approval to go through it. *See id.*

Congress treated access to inholdings differently. 16 U.S.C. § 3170(b). Section 1110(b) provides that "[n]otwithstanding any other provisions of this Act or other law," non-federal owners whose land is within or effectively surrounded

by CSUs "shall be given by the Secretary such rights as may be necessary to assure adequate and feasible access for economic and other purposes." 16 U.S.C. § 3170(b); *see also* 43 C.F.R. § 36.10 (requiring issuance of an access permit when adequate and feasible access does not otherwise exist). That guaranteed right of adequate and feasible access across any CSU does not depend on presidential or congressional approval. *See id.*

KCC, like other inholding owners, has two alternative options for access: a land exchange or an easement. Had KCC decided not enter into a land exchange agreement, it could have gone through § 1110(b), within Title XI, and received an easement. Such an easement would not require presidential and congressional approval. However, KCC choose to enter into a land exchange agreement, an option that is separate from and exists notwithstanding Title XI's access provision.

### IV. For decades, political shifts and the slow grind of litigation have prevented the community of King Cove from gaining its right of access.

Because the federal opening brief discusses KCC's history in trying to resolve the access issue, this brief does not repeat it. U.S. Br. 8–15.

### V. In 2025, the Secretary entered into a land exchange agreement with King Cove Corporation and these suits followed.

Because the federal opening brief discusses the procedural history of this land exchange, this brief does not repeat it. U.S. Br. 15–21.

## SUMMARY OF THE ARGUMENT

The district court erred in vacating the 2025 land exchange.

1. ANILCA's Title XI does not apply to a land exchange under § 1302(h). Title XI governs authorizations for transportation and utility systems whose route "will be within" a conservation system unit. 16 U.S.C. §§ 3161, 3162(4)(A). The district court erred in conflating a federal decision that could, at some point, lead to KCC building a road with a federal decision actually authorizing a road. Title XI does not apply because the exchange authorizes no road. The district court also erred in looking at the land's status at the moment of the Secretary's decision, but Title XI looks to where a system "will be." 16 U.S.C. § 3162(4)(A). The land exchange does not apply because if KCC builds a road on the land it receives through an exchange, the road will be on its land, not within the CSU. The district court's reading also undermines the framework Congress built. Congress protected non-federal land within CSU boundaries, anticipated change of land ownership within CSU boundaries, and authorizes exchanges "[n]otwithstanding any other provision of law." 16 U.S.C. §§ 3103(c); 3192(h).

2. ANILCA's Alaska-specific land exchange provision overrides any conflicting directives from the generally applicable nationwide Refuge Act. The district court erred in concluding the Secretary failed to make a land exchange determination under the Refuge Act. Either ANILCA and the Refuge Act's land

exchange provisions are not potentially conflicting and the Secretary satisfied both by finding that the land exchange was "suitable for disposition" because it satisfies ANILCA's purposes. Or the provisions are potentially conflicting and ANILCA's land exchange provision overrides the Refuge Act's land exchange provision. Either way the Court views this issue, there is no error.

3. This Court should also resolve the plaintiffs' remaining Refuge Act and Wilderness Act claims, which the district court did not reach. Both present purely legal questions that were fully briefed below, and deciding them now would avoid another round of litigation over a road King Cove has sought for decades. Both claims fail for the same reason. Section 1302(h) authorizes exchanges of land within conservation system units, including wilderness. Once conveyed, that land is no longer part of the Refuge or its wilderness, and the restrictions that govern those units do not follow it.

4. Given the district court's errors, and given that the Endangered Species Act issues are curable, this Court should reinstate the 2025 land exchange.

## STANDARD OF REVIEW

This is an APA action. Under the APA, an agency action may be overturned where it is found to be "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The issues in this appeal involve interpreting substantive and procedural statutory provisions of ANILCA, the

Refuge Act, and the Wilderness Act—issues reviewed de novo. *See Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 443 (9th Cir. 2022), *reh'g en banc granted, opinion vacated,* 54 F.4th 608 (9th Cir. 2022), *appeal dismissed as moot*, No. 20-35721, 2023 WL 4066653 (9th Cir. June 15, 2023).

## ARGUMENT

### I. ANILCA's structure and history confirm that Title XI does not apply to land exchange decisions.

The State agrees with the federal appellants' textual argument, with which a panel on this Court also already agreed. *U.S. Br.* 24–34; *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 444 (9th Cir.), *reh'g en banc granted, opinion vacated*, 54 F.4th 608 (9th Cir. 2022), *appeal dismissed as moot*, No. 20-35721, 2023 WL 4066653 (9th Cir. June 15, 2023).[3] In short, Title XI sets out a cohesive process for the approval or disapproval of transportation and utility systems when any route of the system "will be within any conservation system unit." *See* 16 U.S.C. §§ 3161–3167. The 2025 land exchange did not authorize any part of a transportation system, much less a transportation system that "will be within any conservation system unit." *Id.* § 3162(4)(A); 2-ER-112, 122. Any road

[3] At oral argument, the en banc Court focused its questions on different aspects of the panel's decision and not the panel's conclusion that Title XI does not apply to land exchanges. *See* Oral Argument in Case Nos. 20-35721, 20-35727, 20-35728.

KCC might build on its private land would not be "within any conservation system unit," so Title XI does not apply.

This brief explains how ANILCA's structure and history confirm this plain textual interpretation. Congress protected non-federal land within unit boundaries, anticipated that land would enter and leave units as ownership changed, and gave the Secretary flexible exchange authority to address the problems ANILCA's boundaries created.

Congress intended to preserve and maintain private property rights for inholdings created before, by, and after ANILCA's enactment. 16 U.S.C. § 3103(c) (providing that lands within the boundaries of CSUs that are or that will become non-federal lands are not deemed part of the CSU and not subject to regulations that solely apply to CSUs); 43 U.S.C. § 1635(o) (providing that federal public land within ANILCA's new CSUs shall be "administered accordingly unless before, on, or after December 2, 1980, such land has been validly selected by and conveyed to a Native Corporation . . . or the State."); *Sturgeon*, 587 U.S. at 46 ("[W]hen non-public lands . . . are geographically within a [CSU's] boundaries, they may not be regulated as part of the [CSU]." ); *id.* at 52 ("[T]o protect Alaskan's economic well-being, [Congress] mitigated the consequences to non-federal owners whose land wound up in those new system units."). If Title XI were to apply to land

exchanges, that would greatly limit the rights of owners of inholdings who gained land from exchanges after ANILCA was enacted. Congress did not intend that.

Consider the following example: A Native Village Corporation owns an inholding in a CSU that is being bombarded by storms and flooding and wants to exchange lands so that it can relocate its village on more protected uplands. If Title XI applied to the land exchange, that would mean the United States would have to go through Title XI before exchanging lands because the village wanted to install a cell tower, a road, and electrical transmission lines in its relocated home. And the village would be subject to limitations imposed by Title XI. The same village could install that tower, transmission lines, and road on its former non-federal lands without Title XI's obstacles. *See* 16 U.S.C. § 3161 (declaring the purpose of providing a process "to approve or disapprove applications for transportation and utility systems *through public lands*") (emphasis added); § 3164 (detailing the process for approvals or disapprovals of transportation or utility systems); § 3162(4)(A) (defining "transportation or utility system" as certain systems which include a route of the system "within any conservation system unit"); § 3103(c) (providing that land conveyed to non-federal landowners is no longer part of the CSU); § 3102(1)–(3) (defining federal public lands as only those the United States has title to). But, according to the district court, the United States would have to go through the Title XI process (and the village would be subject to Title XI's

limitations) because the village intends to install that same infrastructure on the to-be-acquired land. This interpretation contravenes ANILCA's structure and history because Congress *protected* private property rights within CSUs, both those created before and after ANILCA's enactment. *See* 16 U.S.C. § 3103(c); 43 U.S.C. § 1635(o). Non-federal land within a CSU is *not* part of that CSU. 16 U.S.C. §§ 3102(1)–(3), 3103(c). And Title XI's process for transportation systems within CSUs does not apply to systems built entirely on private land within the boundaries of a CSU. *Id.* § 3162(4)(A).

Congress delegated the Secretary land exchange authority so that he would use it. Creating obstacles to installing roads and utility lines on private lands would thwart land exchanges, when Congress meant to promote them. This is true even under the plaintiffs' cramped interpretation that land exchanges may be made for preservation purposes only.

Consider another example: the State owns precious wildlife habitat within the boundaries of a designated wilderness that the Fish and Wildlife Service desperately wants to incorporate into a CSU for preservation purposes. The State is considering exchanging that land for federal land within the boundary of the same wilderness that is adjacent to a road. The Secretary wants to exchange land because the State land is much more valuable for preservation purposes than the federal land. But the State will agree to the exchange only if it can build a welcome center

comprising a road, plumbing, and utility lines. Under the plaintiffs' theory, a land exchange would have to first go through Title XI, which, according to the plaintiffs requires congressional and presidential approval, and almost never happens. 3-ER-355. This would present a huge obstacle for the Secretary's proposed land exchange. And the proposed exchange would likely fail. Congress did not give the Secretary land exchange authority in § 1302(h), but then tie his hands behind his back with Title XI.

Congress intended for its land exchange provision to resolve access issues for inholdings. As explained above, *supra* at pp. 9–13, Congress provided two independent means for the Secretary to cure access issues: land exchanges and easements across federal lands.

Following congressional intent, the Secretary has used its land exchange provisions to cure access issues. For instance, in 2012, the United States, a Native Village Corporation, and a Native Regional Corporation engaged in a land exchange to resolve an access issue. The exchange documents recognized that "due to the topography of the area, the only usable access to [the Alaska Native Village's] corporation lands . . . is through a corridor of land owned by the United States . . . and within the Alaska Peninsula Wildlife Refuge." 3-ER-516. Because the Native Village Corporation "require[d] access to its corporation lands in order to utilize the lands for the purposes for which said lands were conveyed pursuant to

ANCSA," the United States engaged in a land exchange that conveyed a corridor of federal land for access purposes. *Id.* The 2025 land exchange is simply another example of the Secretary's authorized use of its land exchange authority to solve access problems without Title XI approval.

Title XI's inapplicability to land exchanges is not a "circumvent[ion]" of the law. 1-ER-44. It is the law. Congress intended that Title XI would not apply to land exchanges. Any other reading contravenes both the text and purpose of ANILCA.

## II. ANILCA's Alaska-specific land exchange provision overrides any conflicting directives from the generally applicable nationwide Refuge Act and Wilderness Act.

Before turning to the specific land exchange provision at issue, § 1302(h), it is helpful to understand how § 1302 operates as a whole. 16 U.S.C. § 3192. Subsection (a) gives the Secretary general authority to acquire land through a variety of means including but not limited to exchanges within the boundaries of any CSU other than National Forest Wilderness, "consistent with other applicable law in order to carry out the purposes of [ANILCA]." This "boiler plate land acquisition authority" is consistent with land acquisition authority in the Lower 48. Hearing Before the Senate Energy & Natural Resources Committee, 95th Cong., p. 349–50 (Aug. 3, 1978) (App'x 3–4).

Subsections (b) – (g) limit the Secretary's authority in Alaska, because "'Alaska is different' from the rest of the country." 16 U.S.C. § 3192(b) – (g); *Sturgeon*, 587 U.S. at 32. Subsection (b) allows the Secretary to acquire lands within the boundaries of CSUs owned by the State and local government, Native Corporations, and a narrow class of individuals, but only when those non-federal landowners consent. 16 U.S.C. § 3192(b). For other landowners, subsection (c) allows the Secretary to acquire inholdings without the owners' consent in exchange for federal lands outside the boundaries of CSUs. 16 U.S.C. § 3192(c). Subsections (d) – (f) limit the Secretary's authority to acquire inholdings where the owner has made certain improvements upon the land. 16 U.S.C. § 3192(d) – (f).

Subsection (h), the relevant section here, applies only to acquisition of land through exchanges (rather than acquisition by donation or purchase). And it authorizes exchanges *within* CSUs. 16 U.S.C. § 3192(h). The State agrees with the plaintiffs that one of the purposes Congress intended land exchanges to fulfill was the aggregation of federal lands within the boundaries of CSUs, if that was possible. 3-ER-356. But that was not Congress's only purpose in authorizing land exchanges. *See, e.g.*, H. Rep. No. 96-97, pt. I, at 246 (1979) (App'x 13) (noting that ANILCA's exchange provision was modelled after ANCSA's exchange provision). And because Congress limited the Secretary's authority to acquire land

within the boundaries of CSUs—*see* 16 U.S.C. § 3192(b) – (g)—Congress gave the Secretary broad authority to exchange lands.

Through subsection (h), Congress gave the Secretary authority to execute land exchanges that further the purposes of ANILCA. 16 U.S.C. § 3192(h)(1). Congress gave the Secretary this land exchange authority "notwithstanding any other provision of law." 16 U.S.C. § 3192(h). Put differently, this authority overrides potentially conflicting provisions of other laws. *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 559 (9th Cir. 2016) ("[A]s a general proposition . . . statutory 'notwithstanding' clauses work to sweep aside potentially conflicting laws.") (citing *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)); *see also Galaza v. Mayorkas*, 61 F.4th 669, 673 (9th Cir. 2023).

This land exchange authority is a feature of ANILCA, to help promote ANILCA's sometimes conflicting purposes: balancing the national interest against local interests and conservation against economic and social needs.

### A. Section 1302(h) governs Alaska-specific land exchanges and displaces any conflicting land exchange provision in the Refuge Act.

The district court concluded that the Secretary made a procedural error by applying only the Alaska-specific land exchange provision in ANILCA, and not also the land exchange provision in the Refuge Act. 1-ER-77–84. The land exchange provision in ANILCA provides in relevant part: "Notwithstanding any

other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands . . . .” 16 U.S.C. § 3192(h). The Refuge Act provides, in relevant part, “[i]n administering the System, the Secretary is authorized to . . . [a]cquire lands or interests therein by exchange . . . [for lands] under his jurisdiction which he finds to be suitable for disposition.” 16 U.S.C. § 668dd(b)(3)(A).

As an initial matter, the Secretary did, in fact, determine that the lands conveyed in the exchange were “suitable for disposition.” 2-ER-149. And that is all the Refuge Act requires. 16 U.S.C. § 668dd(b)(3)(A). The Secretary determined that the lands were suitable for disposition because they furthered ANILCA’s purposes. 2-ER-149. What the Secretary did not do was apply the Refuge Act’s substantive mission into his “suitable for disposition” determination, because that would conflict with ANILCA’s broader purposes. 2-ER-148–49.

After failing to credit the Secretary’s “suitable for disposition” determination, the district court hypothesized what would happen if the “suitable for disposition” determination under the Refuge Act conflicted with the land exchange determination under ANILCA. 1-ER-81. If that happened, the district court thought that *maybe* the ANILCA land exchange determination would prevail, 1-ER-81–82—after all, ANILCA is an Alaska-specific and later-in-time statute than the 1966 nationwide Refuge Act, and ANILCA’s land exchange provision

specifically says it applies notwithstanding any other law (i.e., notwithstanding the 1966 Refuge Act's land exchange provision). But there was no conflicting determination. The Refuge Act's land exchange provision simply asked the Secretary to determine whether he, in his discretion, found the exchange lands "suitable for disposition." 16 U.S.C. § 668dd(b)(3)(A). He made that finding. 2-ER-149.

Alternatively, if the Refuge Act necessarily incorporates a narrower substantive standard for land exchanges than ANILCA does, ANILCA's standard prevails. Congress has repeatedly directed ANILCA-specific provisions to prevail over otherwise applicable laws. In ANILCA's land exchange provision itself, Congress gave the Secretary authority to exchange lands "[n]otwithstanding any other provision of law." 16 U.S.C. § 3192(h)(1). Therefore, ANILCA's land exchange provision applies to Alaska-specific land exchanges notwithstanding the more general land exchange provisions in the nationwide Refuge Act of 1966, Pub. L. 89-669, § 4. Moreover, when Congress amended the 1966 Refuge Act to improve the federal government's management of refuges nationwide, it created a special section for how to interpret the Refuge Act provisions in Alaska. The National Wildlife Refuge System Improvement Act of 1997, Pub. L. 105-57, § 9 (1997), 111 Stat 1252. It clarified that if "any conflict arises between" the Refuge Act and ANILCA "then the provision in [ANILCA] shall prevail." *Id.* at § 9(b).

This means, if the suitability of a land exchange under ANILCA conflicts with the suitability of a land exchange under the Refuge Act, ANILCA's land exchange provision prevails. And any argument that the Secretary did not make the "suitable for disposition" determination under the Refuge Act becomes moot.

In sum, there are two ways to see this issue. Either ANILCA and the Refuge Act's land exchange provisions are not potentially conflicting and the Secretary satisfied both by finding that the land exchange was "suitable for disposition" because it satisfies ANILCA's purposes. Or the provisions are conflicting and ANILCA's land exchange provision overrides the Refuge Act's land exchange provision. Either way, there is no error.

### B. The Secretary's land exchange authority is not limited by the substantive management provisions in the Refuge and Wilderness Acts.

The Defenders of Wildlife (DOW) argued below that the land exchange violated substantive management provisions of the Refuge Act and Wilderness Act. 3-ER-374–91. The district court did not resolve these issues. 1-ER-84–85. This Court should do so now. This Court may use its discretion to reach an issue the district court did not resolve below when the "issue is purely legal," "proper resolution is beyond any doubt," and "injustice might otherwise result." *Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1110–11 (9th Cir. 2020).

All three factors are met here. Whether the Refuge and Wilderness Acts prohibit an exchange of land based on the proposed use of the private landowner is a purely legal question. Resolution in the appellants' favor is beyond any doubt because, as explained below, the text and purpose of ANILCA forbid such an interpretation. Finally, the delay in remanding to decide these issues will result in injustice. Residents of King Cove have been waiting for decades for a road. And while they wait in forced isolation, remaining in their community is becoming increasingly difficult. They are inhibited from exercising the full scope of their subsistence rights, they lack access to daily necessities we take for granted, and people die awaiting medical care. 2-ER-127–33.

**1. The land exchange provision only works if federal land conveyed does not continue to be managed as a refuge.**

DOW argued below that when the Secretary engages in a land exchange within a particular refuge, he must ensure that the exchange—and specifically the conveyance of lands in the exchange—is consistent with management directives in the Refuge Act. 3-ER-374–87. This argument is wrong because it would mean that the Secretary can only convey land out of a refuge if the land continues to be treated as a refuge and wilderness.

First, DOW's argument does not align with the purposes of ANILCA. The "purposes of [ANILCA]" are to provide for both national and local interests, to protect the environment while also providing for the economic and social needs of

Alaskans. *Sturgeon*, 587 U.S. at 36, 51–52; ANILCA § 101(d); 16 U.S.C. § 3101(d). ANILCA does not elevate the purposes of any single refuge above the Act's broader goals.

Even if the narrow purposes of the Izembek Refuge applied to ANILCA's land exchange provision, it would apply to the *acquisition* of land. Section 1302(h) authorizes land exchanges when "acquiring lands for the purposes of [ANILCA]." 16 U.S.C. § 3192(h)(1). The statute does not say that in exchanging lands, the *conveyance* of land must[4] be done for the purposes of ANILCA. And it is undisputed that *acquiring* KCC lands within the boundaries of the Izembek Refuge accomplishes the purposes of the Refuge.

The federal acquisition of non-federal land within the boundaries of the Izembek Refuge satisfies, as a matter of law, one of the broader purposes of ANILCA and the more narrow purposes of the Izembek Refuge. In "acquiring lands for the purposes of this Act," 16 U.S.C. § 3192(h), the United States received title to about 1,739 acres, and KCC relinquished its selection rights to about 5,430 more. 2-ER-110, 117–18, 125–26. This includes the Kinzarof Lagoon bookends, which are high value wetlands comprising Essential Fish Habitat, internationally

[4] The State does not take the position that the Secretary may not consider whether the conveyance of land promotes ANILCA's purposes. Rather, the State simply points out that the text requires only the acquisition of land to promote ANILCA's purposes.

designated important wetlands, winter habitat for Steller's eiders, and habitat for sea otters. 2-ER-117–18, 125–26. The Secretary also gained lands that provide important habitat to caribou, brown bears, and tundra swans. *Id.* DOW's view that the conveyance of federal lands to KCC must satisfy the purpose of ANILCA and purposes of the Izembek Refuge ignores the text of the statute, which authorizes the *acquisition* of lands for the purpose of ANILCA.

DOW's argument not only offends the text of the land-exchange provision, it also eviscerates key statutory protections of private landowners' rights. Section 103(c) makes clear that private land within the boundaries of a CSU is *not* part of a CSU. 16 U.S.C. § 3103(c). The United States Supreme Court explained how, in passing ANILCA, this provision, along with others, was meant "to protect Alaskans' economic well-being" by "mitigat[ing] the consequences to non-federal owners whose land wound up in those new system units." *Sturgeon*, 587 U.S. at 52. Because Congress knew that lands selected through ANCSA and the Statehood Act would later be conveyed to the State and Native Corporations, it clarified that those lands would no longer be administered as part of the CSU once conveyed to a Native Corporation or the State. 43 U.S.C. § 1635(o); *see also* 16 U.S.C. § 3103(c).

DOW's argument also undermines one of ANCSA's key purposes. Through ANCSA, Alaska Natives gave up aboriginal rights in exchange for money and

lands, "in conformity with the real economic and social needs of Natives." 43 U.S.C. §§ 1601, 1603, 1605. It would defeat one of ANCSA's primary purposes if Congress provided land to Native Corporations for their shareholders' social and economic needs, while simultaneously precluding that land from being used for their shareholders' social and economic needs. *Cf. City of Angoon v. Marsh (Angoon I)*, 749 F.2d 1413, 1418 (9th Cir. 1984) ("Given the stated purpose of the land conveyance, it is inconceivable that Congress would have extinguished their aboriginal claims and insured their economic well-being by forbidding the only real economic use of the lands so conveyed.") (concluding that land conveyed to Native Corporation in an ANILCA land exchange was private and not subject to the prohibition against timber harvesting in another part of ANILCA). In the 2025 Land Exchange, KCC gave up a large amount of land it selected through ANCSA (which it could use for its social and economic well-being) in exchange for a very small amount of land it could use for its shareholders' social and economic well-being.

Should this Court address whether the land exchange violates the Refuge Act's management directives, it should conclude it does not.

### 2. The land exchange provision only works if federal land conveyed does not continue to be managed as a wilderness.

DOW argued below that because a permanent road (usually[5]) cannot be built on public lands designated as wilderness, the Secretary cannot convey public lands if a road will be built on them. 1-ER-85; 3-ER-382–87. DOW further argued that the Secretary may not even convey land adjacent to wilderness, because the development of non-federal land adjacent to wilderness will, by virtue of its adjacency, impact wilderness. 1-ER-85; 3-ER-387. DOW's interpretation, making ANILCA's land exchange provision a one-way ratchet for preservation purposes, conflicts with statutory text and precedent.

Like its Refuge Act argument, DOW's interpretation nullifies Congress's intent that non-federal lands within a CSU are not part of the CSU. In passing ANILCA, Congress intended that non-federal inholdings created both before and after ANILCA's enactment would not be treated as part of the CSU. *See, e.g.*, 16 U.S.C. § 3103(c); 43 U.S.C. § 1635(o). And through the Wilderness Act, Congress clarified that wilderness is limited to *federal* land. 16 U.S.C. § 1131(c) (defining

[5] DOW incorrectly asserts that the designation of land as wilderness categorically bars roads therein. 3-ER-382. The statutory provision prohibiting roads has at least two exceptions: exceptions provided for in Title 16, chapter 23, and exceptions respecting existing private rights. 16 U.S.C. § 1133(c). The precise limits of those exceptions are not on appeal. The point is, DOW's inaccurate categorical assertions—in an attempt to portray the land exchange as circumventing some categorical bar—are simply wrong.

wilderness as "Federal" land). This means that private inholdings within a designated wilderness area are not subject to the rule that prohibits most permanent roads within wilderness areas. 16 U.S.C. § 1133(c) (generally prohibiting roads within wilderness); 16 U.S.C. § 1131(c) (excluding non-federal land from the definition of wilderness). Congress repeatedly provided throughout ANILCA that private land within the boundaries of CSUs—including land that became private *after* ANILCA's passage—would not be treated as if it were part of the CSU. *See, e.g.*, 16 U.S.C. § 3103(c); 43 U.S.C. § 1635(o).

This Court has likewise concluded that ANILCA's conveyance of lands within the boundaries of a CSU does not subject that land to the restrictive statutory provisions applicable to federal lands within CSUs. *Angoon I*, 749 F.2d at 1415–18. Rather, once conveyed, they become private lands. *Id.*

Finally, plaintiffs' argument undercuts ANCSA's purpose. ANILCA's land exchange provision was "modelled on section 22(f) of [ANCSA]." H. Rep. No. 96-97, pt. I, at 246 (1979) (App'x 13). Section 22(f) of ANCSA authorizes exchanges "for the purpose of effecting land consolidations or to facilitate the management or development of the land, or for other public purposes." 43 U.S.C. § 1621(f) (emphasis added). And more generally, ANCSA intended that land conveyed to Native Corporations would be used for their economic and social needs. 43 U.S.C. § 1601(b).

Notably, Congress can, and has, limited which lands cannot be conveyed through ANILCA's land exchange provision. 16 U.S.C. § 3192(h)(2). In 1988, when the Secretary of Interior was considering so-called "megatrades" in the Arctic National Wildlife Refuge, Congress amended ANILCA to prohibit the Secretary from conveying, by exchange or otherwise, lands or interests within ANWR without prior Congressional approval. Pub. L. 100-395, § 201 (1988), 102 Stat. 981 (codified at 16 U.S.C. § 3192(h)(2)). Congress placed no such limitations in the Izembek Refuge.

DOW's last argument, that the federal government must indirectly regulate private lands by considering the effect on adjacent public lands impermissibly guts ANILCA's protection of private property, expands the definition of wilderness, and has already been rejected by this Court. Using the Wilderness Act to obstruct how private lands adjacent to wilderness are used vitiates the protections for private property that Congress insisted upon. *See, e.g.*, 16 U.S.C. § 3103(c); 43 U.S.C. § 1635(o). It expands the definition of wilderness because it treats non-federal, and thus non-wilderness lands, as wilderness. *See* 16 U.S.C. § 1131(c). And this Court has rejected the argument that federal law obstructing development of public lands could apply to Native Corporation inholdings because of the "spillover" effects on public land from private lands. *City of Angoon v. Hodel (Angoon II)*, 803 F.2d 1016, 1028 (9th Cir. 1986).

Regardless, the Secretary here determined that any "spillover" effects from the exchange would not destroy the wilderness character of the Refuge. 2-ER-125. The proposed road on federally conveyed land would align with historic trails and disturbances from preexisting overland routes connecting King Cove to Cold Bay. *Id.* And the acquisition of KCC lands—as part of the exchange—would add significant acreage within the borders of the Izembek Refuge to the Refuge, to be managed by the federal government as wilderness. 2-ER-125–26.

Should this Court address whether the land exchange violates the Wilderness Act, it should conclude it does not.

Congress authorized land exchanges notwithstanding other laws—notwithstanding the Refuge Act's management provisions and the Wilderness Act's general prohibition of roads. DOW's argument otherwise contravenes the text and purposes of ANILCA.

### III. Vacatur of the land exchange is inappropriate.

This Court should reinstate the Secretary's 2025 Land Exchange decision. The district court vacated the land exchange after finding that the Secretary failed to comply with Title XI of ANILCA, the Refuge Act, and the Endangered Species Act. 1-ER-86–89. Because Title XI applies only to approvals or disapprovals of transportation systems and does not apply to land exchanges, the Secretary did not fail to comply with Title XI. Because the Secretary determined that the exchange

lands were suitable for disposition given ANILCA's purpose, it complied with the procedural determination the district court said the Refuge Act requires. If the Refuge Act's land exchange provision includes a different substantive standard that conflicts with ANILCA's land exchange provision, ANILCA's provision prevails. At the very least, if there is some further procedure the Secretary must take under the Refuge Act, it can be remedied on remand. *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 1015 (9th Cir. 2025) (noting that remand without vacatur may be appropriate when the outcome would be the same and remand would simply allow the agency to offer better reasoning or comply with procedural rules). As to the district court's finding of two Endangered Species Act violations, once this Court reinstates the land exchange, the Secretary can issue a new Biological Opinion and incidental take statement,[6] mooting those claims. *See Grand Canyon Tr. v. Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012) ("We have held that the issuance of a superseding BiOp moots issues on appeal relating to the preceding

---

[6] The Army Corps of Engineers has already issued an updated Biological Opinion in conjunction with the 404 permit, which is publicly available and judicially noticeable, and which resolves the issues the district court identified. *See* https://reports.ecosphere.fws.gov/ FWSPublicReports/Reports/Index?reportname=BiologicalOpinionReport, and select Anchorage for "FWS Office" and 2026 for "BO YEAR." The Biological Opinion issued after this Court reinstates the Land Exchange decision would mirror any Biological Opinion issued in conjunction with the 404 permit.

BiOp."); *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111–12 (10th Cir. 2010) (holding that issuance of new BiOp mooted prayer for injunctive relief); *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1122–24 (9th Cir. 1997) (holding that issuance of the new BiOp mooted the challenge to the old BiOp). To the extent vacatur was an appropriate remedy, it no longer is.

Remand without vacatur is especially warranted given the equities at stake. *See Ctr. for Biological Diversity*, 141 F.4th at 1015 (finding vacatur unwarranted after weighing the equities). Although the land exchange in no way authorizes any part of a road that will be within a CSU, once land is exchanged, King Cove will be able to pursue building a life-saving road on its own lands. Until then, residents wait. As one King Cove resident explained, "My mom has been one of the most recent deaths due to the lack of transport out of King Cove, but she's not the first, and I can guarantee she won't be the last." 2-ER-130.

## CONCLUSION

For these reasons, the Court should reverse the district court's decision and reinstate the October 2025 Land Exchange.

RESPECTFULLY SUBMITTED November 12, 2026.

STATE OF ALASKA
CORI MILLS
ACTING ATTORNEY GENERAL

By: s/Laura Wolff
Laura Wolff
Assistant Attorney General
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
(907) 269-6612 phone

## STATEMENT OF RELATED CASES

The related cases are consolidated in these consolidated appeals.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 12, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Laura Wolff
Laura Wolff
Assistant Attorney General

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** Nos. 26-6479, 26-6481, 26-6484, 26-6485, 26-6487, 26-6490, 26-6551, 26-6554, 26-6570, 26-6997, 26-7055

I am the attorney or self-represented party.

**This brief contains** 8,653 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ● is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [ ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Laura Wolff **Date** November 12, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

# APPENDIX TO ALASKA'S FIRST BRIEF ON CROSS APPEAL

**Congressional Record (Excerpts)**

125 Cong. Rec. 11158 (1979) ........ App'x 1

Hearing Before the Senate Energy & Natural Resources Committee, 95th Cong (Aug. 3, 1978) ........ App'x 2

**Committee Reports (Excerpts)**

H. Rep. No. 95-1045, Part I (1978) ........ App'x 5

H. Rep. No. 96-97, Part I (1979) ........ App'x 12

S. Rep. No. 95-1300 (1978) ........ App'x 14

S. Rep. No. 96-413 (1979) ........ App'x 16

**Draft Bill (Excerpts)**

H.R. 39, 95th Cong. ........ App'x 19

In sum, the Alaska lands bills reported to the House by the Interior and Merchant Marine Committees are unsatisfactory compromises of both the substance and intent of the bill so overwhelmingly supported and passed by the House last year. I firmly believe that the Udall-Anderson substitute is a sound and balanced approach to Alaska land protection, management, and enjoyment. It offers comprehensive protection for eco-systems and unique wildlife species to continue their spectacular life-cycles undisturbed. It provides ample opportunity for industry and developmental interests to explore and tap Alaska's vast resources and conserves some of these treasures for future use. And ultimately, it recognizes the need to grant the State of Alaska the flexibility it deserves to determine its own destiny.

I urge my colleagues to reaffirm their previous commitment to a meaningful and reasonable Alaska lands bill by supporting the Udall-Anderson substitute.

Mr. SEIBERLING. Mr. Chairman, as I have already explained, the vast majority, in fact all but two of these amendments are amendments that were not only previously noticed in the RECORD but they correct typographical and other printing errors such as in some land descriptions, they restore accidental omissions, and they make other similar corrections which do not affect the substance or policy provisions of the Udall-Anderson bill.

There are, however, Mr. Chairman, two amendments which I believe not to be in that category. However, they are not controversial, and I will explain them now.

The first is an amendment, included in the package we just presented, which deals with the Killik River, which is on the North Slope, north of the Brooks Range, and reclassifies it from a wild river category to a study category. The reason is that the Arctic Slope Regional Corporation has virtually completed receiving all of its lands under the Alaska Native Claims Settlement Act and this amendment recognizes that transfer, and by providing that this Killik River area which is included within some of the native lands, will be put in a study category until the Natives and the Department of the Interior can work out some consensus as to how they wish to proceed.

The foregoing is a concession that lessens the restrictions of the Udall-Anderson bill in that particular instance.

The other amendment is an amendment to respond to a point that I think has been beaten to death by the gentleman from Alaska (Mr. YOUNG) but I think it needs to be clarified because some people may not understand.

□ 1400

The Udall-Anderson bill, as does the Breaux-Dingell bill, as does the Huckaby bill, includes certain State-selected lands and certain State-owned lands on which they already have patent (as well as some Native or private lands) within the borders of some of the conservation system units in Alaska. I will not dwell on the pros and cons of how much of those lands ought to be within and outside or whether some of those lands have been validly selected by the State or what other contest is in existence with respect to some of those lands; but there is no question in my mind that the present text of the Udall-Anderson bill does not alter in any way the ability of the State or Natives to do what it will with those lands. To the extent that access is required to get to lands if they are surrounded by such conservation units, we guarantee the owners' ability to have access to those lands. This amendment does not deal with the question of access.

Mr. Chairman, I will yield to the gentleman in just 1 minute when I finish laying out what this amendment does.

All this amendment does is restate and make clear beyond any doubt that any State, Native or private lands, which may lie within the outer boundaries of the conservation system unit are not parts of that unit and are not subject to regulations which are applied to public lands which, in fact, are part of the unit.

It has already been pointed out that there are varying acreages; but this amendment reinforces the already ample protections accorded to such lands that are within the boundaries of such a park or refuge or other conservation area.

Mr. YOUNG of Alaska. Mr. Chairman, will the gentleman yield?

Mr. SEIBERLING. I yield to the gentleman from Alaska.

Mr. YOUNG of Alaska. Mr. Chairman, is the gentleman saying that if there is an in-holding of State land and private land, be it Native or within a private individual's hands, that they have the right to build a road or a pipeline or a powerline to develop those things across the wilderness areas, or a park or a refuge or a wild and scenic river?

Mr. SEIBERLING. As far as the question of access is concerned, that is covered by a separate section dealing with access. It does grant them the absolute right to access to their in-holdings.

Mr. YOUNG of Alaska. Are there any catch words in the gentleman's amendment that say there is compatibility with the unit or anything like this that will preclude us because of some nice little sharp lawyer sitting down in one of the coalition areas?

The CHAIRMAN. The time of the gentleman from Ohio (Mr. SEIBERLING) has expired.

(By unanimous consent, Mr. SEIBERLING was allowed to proceed for 1 additional minute.)

Mr. SEIBERLING. Mr. Chairman, what it does is say that the fact that it is within the boundaries drawn on the map for that conservation unit does not in any way change the status of that State, native, or private land or make it subject to any of the laws or regulations that pertain to U.S. public lands, so that those inholdings are clearly not controlled by anv of the public land laws of the United States.

Mr. YOUNG of Alaska. Mr. Chairman, may I ask again, if the gentleman will yield to me further, what is the effect of the clean air standard in the class I Clean Air Act; what would be the effect of that?

Mr. SEIBERLING. This is not an effort to amend the Clean Air Act or any of the other acts that are not public lands laws.

Mr. YOUNG of Alaska. Well, Mr. Chairman, if the gentleman will yield further, it is well and good to offer an amendment that looks good on the surface. I am just trying to make it clear for the record that if the gentleman is trying to attempt to make sure that the State has its right to its 4 million acres of land, that we are not circumvented or shortcut by the Clean Air Act or the compatibility test or the access provision, because if that is so, we do not have anything.

AMENDMENTS OFFERED BY MR. SEBELIUS TO THE AMENDMENT IN THE NATURE OF A SUBSTITUTE OFFERED BY THE COMMITTEE ON MERCHANT MARINE AND FISHERIES

Mr. SEBELIUS. Mr. Chairman, I offer Sebelius amendments 1 and 2 to the amendment in the nature of a substitute offered by the Committee on Merchant Marine and Fisheries.

PARLIAMENTARY INQUIRY

Mr. SEIBERLING. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state the parliamentary inquiry.

Mr. SEIBERLING. Mr. Chairman, I do not believe we have voted on this amendment yet.

The CHAIRMAN. That is correct. As long as there are amendments pending for the Merchant Marine and Fisheries matter proposed, we will take those prior to voting on the gentleman's amendments.

The gentleman from Kansas (Mr. SEBELIUS) has, I understand, amendments to the Merchant Marine and Fisheries matter.

Mr. SEBELIUS. Mr. Chairman, I have amendments 1 and 2 to Breaux-Dingell.

I ask unanimous consent that the amendments be considered as read and printed in the RECORD and that they be considered en bloc.

The CHAIRMAN. Is there objection to the request of the gentleman from Kansas?

There was no objection.

The CHAIRMAN. The Clerk will designate the amendments.

The amendments offered to the amendment in the nature of a substitute are as follows:

Section 201 of the Breaux-Dingell bill is amended by revising paragraph (3) (page 294, line 23) to read as follows:

"(3) Gates of the Arctic National Park, containing approximately eight million and fifty thousand acres of public lands, and Gates of the Arctic National Preserve, containing approximately sixty thousand acres of public lands as generally depicted on a map entitled 'Gates of the Arctic National Park and Preserve,' dated March 1978, which shall be managed to maintain the diversity of natural values of the area and also for the following purposes, among others: to preserve the undeveloped character of the park, including opportunities for visitors

2-12-3

# Transcript of Proceedings

UNITED STATES SENATE

ALASKA (d)(2) LANDS

- - - -

THURSDAY, AUGUST 3, 1978

- - - -

NOT REVIEWED FOR ACCURACY OR EDITED

United States Senate Committee
on Energy and Natural Resources
Washington, D.C.

PAGES 306 through 364

Acme Reporting Company
*Official Reporters*
1411 K Street, N.W.
Washington, D. C. 20005
(202) 628-4888

Mr. Williams. The land acquisition authority, generally, Mr. Chairman, and now we are shifting away from wild and scenic rivers. We are now talking about general land acquisition authority. H.R. 39 provides the Secretary with boiler plate land acquisition authority, the authority to acquire lands, the authority to acquire improved property if he finds such acquisition is necessary to meet the purposes of the act, his authority to grant rights of use and occupancy.

Generally, the land acquisition authority we have provided in park legislation consistently over the years. Senator Stevens' bill, the top of page three, gives the Secretary general land acquisition authority, also, but provides lands owned by the state or private land owners can be acquired by the Secretary only with a concurrence of the land owner and his willingness to sell.

The Chairman. As I understand it, this applies existing law to Alaska.

Senator Stevens. There is one exception where I understand there is a possibility of condemnation under existing law. Would you explain that?

The Chairman. Let's follow existing law on this. If there is some unique situation that applied in the lower 48 --

Senator Melcher. Let's identify the four systems. Under the wilderness act you cannot condemn.

cs15

Mr. Quarles. You cannot condemn national forest wilderness.

Senator Melcher. I don't think you can in the BLM wilderness either.

Mr. Quarles. That is not wilderness act, yes. Section 603 of FLPMA would limit it to rights of way only.

Senator Hansen. I think we ought to follow existing law.

The Chairman. WIthout objection, yes.

Senator Stevens. There is no condemnation law extended to Alaska?

The Chairman. No. Whatever condemnation exists applies to Alaska where there is no such authority in existing law, that is it.

Mr. Harvey. For example, H.R. 39 said Agriculture could condemn lands in the forest wilderness in Alaska. They will not be able to condemn them because existing law says you don't. But if the Park Service has authority to condemn lands elsewhere, they will be condemning lands in Alaska conceivably.

You have already, Mr. Chairman, as I indicated -- I am sorry -- in your recommendations on cooperative management, you have recommended this provision not be adopted as does the Administration.

The Chairman. All right. That is out. Item 5.

95TH CONGRESS } HOUSE OF REPRESENTATIVES { REPT. No. 95
*2d Session* } { 1045, Part I

# DESIGNATING CERTAIN LANDS IN THE STATE OF ALASKA AS UNITS OF THE NATIONAL PARK, NATIONAL WILDLIFE REFUGE, WILD AND SCENIC RIVERS AND NATIONAL WILDERNESS PRESERVATION SYSTEM, AND FOR OTHER PURPOSES

APRIL 7, 1978.—Ordered to be printed.

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

together with

ADDITIONAL VIEWS, DISSENTING VIEWS, SUPPLEMENTAL VIEWS AND ADDITIONAL COMMENTS

[To accompany H.R. 39]

(Including the cost estimate of the Congressional Budget Office)

The Committee on Interior and Insular Affairs, to whom was referred the bill (H.R. 39) To designate certain lands in the State of Alaska as units of the National Park, National Wildlife Refuge, Wild and Scenic Rivers, and National Wilderness Preservation System, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Page 1, beginning on line 3, strike out all after the enacting clause and insert in lieu thereof the following:

SHORT TITLE AND TABLE OF CONTENTS

SECTION 1. This Act, together with the following table of contents, may be cited as the "Alaska National Interest Lands Conservation Act".

TABLE OF CONTENTS

Sec. 1. Short title and table of contents.

TTLE I—FINDINGS, POLICY, AND DEFINITIONS

Sec. 101. Findings.
Sec. 102. Policy.
Sec. 103. Definitions.

the land managing agencies with flexibility and an ability to make any necessary adaptations to future conditions.

In a number of instances, there were proposals (whether or not for establishing new land-managing or land-classifying agencies) that included suggestions that certain areas of public lands in Alaska should be placed into new, untried categories sometimes described as "holding patterns." After careful consideration of the possible merits of such an approach, the Committee is convinced that little would be gained and that the chief result would be to continue even longer the present uncertainty regarding the future policies which will be applied to significant public lands areas. The Committee's approach throughout has been to do everything possible to reduce such uncertainties, which have been the cause of much of the economic, social, and political difficulties which Alaska has experienced for so long.

Continuation of such uncertainty is also inappropriate in view of the extensive studies which have preceded the introduction of legislative recommendations concerning the national interest lands by former and present Administrations; in fact, the Committee notes that there is not only an extremely large and highly predictive amount of knowledge available about Alaska's resources and environment, but that more is presently known about Alaska than about many of the older States of the Union. For example, the Alaska Regional Profiles—which have been compiled in a cooperative undertaking among the Arctic Environmental Information and Data Center of the University of Alaska, the State government, and the Federal-State Land Use Planning Commission for Alaska—are undoubtedly one of the most definitive set of atlases on a state's resources and environment available anywhere in the world. The Committee has been guided by the conviction that its proper course is to use the extensive knowledge now available, and not to invoke the myth that little is known about Alaska as an excuse for putting off the decisions which are needed to be made today.

## TITLE XII. ADMINISTRATIVE PROVISIONS

### *Overview*

Title XII contains the general administrative provisions which apply, unless otherwise stipulated, to all of the conservation system units. Although many of the provisions are identical to those governing similar units in other States, the Committee made a number of modifications to meet certain administrative situations unique to Alaska. In general, these provisions are intended to assure that the planning, development, managament and use of the conservation system units protect the national interest as well as the interests of the State, local governments, Native corporations and local residents.

### *Land Acquisitions and Exchanges*

Section 1201, for example, which provides for acquisition of lands or other interests (including scenic easements), restricts the Secretary from acquiring, except by donation, lands owned by the State

(or political subdivision) or a Native corporation which has Natives as a majority of its stockholders. The Committee recognizes that many of the units will contain State and Native inholdings; however the Committee anticipats that the Secretary will use his authority under Title XI to work out voluntary, cooperative agreements with the other owners in planning and managing these lands, and his authority uder section 1201(f) to make exchanges of lands.

The Secretary is further restricted from acquiring privately-owned improved property within the conservation system units unless he first determines that such acquisition is necessary. The intent is that the Secretary should not acquire improved property unless such acquisition is needed to assure public use and access or to prevent incompatible development.

The definition of "improved property" includes not only a detached single family dwelling but also property developed for non-commercial recreational uses, such as cabins used for hunting and fishing purposes. The definition is intended to make clear that the protections provided to "improved property" extend only to such dwellings or cabins under construction before January 1, 1978, and the related land necessary for their enjoyment.

The definition further specifies that only improved property on either private land or "Federal land entry on which was legal and proper" qualify. The term "Federal land entry on which was legal and proper" is intended to embrace structures which were erected on Federal land by persons whose entry onto the land was not illegal *ab initio.* (This includes those persons who legally entered lands then open to homesteading but who failed to meet all statutory or administrative requirements, such as recordation, before the relevant lands were closed to entry or who have not yet met such requirements.) The Committee intends to place these persons, who may not have perfected their entries or whose entry has not ripened into title, on the same footing as persons who have valid, unpatented mining claims: that is, persons covered by this definition are to be regarded as being *pedis possessio*, and for the purposes of section 1201 are to be dealt with as though they have perfected their entries and have received title to the land on which their dwellings are located. This section does not apply to cabins or other structures which are the subject of National Forest special use permits.

By providing, in section 1201(e) that the Secretary shall give prompt and careful consideration to any offer by an owner who wishes to sell his property, if continued ownership is causing or would result in hardship to him, the Committee does not intend to authorize the Secretary to pay less than the fair market value. The Committee expects the Secretary to deal fairly with landowners, but the Secretary should delve into allegations of hardship and determine the facts. The Committee does not intend that an owner be permitted to sustain an undue hardship case because he can no longer use resources on the public lands in a manner which, in any event, would not be permitted under the Federal Land Policy and Management Act of 1976 (Public Law 94–579).

Section 1201 (f) is the "exchange" portion of the general "acquisition" provisions. Modelled on section 22 (f) of the Alaska Native

Claims Settlement Act, it is intended to provide the Secretary with great flexibility in acquiring lands, by permitting him to enter into exchanges. This flexibility extends to making exchanges of land within conservation system units—thus, for example, permitting the Secretary to acquire the lands which Chugach, Inc., has selected within the Wrangell-St. Elias National Park/Preserve by providing to that Corporation other lands inside or outside that or some other park, wildlife range, or other conservation system unit, or unit of the National Forest System. Of course, the committee does not expect that this flexibility will be used to undermine the essential integrity of any conservation system unit or to frustrate the purposes of any such unit.

*Scenic Easements*

The Committee considered but rejected a proposal to include Mount Sukakpak within the Gates of the Arctic National Park, because such an inclusion would have brought within the Park boundaries a portion of the area withdrawn as a corridor for the existing Trans-Alaska Pipeline. At the same time, the Committee recognized the need to protect the natural and scenic values of this free-standing monolith and the other public lands along the pipeline haul road from incompatible development. Therefore, the Committee has included a provision, in subsection 1202(h), authorizing and encouraging the Secretary to acquire or reserve scenic easements around Mt. Sukakpak and elsewhere within the pipeline corridor, without interfering with existing or proposed uses of the corridor for pipeline or similar purposes. This authorization to the Secretary also extends to the public lands within the area to be studied, under section 1306, for a possible Denali Scenic Highway.

*Access*

The Committee recognizes that Alaskan conditions and means of travel, combined with the number and size of the conservation system units, make questions of access to, within, and across the units of particular importance to the public, to private and State landowners, a public hearing in the affected area.

Thus, in section 1202, the Committee has included a number of provisions which are intended to meet these concerns. The Secretary, in section 1202 (a) is given authority to take action both within and outside the units to assure access. This includes the authority to acquire (subject to the acquisition provisions of section 1201) or reserve easements or other interests in land. Section 1202 (b) directs the Secretary, in administering the conservation system units, to permit the customary patterns and modes of travel across the units, and provides that any conditioning of such travel may be made by the Secretary only under reasonable regulations adopted after advance notice and a public hearing in the affected area.

Section 1202(c) assures that access will be provided, for economic or other purposes, to State or private holdings (including valid mining claims and similar valid occupancies) which are "effectively surrounded" by public lands within one or more conservation system

units. This provision, which was adopted at the suggestion of the Alaska Legislature's "Steering Council for D–2 Lands," is similar to but expands upon the access provisions of section 5 of the Wilderness Act. It was adopted in recognition of the fact that valid existing mining claims and similar occupancies are within the boundaries of the conservation system units, and that a number of additional valid inholdings will be created by the completion of the lands transfers mandated by the Alaska Native Claims Settlement Act.

It is the intent of the Committee that these provisions concerning access be liberally construed in favor of those seeking access. In particular, it should be noted that by use of the phrase "effectively surrounded" in section 1202(c) the Committee intends to provide for cases in which an inholding is not completely enclosed by a conservation system unit's public lands, but is so generally embraced by those lands that the effect as a practical matter is the same. Similarly, by speaking of trave "across" a unit in section 1202(b), the Committee intends to provide for travel which is not for the primary purpose of visiting or enjoying recreational use of a conservation system unit, but which includes a more or less extensive passage on or over the lands within such a unit. (Public access to the conservation system units is addressed in section 1202(a)(3); this includes access for recreational purposes.)

At the same time, the Committee does not intend that the needed liberal construction of these access provisions will prevent the Secretary from adopting reasonable regulations concerning routes, modes, or frequency of travel which may be necessary to protect the natural and other values of the conservation system units or to assure that the access provided under 1202(a) and the travel permitted under 1202(b) will remain consistent with the purposes of the conservation system units.

As to modes of access, the Committee recognizes that the use of aircraft, motorboats, and snowmobiles is generally appropriate and even necessary in Alaska, and intends that such uses be allowed to continue, subject to reasonable regulations for protection of the natural and other values of the conservation system units.

*Archeological and Paleontological Sites*

Section 1203 would assure protection of some significant, isolated, archeological and paleontological sites located near the proposed Bering Land Bridge National Preserve, Yukon Charley National Preserve and Kobuk Valley National Park. These areas were not glaciated during the last ice age, and thus have high potential:

*Bering Land Bridge National Preserve:* The Seward Peninsula has some of the highest potential for archeological sites associated with the Bering Land Bridge, the ancient link between Russia and North America. The recently discovered petroglyphs south of Dearing are considered to be of international significance. Sites have been discovered throughout the Seward Peninsula. Although the best and most significant are included within the proposed preserve, there have also

administration, public use and enjoyment, or protection of subsistence activities.

In this connection, a review of the legislative history of the Statehood Act reveals that the intent of Congress was to assign to the State certain Federal properties and the responsibility for conducting Federal aid research programs, regulating numbers of sportsmen and methods of taking. The Act did not transfer ownership over the fish and wildlife species themselves, since they are the property of no one until reduced to possession, and such transfer of responsibility likely would have been unconstitutional. Nevertheless, the Federal land managers and State authorities must work together closely to assure that the broad public interest in the taking of fish and wildlife in conservation system units is preserved and enhanced for all time to come.

*Hunting Guides and Nonsubsistence Trappers*

Since national parks and monuments are sanctuaries for wildlife, non-subsistence trapping and sport hunting are generally prohibited under section 1209(a) except in national preserves where the Secretary may permit sport hunting. However, several guides now provides services for hunters in portions of the extensions to Katmai and Denali National Parks and of the Gates of the Arctic and Wrangell-St. Elias National Parks. While the Committee did not wish to open these parks generally to sport hunting, the Committee does not intend to unduly affect the livelihood of the existing guides.

Thus the bill provides, in subsection 1209(c), alternatives which the Secretary can offer to persons who presently have licenses to guide hunters in those specified parks, if the Secretary finds that they would suffer economic hardship when sport hunting in those parks is prohibited as a result of this Act. Included is an option to allow those persons now duly licensed as guides to continue guiding for sport hunting for 20 years or for life. In providing this option, the Committee does not intend that such guiding permits shall be transferable or that the provision of such permits is to be construed as authorizing the extension of hunting guide services beyond that allowed under their existing permits. To this end, the section contains a number of restrictions to ensure that such services and the taking of wildlife by persons guided by the permittees are carefully controlled and regulated.

Similar provisions and restrictions are contained in section 1209(d) for persons who have an existing license or permit for non-subsistence trapping in portions of Cape Krusenstern National Monument and Kobuk Valley National Park and in portions of the extensions to Denali National Park. The National Park Service estimates that there is possibly only one commercial trapper within Cape Krusenstern, several in the Minchumina area of Denali, and fewer than five in Kobuk Valley. Virtually all other trapping is subsistence-related, and permitted under the provisions of Title VII.

*Maps and Reports*

Section 1210 provides, among other things, for the Secretary to make minor boundary adjustments to the conservation system units.

23-830 O - 78 - 15

In exercising this authority, the Secretary should attempt to follow natural features and hydrographic divides and to avoid unnecessary conflicts with State selection interests and Native and other private lands.

Section 1211 requires that the Secretary submit to the appropriate Committee of Congress an environmental impact statement (EIS), when required by NEPA, and a report explaining the major federal action which is the subject of such EIS at least sixty (60) days before the commencement of such action.

## TITLE XIII. MISCELLANEOUS

As the designation "miscellaneous" indicates, this Title contains a number of items proper for inclusion in this Act but not closely tied to other specific title.

### *Iditarod National Historic Trail*

The first such item concerns the Iditarod National Historic Trail. As recommended by the Administration, the bill includes this trail within the National Trails System by an appropriate amendment to the National Trails System Act. In providing for establishment of this unit, the Committee recognizes that when this report was filed, the "historic" trails category had yet to be established under the National Trails Act. The Committee assumed that by the time this action becomes law, other national trail legislation, pending in the House, will be enacted. In any event, it is the intent of the Committee that the Iditarod Trail be established as a National Trail, regardless of the outcome of the other pending legislation.

### *Klondike Gold Rush National Historic Park*

Similarly, section 1302 embodies a recommendation of the Administration by amending the Act establishing the Klondike Gold Rush National Historic Park so that the State of Alaska, in transferring lands to that Park, may include the minerals in the lands transferred. This language was requested by the Administration because the Alaska Statehood Act provides that if the State attempts to include minerals in the transfer of lands which the State has received from the United States, then the minerals "shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States District Court for the District of Alaska." The Committee was informed that this section of the Statehood Act apparently has the rather paradoxical effect that if the State attempts to transfer lands to the United States, and attemps to include the minerals in that transfer, the United States can receive the minerals only after the Attorney General brings action in the federal court in Alaska. The language of section 1302 would avoid the necessity of what would thus be an entirely friendly and uncontested suit, and would clear the way for the State to transfer to the United States lands which the State wishes to include in the Klondike National Historical Park,

96TH CONGRESS } HOUSE OF REPRESENTATIVES { Rept. 96–
*1st Session* } { 97 Part I

# PROVIDING FOR THE DESIGNATION AND CONSERVATION OF CERTAIN PUBLIC LANDS IN THE STATE OF ALASKA, INCLUDING THE DESIGNATION OF UNITS OF THE NATIONAL PARK, NATIONAL WILDLIFE REFUGE, NATIONAL FOREST, NATIONAL WILD AND SCENIC RIVERS, AND NATIONAL WILDERNESS PRESERVATION SYSTEMS, AND FOR OTHER PURPOSES

APRIL 18, 1979.—Ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

together with

## DISSENTING, SUPPLEMENTAL, AND SEPARATE VIEWS

**[To accompany H.R. 39]**
**[Including the cost estimate of the Congressional Budget Office]**

The Committee on Interior and Insular Affairs, to whom was referred the bill (H.R. 39) to provide for the designation and conservation of certain public lands in the State of Alaska, including the designation of units of the National Park, National Wildlife Refuge, National Forest, National Wild and Scenic Rivers, and National Wilderness Preservation Systems, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

The amendments are as follows:

Page 2, beginning on line 3, strike all after the enacting clause and insert in lieu thereof the following:

That this Act may be cited as the "Alaska National Interest Lands Conservation Act".

TABLES OF CONTENTS

Sec. 1. Short title and table of contents.

TITLE I—FINDINGS, POLICY, AND DEFINITIONS

Sec. 101. Findings.
Sec. 102. Policy.
Sec. 103. Definitions.

that is, persons covered by this definition are to be regarded as being *pedis possessio*, and for the purposes of section 1201 are to be dealt with as though they have perfected their entries and have received title to the land on which their dwellings are located. This section does not apply to cabins or other structures which are the subject of National Forest special use permits.

By providing, in section 1101(e) that the Secretary shall give prompt and careful consideration to any offer by an owner who wishes to sell his property, if continued ownership is causing or would result in hardship to him, the Committee does not intend to authorize the Secretary to pay less than the fair market value. The Committee expects the Secretary to deal fairly with landowners, but the Secretary should delve into allegations of hardship and determine the facts.

Section 1101(f) is the "exchange" portion of the general "acquisition" provisions. Modelled on section 22(f) of the Alaska Native Claims Settlement Act. It is intended to provide the Secretary with great flexibility in acquiring lands by permitting him to enter into exchanges. This flexibility extends to making exchanges within conservation system units.

The Committee expects that the Secretary will use his condemnation authority only as a last resort. The Committee expects the Secretary to utilize his exchange authority and his authority to acquire easements where possible rather than resort to fee condemnation. Of course, should condemnation prove necessary, the Secretary is expected to notify and consult with the Committee as is currently the practice.

The provision also specifies that all lands, waters, and interests acquired by the Secretary within the boundaries of a conservation system unit shall automatically be added to the unit.

Lastly, the Secretary is authorized to acquire scenic easements to protect Sukakpak Mountain, in the pipeline corridor, and along the highway study area described in Section 1205(a).

H.R. 39 as introduced contained a nearly identical provision. However, it also provided that the State and Native corporations could relinquish certain lands which would be included in conservation system units. Furthermore, it specified that all lands withdrawn under Section 17(d)(1) of ANCSA within unit boundaries would be added to those units. There was concern that this provision would abrogate certain land selection rights possessed by the State of Alaska.

*Section 1102: Archaeological and Palentological Sites*

The Committee adopted a provision that would ensure protection of some significant isolated archeological and paleontological sites located outside the boundaries, but near the Bering Land Bridge National Preserve, Yukon-Charley National Preserve, Kobuck Valley National Monument and Preserve, and Cape Krusenstern National Preserve. These regions were not glaciated during the last Ice Age, and thus, have high potential for contributing knowledge about life in the Arctic at the time man entered the New World.

The Secretary does not have the authority under the Committee amendment to condemn lands for these purposes. The Secretary's authority in this regard is extended to the Cape Krusenstern National Preserve by the Committee amendment. Nothing in this legislation is intended to preclude appropriate archeological or other studies whether

# Calendar No. 1251

95TH CONGRESS 2d Session } SENATE { REPORT No. 95–1300

## DESIGNATING CERTAIN LANDS IN THE STATE OF ALASKA AS UNITS OF THE NATIONAL PARK, NATIONAL WILDLIFE REFUGE, NATIONAL WILD AND SCENIC RIVERS AND NATIONAL WILDERNESS PRESERVATION SYSTEMS, AND FOR OTHER PURPOSES

OCTOBER 9 (legislative day, SEPTEMBER 28), 1978.—Ordered to be printed

Mr. JACKSON, from the Committee on Energy and Natural Resources, submitted the following

## REPORT

together with

## MINORITY AND SUPPLEMENTAL VIEWS

[To accompany H.R. 39]

The Committee on Energy and Natural Resources, to which was referred the act (H.R. 39) to designate certain lands in the State of Alaska as units of the National Park, National Wildlife Refuge, National Wild and Scenic Rivers and National Wilderness Preservation Systems, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the act as amended do pass.

The amendments are as follows:

1. Strike out all after the enacting clause and insert the following:

SECTION 1. This Act may be cited as the "Alaska National Interest Lands Conservation Act".

TABLE OF CONTENTS

TITLE I—PURPOSES, DEFINITIONS, AND MAPS

Sec. 101. Purposes.
Sec. 102. Definitions.
Sec. 103. Maps.

TITLE II—NATIONAL PARK SYSTEM

Sec. 201. Establishment of new areas.
Sec. 202. Additions to existing areas.
Sec. 203. General administration.
Sec. 204. Native selections.
Sec. 205. Commercial fishing.
Sec. 206. Withdrawal from mining.

50 percent of its market price absorbed by transportation costs, can support its own highly sophisticated transport system. Most other Alaska resources are simply unable to do this. Under present economic conditions, the resources simply are not valued that highly by the marketplace. Furthermore, a general reduction of relative costs, and especially labor costs, would have a much greater effect in terms of increasing the competitive position of most Alaska natural resources than would reduced transport costs.

(4) With the exception of oil and gas, broad scale development of Alaska natural resources must be considered to be far in the future, and in some instances may never occur. This conclusion is based both on the overall structure of present costs of resource development and on an assessment of future changes in costs and market prices for Alaska resources.

(5) In addition to great uncertainty as to *when* resource development might occur, there is equally great uncertainty as to *where* such development would occur, *what* form such development would take, or for *how long* or *how much* resource development would be involved. Furthemore, we do not know the market destination of the resource.

Therefore, the Committee believes that Alaska National Interest Lands legislation cannot designate at this time the routes of transportation corridors. The location, timing, type and magnitude of resource development is unknown, market destinations for the produced resources are unknown, and, due to the forces of technological change, both the product form and appropriate transport mode cannot be anticipated with any degree of certainty. These same unknowns suggest as well, that it would be fruitless to attempt to draw boundaries of four systems units to leave open transportation corridors.

The prime motivating factor for a consolidated process of transportation for Alaska's conservation unit was the uncertainty with which transportation needs can be determined. Alaska has few roads and no statewide transportation network. Presently, the bulk of Alaska, particularly where the majority of the areas established by the Committee are located, is accessible only by air or water. Future surface transportation needs cannot be addressed by the designation of a system of corridors.

Instead. the Committee devised a process to provide for access across four systems units when the resource development activities are to begin and when the mode of transportation and destinations of the resource to be extracted are known.

The process will involve the Secretary, the Secretary of Transportation and the State of Alaska in planning future surface transportation needs. This alters the traditional discretionary role of most existing law for conservation units, but replaces it with a system which will insure orderly transportation planning.

The Committee does not agree with the arguments that existing law is sufficient to site transportation corridors across four systems units. First of all, existing law makes siting of roads and airports, particularly, but other modes as well, very difficult if not impossible in wildernesses, parks, wild and scenic rivers, and wildlife refuges (in descending order of difficulty). Secondly, existing law makes for bad

34-309—78——14

96TH CONGRESS } SENATE { REPORT
1st Session } { No. 96–413

# ALASKA NATIONAL INTEREST LANDS

NOVEMBER 14 (legislative day, NOVEMBER 5, 1979.—Ordered to be printed

Mr. JACKSON, from the Committee on Energy and Natural Resources, submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 39]

The Committee on Energy and Natural Resources to which was referred the act (H.R. 39) to provide for the designation and conservation of certain public lands in the State of Alaska, including the designation of units of the National Park, National Wildlife Refuge, National Forest, National Wild and Scenic Rivers, and National Wilderness Preservation Systems, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the act, as amended, do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert the following:

## IV. LEGISLATIVE HISTORY

The Committee had 11 bills relating to the Alaska National Interest Lands pending before it during the 95th Congress. S. 499, containing the 1973 proposals of Interior Secretary Rogers C. B. Morton and S. 500, the Alaska Coalition proposal, were introduced by Senators Jackson and Hansen (by request), on January 28, 1977.

On May 12, 1977, Senator Metcalf introduced S. 1500 as a substitute for S. 500. Senator Durkin introduced an amendment to S. 1500 (No. 2176) on May 16, 1978. Senator Stevens' proposal, S. 1787 was introduced June 30, 1977. S. 2465, the Carter Administration proposal was introduced by request on January 31, 1978. Senator Gravel introduced his bill, S. 2944, on April 15, 1973.

H.R. 39, as passed by the House, was referred to the Committee on June 8, 1978.

In addition to comprehensive Alaska lands legislation, S. 1546, introduced by Senator Abourezk creating a National Preserve on Admiralty Island, S. 3016 proposed by Senators Gravel and Stevens and S. 3303, proposed by the Administration containing numerous provisions to improve the implementation of the Alaska Native Claims Settlement Act, were referred to the Committee on Energy and Natural Resources.

The Full Committee held 7 days of hearings in Washington on the Alaska National Interest Lands bills during the 95th Congress. During the 94th Congress 2 days of hearings were held on S. 1687, the Administration "d-2" proposal. In addition the Committee staff conducted workshops in 7 Alaska villages during September 1977 and participated in 7 days of workshops in February, 1978.

Committee markup of these proposals in the 95th Congress commenced on June 22, 1978. After 46 markup sessions, the Committee ordered H.R. 39 favorably reported with an amendment in the nature of a substitute on October 5, 1978.

The Committee on Energy and Natural Resources continued to consider Alaska Lands legislation in the 96th Congress. On January 15, 1979, Senator Jackson introduced S. 9 which was virtually identical to the bill reported by the Committee in October, 1978.

Senator Durkin introduced the Alaska Coalition Proopsal, S. 222, with 19 cosponsors, on January 25, 1979.

H.R. 39, once again the number of the House bill, passed by the House and was referred to the Committee on May 24, 1979.

The Committee met on July 10, 1979, to consider a request by Senator Gravel to conduct field hearings in the State of Alaska. Given the extensive legislative history and public debate on this issue, the Committee agreed to proceed to markup rather than to hold any further hearings.

Full Committee markup on Alaska Lands began on October 9, 1979. S. 9 was used as the text for purposes of amendment. On October 30, 1979, after 12 markup sessions, the Committee ordered H.R. 39 favorably reported with an amendment in the nature of a substitute.

govern the areas covered by the legislation and that the provisions of existing law govern the other federal lands in the State of Alaska. The section becomes effective upon the relinquishment of specified State selections made on November 15, 1978.

*Section 1324: Access*

This section is designed to remove the uncertainties surrounding the status of the rights of the owners of non-Federal lands to gain access to such lands across Federal lands. It has been the Committee's understanding that such owners had the right of access to their lands subject to reasonable regulation by either, the Secretary of Agriculture in the case of national forests, or by the Secretary of the Interior in the case of public lands managed by the Bureau of Land Management under the Federal Land Policy and Management Act of 1976. However, a recent District Court decision in Utah (*Utah* v. *Andrus* et al., C79-0037, October 1, 1979, D. C. Utah) has cast some doubt over the status of these rights. Furthermore, the Attorney General is currently reviewing the issue because of differing interpretations of the law by the Departments of Agriculture and the Interior.

The Agriculture Department believes that non-Federal land owners have the right of access to national forest lands subject to reasonable rules and regulations. They find nothing in the Organic Act of 1897 (16 U.S.C. 473–478, 479–482, 551) or the Wilderness Act which precludes such access. In fact, they interpret Section 5(a) of the Wilderness Act (16 U.S.C. 1131–1136) as mandating access to non-Federal in holdings within national forest wilderness.

The Interior Department on the other hand, interprets Section 5(c) of the Wilderness Act as expressly authorizing denial of access to such inholders in wilderness areas. Based on that interpretation, Interior then concludes that the provisions for wilderness review of public lands organized by BLM in section 603(c) of the Federal Land Policy and Management Act also authorized denial of access across public lands subject to wilderness review.

The Committee amendment is designed to resolve any lingering legal questions by making it clear that non-Federal landowners have a right of access. National Forests and public land, subject, of course, to reasonable rules and regulations.

## Title XIV—Amendments to the Alaska Native Claims Settlement Act and Related Provisions

*Section 1401: Stock Alienation*

This section is intended to allow Native Corporations the option of giving their shareholders and Corporations additional protection after 1992 when stock can be alienated. The section is also designed to limit the possibility of take over of Native Corporations by outside interests. This is accomplished by allowing the Corporations the option of amending their bylaws to provide for a right of first refusal before the culmination of a sale or other transfer of the stock and also to limit voting in Native Corporations to Alaska Natives or their direct descendants. In addition, this section allows Alaska Native members of professional organizations to alienate their stock in cases where holding Native stock may interfere with their ability to conduct their business.

HOUSE NO. 3
AMENDMENTS TO H.R. 39 MADE TO ORIGINAL BILL BY GOAL STAFF PRIOR TO GOAL MARKUP. INCLUDES CHANGES SUGGESTED DURING HEARINGS AND BY DOI (SEE BILL NO. 2)

372

# [COMMITTEE PRINT]

OCTOBER 17, 1977

RECOMMENDATIONS FOR SUBSTITUTE TEXT FOR H.R. 39

95TH CONGRESS
1ST SESSION

# H. R. 39

---

IN THE HOUSE OF REPRESENTATIVES

---

# A BILL

SHORT TITLE AND TABLE OF CONTENTS

SECTION 1. This Act, together with the following table of contents, shall be cited as the "Alaska National Interest Lands Conservation Act".

TABLE OF CONTENTS


| | Page |
|---|---|
| Sec. 1. Short title and table of contents | 1 |
| TITLE I—FINDINGS, POLICY, AND DEFINITIONS | |
| Sec. 101. Findings | 4 |
| Sec. 102. Policy | 6 |
| Sec. 103. Definitions | 8 |
| TITLE II—NATIONAL PARK SYSTEM | |
| Sec. 201. Establishment of new areas | 13 |
| Sec. 202. Additions to existing areas | 22 |
| Sec. 203. Administrative provisions | 24 |


J. 96-941——1

other action which the Secretary determines should be taken following termination of the Council to continue carrying the purposes for which the Council was established.

## TITLE XII—ADMINISTRATIVE PROVISIONS

### LAND ACQUISITIONS AND EXCHANGES

SEC. 1201. (a) Except as otherwise provided in this Act, in order to carry out the purposes of this Act, the Secretary is authorized to acquire by purchase, donation, or exchange any lands within the boundaries of any conservation system unit. Land owned by the State, a political subdivision of the State, or a Native Corporation may only be acquired for such purposes with the consent of the State, political subdivision of the State, or Native Corporation.

(b) No improved property shall be acquired under subsection (a) without the consent of the owner unless the Secretary first determines that such acquisition is necessary to the fulfillment of the purposes of this Act or to the fulfillment of the purposes for which the concerned conservation system unit was established or expanded.

(c) The owner of an improved property on the date of its acquisition, as a condition of such acquisition, may retain for himself, his heirs and assigns, a right of use and occupancy of the improved property for noncommercial residential or recreational purposes, as the case may be, for a definite term of not more than twenty-five years, or, in

lieu thereof, for a term ending at the death of the owner or the death of his spouse, whichever is later. The owner shall elect the term to be reserved. Unless the property is wholly or partially donated, the Secretary shall pay to the owner the fair market value of the property on the date of its acquisition, less the fair market value on that date of the right retained by the owner. A right retained by the owner pursuant to this section shall be subject to termination by the Secretary upon his determination that such right is being exercised in a manner inconsistent with the purposes of this Act, and it shall terminate by operation of law upon notification by the Secretary to the holder of the right of such determination and tendering to him the amount equal to the fair market value of that portion which remains unexpired.

(d) For the purposes of this section, the term "improved property" means: (1) a detached single family dwelling, the construction of which was begun before January 1, 1977 (hereinafter in this section referred to as "dwelling"), together with so much of the land on which the dwelling is situated, such land being in the same ownership as the dwelling, as the Secretary shall designate to be reasonably necessary for the enjoyment of the dwelling for the sole purpose of noncommercial residential use, together with any structures necessary to the dwelling which are situated on the land so

designated, or (2) property developed for noncommercial recreational uses, together with any structures accessory thereto which were so used on or before January 1, 1977. In determining when and to what extent a property is to be considered an "improved property", the Secretary shall take into consideration the manner of use of such buildings and lands prior to January 1, 1977, and shall designate such lands as are reasonably necessary for the continued enjoyment of the property in the same manner and to the same extent as existed prior to such date.

(e) In acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within the National Forest System) or interests therein (including Native selection rights) with the corporations organized by the Native groups, Village Corporations, Regional Corporations, and the corporations organized by Natives residing in Juneau, Sitka, Kodiak, and Kenai, all as defined in the Alaska Native Claims Settlement Act, and other municipalities and corporations or individuals, the State (acting free of the restrictions of section 6(i) of the Alaska Statehood Act (72 Stat. 340)), or any Federal agency. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the concerned Secre-

tary determines it is in the public interest, such exchanges may be made for other than equal value.

(f) All lands, water, and interests therein acquired by the Secretary and located within the boundaries of any conservation system unit shall become part of such unit and subject to the laws and regulations applicable to such unit.

ACCESS

SEC. 1202. (a) In making conveyances to the State and to Native Corporations and in carrying out his other duties under this Act, the Secretary shall take such actions (including reservation of easements and issuance of regulations) as are required to carry out the following purposes:

(1) providing access to subsistence lands for purposes of subsistence uses under this Act;

(2) providing access for purposes of administering units of the National Park, National Wildlife Refuge, National Forest, or Wild and Scenic Rivers systems established or expanded by this Act;

(3) providing public access to conservation system units, consistent with the purposes for which the units are established or expanded;

(4) insuring continued public access to areas conveyed to the State, particularly in cases where such areas are enclosed by one or more conservation system units, in such manner as is established by this Act and is con-

sistent with the purposes for which the concerned conservation system units were established or expanded;

(5) insuring continued access to areas conveyed to the Native Corporations by those persons entitled to such access.

(b) In reserving any necessary easements under this section, the Secretary shall be guided by the principles set forth in section 803 (b) regarding easements on lands to be conveyed to Native Corporations.

(c) Except as otherwise provided in section 10 (f) of the Wild and Scenic Rivers Act, section 607 (b), section 715, or section 718 of this Act, or any other provision of this Act, in administering the conservation system units in Alaska, the Secretary shall permit the continuation of customary patterns of travel by Alaska residents across such units. Such travel, including the modes of travel, may be conditioned by such reasonable regulations as the Secretary shall promulgate to assure that such travel is consistent with the purposes for which such unit was established. Before promulgating regulations under this section, the Secretary shall give at least sixty days public notice of the proposed regulations, including at least publication of the proposed regulations in a newspaper or newspapers having general circulation in each State judicial district in Alaska where the unit or units affected by the proposed regulations are located,

and shall hold a public hearing or hearings concerning the proposed regulations at one or more locations convenient to the unit or units affected.

ARCHEOLOGICAL AND PALEONTOLOGICAL SITES

SEC. 1203. Notwithstanding any acreage or boundary limitations contained in this Act with respect to the conservation system units described in sections 201 (2), 201 (6), and 201 (10), the Secretary of the Interior may acquire, by purchase, donation, or exchange any significant archeological or paleontological site in Alaska located outside of any such unit, the resources of which are closely associated with such unit. If any such site is so acquired, it shall be included in and managed as part of such unit. Property owned by a State or unit of local government may be acquired under this section only by donation or exchange. Not more than seven thousand five hundred acres of land may be acquired under this section for inclusion in a single conservation system unit. Before acquisition of any property in excess of one hundred acres under the provisions of this section, the Secretary shall—

(1) submit notice of such proposed acquisition to the Committee on Interior and Insular Affairs of the House of Representatives and the Energy and Natural Resources Committee of the Senate; and