**Nos. 26-6479, 26-6481, 26-6484, 26-6485, 26-6487, 26-6490, 26-6551, 26-6554, 26-6570, 26-6997, 26-7055**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

NATIVE VILLAGE OF HOOPER BAY, et al., FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,
*Plaintiffs-Appellees-Cross-Appellants,*
and
DEFENDERS OF WILDLIFE,
*Plaintiff-Appellee,*
v.
DOUG BURGUM, et al., AND KING COVE CORPORATION,
*Defendants-Appellants,*
STATE OF ALASKA,
*Intervenor-Defendant-Appellant.*

On Appeal from the U.S. District Court for the District of Alaska, Nos. 3:25-cv-00316, -00318, -00319 (Hon. Sharon L. Gleason)

# JOINT BRIEF OF AMICI CURIAE NANA REGIONAL CORPORATION, INC., CHUGACH ALASKA CORPORATION, AND THE ALEUT CORPORATION IN SUPPORT OF FEDERAL APPELLANTS, KING COVE CORPORATION, AND THE STATE OF ALASKA, SUPPORTING REVERSAL IN PART AND AFFIRMANCE IN PART

Christopher J. Slottee
Robert Misulich
Samuel Schimmel
Schwabe, Williamson & Wyatt, P.C.
420 L Street, Suite 400
Anchorage, Alaska 99501
(907) 339-7130
CSlottee@schwabe.com
*Counsel for Amici Curiae*

November 19, 2026

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), NANA Regional Corporation, Inc., Chugach Alaska Corporation, and The Aleut Corporation each state that they are Alaska Native Regional Corporations organized under the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq. None has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any of them.

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ........ 1

SUMMARY OF ARGUMENT ........ 4

ARGUMENT ........ 5

I. ANILCA carried the ANCSA settlement forward, and Native Corporations relied on it. ........ 5

A. Congress settled Native claims with fee title and preserved that settlement in ANILCA. ........ 5

B. The district court correctly held that ANILCA's economic and social purposes guide its implementation. ........ 8

II. Land exchanges are how the settlement works on the ground. ........ 10

A. Different regions use the exchange authority to solve different problems ........ 10

B. The noticed agreements illustrate exchanges for community needs. ........ 11

C. The King Cove exchange is of the same kind. ........ 13

III. The Title XI and Refuge Act rulings would unsettle that practice across Alaska. ........ 15

IV. The upheld § 810 analysis addresses the subsistence concerns presented here. ........ 17

V. The Title XI and Refuge Act holdings are also wrong as a matter of statutory text. ........ 18

A. Title XI requires a qualifying system authorization, not merely a project-related conveyance. ........ 18

B. The Refuge Act's suitability clause conditions only the exchange power that Act confers. ........ 21

VI. With those holdings reversed, the Court should direct remand without vacatur. ........ 22

CONCLUSION ........ 23

CERTIFICATE OF COMPLIANCE ........ 25

# TABLE OF AUTHORITIES

## Cases

*Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012)..........................23

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ..............................................22

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976 (9th Cir. 2025) ..........................................................................................................23

*Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991 (9th Cir. 1994) .............................6

*Morton v. Mancari*, 417 U.S. 535 (1974) ...............................................................21

*Native Village of Hooper Bay v. Burgum*, Nos. 3:25-cv-00316-SLG, 3:25-cv-00318-SLG & 3:25-cv-00319-SLG, Decision and Order (D. Alaska Aug. 18, 2026) ........................................................................................................ passim

*Sturgeon v. Frost*, 139 S. Ct. 1066 (2019)..............................................................20

## Statutes

Alaska National Interest Lands Conservation Act § 101(d), 16 U.S.C. § 3101(d) ..1, 4, 8

Alaska National Interest Lands Conservation Act § 1302(h), 16 U.S.C. § 3192(h) ........................................................................................................ passim

Alaska National Interest Lands Conservation Act § 1412, 43 U.S.C. § 1639.......1, 6

Alaska National Interest Lands Conservation Act § 304(a), Pub. L. No. 96-487, tit. III, 16 U.S.C. § 668dd note.........................................................................21

Alaska National Interest Lands Conservation Act § 810, 16 U.S.C. § 3120... passim

Alaska National Interest Lands Conservation Act § 910, 43 U.S.C. § 1638 9, 16, 24

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3162(1)... 18, 19, 20

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3164(a) ......... 18, 19

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3164(b)-(c) ..........18

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3165.....................20

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3166(b)–(c) .........15

Alaska National Interest Lands Conservation Act, Title XI........................... passim

Alaska Native Claims Settlement Act § 2(b), 43 U.S.C. § 1601(b) ......................1, 5

Alaska Native Claims Settlement Act § 7(i)–(j), 43 U.S.C. § 1606(i)–(j) ................8
Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1629h ...................... i, 1
Clean Water Act ..........................................................................................16
Endangered Species Act..................................................................................23
National Environmental Policy Act ..............................................................9, 16
National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd(b)(3)(A) ..................................................................................................... passim
National Wildlife Refuge System Improvement Act of 1997 § 9(b), Pub. L. No. 105-57, 111 Stat. 1252, 1260 .......................................................................22

**Rules**

Fed. R. App. P. 26.1 ........................................................................................ i
Fed. R. App. P. 29(a)(4)(A) ................................................................................ i
Fed. R. App. P. 29(a)(4)(E)..................................................................................4
Fed. R. App. P. 29(a)(5)......................................................................................25
Fed. R. App. P. 32(a)(5)–(6), (g) ........................................................................25
Fed. R. App. P. 32(f) ..........................................................................................25

**Legislative History**

126 Cong. Rec. 29,279–80 (1980) ........................................................................7
*Alaska Lands—Part 1: Hearings Before the Subcomm. on Fisheries & Wildlife Conservation & the Env't of the H. Comm. on Merchant Marine & Fisheries*, 95th Cong. (1978) ..........................................................................................7
*Alaska National Interest Lands—Part 2: Hearings Before the Subcomm. on Fisheries & Wildlife Conservation & the Env't of the H. Comm. on Merchant Marine & Fisheries*, 96th Cong. (1979) ...........................................................7
H.R. Rep. No. 92-523 (1971), reprinted in 1971 U.S.C.C.A.N. 2192...................5, 6
H.R. Rep. No. 96-97, pt. 1 (1979).....................................................................6, 16
S. Rep. No. 96-413 (1979) ..................................................................................6

**Other Authorities**

Chugach Alaska Corp., *Lands*, https://www.chugach.com/about-us/lands...............2

Decision of the Secretary (2-ER-110, 149) ..................................................... 14, 22

Declaration of Candace Nielson ............................................................. 2, 3, 13, 14

Declaration of Diana Biesanz and attachments in support of Federal Defendants' Response to Motion for Summary Judgment (3-ER-394–612)................... 11, 12

Declaration of Elizabeth A. Cravalho, D. Ct. Dkt. 41-3, No. 3:25-cv-00319-SLG .1, 2, 9, 10

Federal Appellants' Brief (U.S. Br.)............................................................... passim

Final Report ANILCA Section 810 Analysis of Subsistence Impact for the Proposed 2025 Izembek Land Exchange (2-ER-167–273) ................................................17

King Cove Corporation's Brief (KCC Br.)................................................ 15, 18, 20

State of Alaska's Brief (State Br.) .................................................................. passim

The Aleut Corp., *Lands*, https://www.aleutcorp.com/lands/ .....................................3

The Aleut Corp., *Road to King Cove*, https://www.aleutcorp.com/road-to-king-cove/ ..........................................................................................................................3

## INTEREST OF AMICI CURIAE

NANA Regional Corporation, Inc. ("NANA"), Chugach Alaska Corporation ("Chugach"), and The Aleut Corporation ("Aleut") are Alaska Native Regional Corporations established under the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601–1629h. Congress enacted ANCSA to settle Alaska Native land claims. It did so with the goal of providing for the economic and social needs of Alaska Natives and to ensure Native participation in decisions affecting Native lands and property. 43 U.S.C. § 1601(b). The Alaska National Interest Lands Conservation Act ("ANILCA") subsequently established conservation system units throughout Alaska while recognizing the State's economic and social needs and preserving the rights established under ANCSA. 16 U.S.C. § 3101(d); 43 U.S.C. § 1639. Together, these statutes govern the ownership, use, and management of millions of acres of Alaska Native lands.

NANA is the Alaska Native Regional Corporation for northwest Alaska and the successor to ten village corporations that merged with it in 1976. NANA owns more than 2.2 million acres of surface and subsurface estate conveyed under ANCSA and represents more than 15,500 Iñupiaq shareholders. Declaration of Elizabeth A. Cravalho ¶¶ 8–10, D. Ct. Dkt. 41-3, No. 3:25-cv-00319-SLG ("Cravalho Decl."). Fifty-eight percent of the Iñupiat's traditional lands in the NANA region lie within the boundaries of conservation system units that ANILCA

created, as do two of the region's villages, and much of NANA's own land adjoins those units. *Id.* ¶ 21. Federal land management decisions directly affect NANA's ability to access and use its lands for economic development, subsistence, and the benefit of its shareholders.

Chugach is the Alaska Native Regional Corporation for Prince William Sound and portions of the Kenai Peninsula, representing more than 3,000 Alaska Native shareholders. Chugach owns roughly 378,000 acres of surface and subsurface estate and more than 550,000 additional acres of subsurface estate. Its landholdings include divided estates in which federal conservation interests overlap with Native property rights. These overlaps underscore the importance of land exchanges in addressing access limitations and ensuring the practical use of lands conveyed under ANCSA. *See* Chugach Alaska Corp., *Lands*, https://www.chugach.com/about-us/lands.

Aleut is the Alaska Native Regional Corporation for the Aleutian and Pribilof Islands and portions of the Alaska Peninsula, representing more than 4,200 Alaska Native shareholders. Declaration of Candace Nielsen ¶ 4 ("Nielsen Decl."). Aleut's shareholder records as of November 18, 2026, show that "approximately 210 Aleut shareholders reside in King Cove" and "approximately 9 reside in Cold Bay." *Id.* ¶ 5. Aleut owns 70,789 acres of surface estate and 1.57 million acres of subsurface estate throughout the Aleut Region. *Id.* ¶ 6. Aleut holds "approximately 9.3 acres of surface estate and approximately 34,000 acres of subsurface estate" in the immediate

vicinity of King Cove, Cold Bay, and the Izembek National Wildlife Refuge. Id. ¶ 7. Aleut's interests include lands near federal conservation units and communities that depend on reliable transportation and access to essential services. Aleut has been a strong supporter of the proposed King Cove to Cold Bay road because of "the importance of reliable transportation and access to essential services for the communities in which its shareholders live." Nielsen Decl. ¶ 8. *See* The Aleut Corp., *Lands*, https://www.aleutcorp.com/lands/; The Aleut Corp., *Road to King Cove*, https://www.aleutcorp.com/road-to-king-cove/.

Amici's landholdings and circumstances differ, but they share an interest that reaches well beyond the Izembek Isthmus. Amici support the exchange and the community needs it serves. Their additional concern is the rule this case will establish for Native landownership and future exchanges throughout Alaska. Section 1302(h) is a tool Congress gave the Secretary to address landownership, access, and community needs as they arise, and it names Native Corporations first among eligible exchange partners. 16 U.S.C. § 3192(h)(1). Amici support the district court's recognition that this authority serves the economic and social needs of Alaska's people. 1-ER-2–90 (Decision and Order, Aug. 18, 2026). They challenge its Title XI and National Wildlife Refuge System Administration Act ("Refuge Act") suitability rulings in Part V. They write principally to offer the perspective of Regional Corporations that took part in shaping ANILCA, that hold land across Alaska, and

that will live under whatever rule this case produces, while respecting applicable conservation and subsistence protections.

No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amici and their counsel contributed money intended to fund its preparation or submission. Fed. R. App. P. 29(a)(4)(E). Amici have moved for leave to file.

## SUMMARY OF ARGUMENT

The district court correctly construed ANILCA's purposes to include "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people," 16 U.S.C. § 3101(d), and held that the Secretary may weigh those needs in an exchange under § 1302(h). 1-ER-20–37. That independent statutory construction is distinct from review of the Secretary's application of the statute to this exchange. Amici principally offer the Regional Corporations' perspective on the history, practice, and consequences of the exchange authority, and address its statutory limits in Part V.

First, the history. Native Corporations took part in framing ANILCA and supported its conservation designations on the understanding that the Act would carry the ANCSA settlement forward: fee ownership, the freedom to use Native land as its owners decide, and a flexible exchange authority to fix the ownership problems that new conservation boundaries would create.

Second, the practice. The twelve agreements noticed below, executed between 2010 and 2017, illustrate exchanges to consolidate split estates, accommodate village landfills, and secure construction materials. One, involving land managed by the Izembek Refuge, expressly anticipated a possible future transportation corridor. Another conveyed a corridor through the Alaska Peninsula Refuge so that a village corporation could reach its own land. These agreements do not establish that every exchange or later project escapes other statutory requirements. They show why ownership adjustments and community needs frequently intersect.

Third, the consequences. A rule that makes an exchange's lawfulness turn on what the Native owner intends to build, and that adds an undefined refuge-suitability test, would reach that ordinary practice in every region. The Court should affirm the district court's reading of ANILCA's purposes, reverse its Title XI and Refuge Act holdings, and direct that the matter be remanded to the agency without vacatur.

## ARGUMENT

### I. ANILCA carried the ANCSA settlement forward, and Native Corporations relied on it.

#### A. Congress settled Native claims with fee title and preserved that settlement in ANILCA.

ANCSA settled aboriginal land claims not with reservations but with fee title to roughly 44 million acres, held by Native-owned corporations charged with meeting the "real economic and social needs of Natives." 43 U.S.C. § 1601(b). Congress expected most of that land to be "selected for its economic potential," H.R.

Rep. No. 92-523 (1971), *reprinted in* 1971 U.S.C.C.A.N. 2192, 2195, and this Court has had "no doubt that Congress intended" that corporations selecting land for that reason "would be able to develop that land and to realize that potential." *Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991, 996–97 (9th Cir. 1994).

ANILCA followed nine years later and was written to carry that settlement "toward its final fruition." H.R. Rep. No. 96-97, pt. 1, at 233–34 (1979). Congress provided that ANCSA remains "fully applicable" and that nothing in ANILCA "shall be construed to alter or amend" it. 43 U.S.C. § 1639. Because the new conservation system units surrounded or overlaid Native selections, the House committee explained that including lands to be conveyed to Natives within unit boundaries was "not intended to restrain or restrict the natives ability to use such lands in the manner which they decide." H.R. Rep. No. 96-97, pt. 1, at 179. And Congress chose exchange, not condemnation, as the principal means of adjusting ownership inside the units. The Senate committee described "a unique approach to land acquisition" meant "to maximize the use of exchange authority," S. Rep. No. 96-413, at 304 (1979), and the House committee described an authority giving the Secretary "great flexibility" that "extends to making exchanges within conservation system units," H.R. Rep. No. 96-97, pt. 1, at 246.

Native Corporations were participants in that process, not bystanders. NANA told Congress in 1979 that its region was "virtually surrounded by the parks and

refuges and preserves that are being created," and that it had agreed to support the proposed designations on the understanding that the legislation would protect subsistence. *Alaska National Interest Lands—Part 2: Hearings Before the Subcomm. on Fisheries & Wildlife Conservation & the Env't of the H. Comm. on Merchant Marine & Fisheries*, 96th Cong. 1395, 1403 (1979) (testimony of William L. Hensley). NANA also told Congress how Native owners would manage their own land. Its shareholders would not "sacrifice our traditional cultural values for massive developments," but with their options open they could develop Native lands "in a manner that will have negligible impact on neighboring lands." *Alaska Lands—Part 1: Hearings Before the Subcomm. on Fisheries & Wildlife Conservation & the Env't of the H. Comm. on Merchant Marine & Fisheries*, 95th Cong. 765 (1978) (same). Congress accepted that premise. The legislative record describes an intent to leave to "the Alaska Native people themselves, rather than to the Federal and State resource managers, the choice as to the direction and pace, if any, of the evolution of the subsistence way of life and of Alaska Native culture." 126 Cong. Rec. 29,279–80 (1980).

Fee title is the heart of that bargain. Congress chose not to place Native land in trust or under federal supervision. It conveyed ownership and left decisions about that land to Native shareholders acting through their corporations. And because resource revenues from regional corporation lands are shared with every other region

and passed through to village corporations, 43 U.S.C. § 1606(i)–(j), what one Native corporation is able to do with its land matters to Alaska Natives statewide.

### B. The district court correctly held that ANILCA's economic and social purposes guide its implementation.

ANILCA recognizes Alaska's economic and social needs alongside its conservation and subsistence purposes. ANILCA § 101(d), 16 U.S.C. § 3101(d). The district court correctly rejected the argument that Congress completed this balancing when it enacted ANILCA in 1980. Although Congress established the initial conservation designations, "the Secretary's implementation of ANILCA was just then beginning." 1-ER-25. Congress provided continuing authority to manage and exchange lands to carry out ANILCA's purposes. Accordingly, those purposes continue to guide the Secretary's administration of the Act, including the exercise of land exchange authority.

Congress provided the Secretary with express authority to carry out these purposes through land exchanges. Section 1302(h)(1) authorizes the Secretary to exchange federal lands, including lands within conservation system units and Native selection rights, to acquire lands for ANILCA's purposes. 16 U.S.C. § 3192(h)(1). The statute expressly identifies Alaska Native Corporations as eligible exchange partners and permits exchanges on the basis of equal value, subject to its stated exceptions. *Id.* Congress did not limit this authority to the original land designations or to lands threatened with condemnation. Indeed, the district court correctly rejected

the argument that § 1302(h) applies only to inholdings facing condemnation. 1-ER-37 n.115.

This authority allows the Secretary to address landownership, access, and community needs as they arise, rather than limiting exchanges to circumstances existing when ANILCA was enacted. NANA's earlier participation in ANILCA's development and implementation reflects the importance of administering ANILCA consistently with the rights established under ANCSA. Cravalho Decl. ¶¶ 19–26. Amici have a direct interest in preserving this authority as a means of addressing the economic, social, and subsistence needs of their shareholders while carrying out ANILCA's conservation purposes.

The Court should preserve that statutory construction and the related rulings to the extent they are challenged on cross-appeal. ANILCA § 910 , codified at 43 U.S.C. § 1638, addresses environmental review of conveyances under the Native land settlement. It exempts conveyances and specified actions leading to conveyances to Natives or Native Corporations under ANCSA or ANILCA from National Environmental Policy Act's ("NEPA") environmental-impact-statement requirement. The district court held that the exemption applies to this § 1302(h) conveyance, not merely to conveyances satisfying original ANCSA entitlements. 1-ER-55–56; 43 U.S.C. § 1638. That ruling does not exempt later road permits from NEPA or other applicable law. The court also upheld the Secretary's § 810 analysis

and his explanation for changing policy. 1-ER-47–55, 57–61. Amici support those rulings on this record, without enlarging them into immunity from independent statutory duties.

## II. Land exchanges are how the settlement works on the ground.

### A. Different regions use the exchange authority to solve different problems.

For Alaska Native Corporations, land is not an investment held apart from the people who own it. Ninety-eight percent of NANA's shareholders rely on traditional lands for subsistence foods, yet subsistence in the Arctic requires cash for fuel to heat homes and to travel to harvest. In Noatak, where fuel now arrives only by air, gasoline and heating fuel cost more than $17 per gallon. Cravalho Decl. ¶¶ 15–16. The ability to remain in a traditional community therefore depends on that community's economic viability and on access to land. *Id.* ¶ 16. NANA's land policies require that development minimize or eliminate impacts on subsistence resources, and land exchanges are one way NANA reconciles the two. *Id.* ¶ 19. For Native landowners, development and stewardship are not opposing categories. They are obligations owed to the same people.

Chugach and Aleut illustrate different dimensions of the same concern. Chugach's divided surface and subsurface estates make workable ownership and access arrangements important to realizing the value of Native property while maintaining conservation protections. Aleut's regional transportation interests,

including its support for the King Cove road, connect ownership and access directly to community safety and essential services. Their landholdings and published positions are described above. Neither interest depends on a claim that Native lands are unregulated. The shared concern is preserving a practical exchange mechanism within the statutory framework Congress enacted.

**B. The noticed agreements illustrate exchanges for community needs.**

The record contains at least twelve exchange agreements between the Secretary and Native Corporations involving Alaska refuge lands, executed between 2010 and 2017. 3-ER-394–612; *see* 1-ER-17–18. Each invokes § 1302(h) as its authority, and each is an equal-value exchange. Their purposes are modest and practical.

Isanotski Corporation, the village corporation for False Pass, exchanged lands managed by the Izembek Refuge so that it could "open a new sanitary landfill required to contain local waste and minimize environmental degradation," own the rock, sand, and gravel "useful for roads, fill material, and armor rock required to accommodate village construction projects," and have "sufficient space to accommodate a transportation corridor, should one be needed in the future." 3-ER-399.

The exchange with Sea Lion Corporation, the village corporation for Hooper Bay, transferred subsurface estate beneath a landfill "being relocated by the City of

Hooper Bay." 3-ER-530. The Shumagin and Akutan exchanges were meant to give the refuge "more effective management over its lands for wildlife and habitat purposes" and the corporation "more freedom and control over its lands for economic purposes." 3-ER-458, 467.

Oceanside Corporation and Bristol Bay Native Corporation, a regional corporation, exchanged lands with the United States because "the only usable access" to Oceanside's lands near Perryville was "through a corridor of land owned by the United States" within the Alaska Peninsula Refuge, and Oceanside needed that access to use its lands "for the purposes for which said lands were conveyed pursuant to ANCSA." 3-ER-516; *see* State Br. 22. Other agreements consolidated surface and subsurface ownership, including for Chevak Company. 3-ER-560.

None of the twelve agreements refers to a Title XI application or to a suitability finding under the Refuge Act. They reflect a shared understanding between the Secretary and Native Corporations that § 1302(h) is a complete authority for adjusting ownership within refuge boundaries, including where the stated object is a landfill, a materials site, an access corridor, or room for a future transportation corridor. These are the exchanges the decision below calls into question.

**C. The King Cove exchange is of the same kind.**

The proposed King Cove to Cold Bay road presents these concerns in concrete terms. King Cove residents depend on air and marine transportation for access to medical care and essential services. Severe weather can prevent travel to the all-weather airport in Cold Bay, delaying medical evacuations and other necessary transportation. The district court acknowledged these concerns and the Secretary's consideration of testimony from King Cove residents. 1-ER-34–36. As the Secretary explained, the proposed exchange would allow King Cove Corporation ("KCC") to pursue construction of a road intended to improve access to medical care, transportation, and other essential services. *Id.* These benefits fall directly within ANILCA's economic and social purposes. Commercial transportation can serve those purposes as well. 16 U.S.C. § 3101(d). The exchange can meet those needs while acquiring lands for conservation purposes, subject to ANILCA's subsistence protections. 1-ER-31–37.

In 2006, Nielsen, Aleut's Director of Regional Strategy & Policy, witnessed her uncle, who had double pneumonia, "have to be hoisted 20 feet from a fishing vessel to the treacherous Cold Bay dock" after "a 3 hour trip in high winds and seas." Nielsen Decl. ¶¶ 1, 11. The medical evacuation flight "could not land in King Cove due to the high winds." *Id.* ¶ 11. For Aleut shareholders in King Cove, these challenges create "significant barriers to obtaining timely medical care, emergency

evacuation, and other essential services" and are "not isolated incidents but ongoing realities that affect their health, safety, and quality of life." *Id.* ¶ 12.

The Secretary also identified conservation benefits. The United States conveyed approximately 490 acres to KCC, about 336 of them designated wilderness. 2-ER-110; 1-ER-11–12. KCC conveyed approximately 1,739 acres near Kinzarof Lagoon and relinquished selection rights to approximately 5,430 acres within the Refuge, and the United States paid $48,050 to equalize value. 2-ER-110; 1-ER-11. Because KCC may identify replacement selections outside the Refuge, the relinquishment does not permanently reduce its overall land entitlement by the same acreage. 1-ER-11 n.39.

The Secretary considered these interests and determined that the exchange furthered ANILCA's purposes. He recognized the conservation value of lands acquired from KCC, considered the effects on subsistence resources, and evaluated the economic and social benefits to King Cove residents. 1-ER-31–36. The Secretary identified the health and safety of King Cove residents as a principal reason for approving the exchange. 1-ER-36. The district court upheld that determination, finding that the Secretary had not made a clear error of judgment in concluding that the exchange furthered ANILCA's purposes. 1-ER-36–37.

### III. The Title XI and Refuge Act rulings would unsettle that practice across Alaska.

Amici agree with the Federal Appellants, King Cove Corporation, and the State that Title XI does not apply to a conveyance of title under § 1302(h), and that the Refuge Act's suitability clause conditions only the exchange power that Act confers. U.S. Br. 24–42; KCC Br. 12–25; State Br. 18–28. Before turning briefly to the statutory text in Part V, amici address what the district court's contrary rulings would mean in practice.

The district court held that the exchange was a Title XI authorization because its purpose was to enable a road and its terms identified the route and imposed design and mitigation conditions. 1-ER-42–44. For Native communities, that test has no natural stopping point. The parties make the point in general terms. U.S. Br. 30–31; KCC Br. 14–15. Amici can describe what it means on the ground. Many of the communities amici serve are not connected to any road system. In such places, whether a gravel source, a landfill, an airstrip, a power line, or a road can be built is very often a question of who owns a particular parcel, and an exchange is how that question is answered. If the owner's intended use converts the conveyance into a transportation or utility authorization, then the exchanges Native communities most need are the ones that would require the full Title XI process and, where wilderness is involved, presidential approval and a joint resolution of Congress. *See* 16 U.S.C. § 3166(b)–(c); 1-ER-37.

That result is at odds with two things the district court itself recognized. The court held that ANILCA § 910 exempts conveyances to Native Corporations from NEPA's impact-statement requirement, 1-ER-55–56, yet its Title XI ruling would subject many of those same conveyances to a process built around an impact statement. And the court relied on the negotiated design and mitigation conditions as evidence that the exchange authorized a road. 1-ER-42. Those conditions are the kind of stewardship commitments Native Corporations make as landowners. A rule that counts them against an exchange would discourage the Secretary and Native Corporations from agreeing to them.

The ruling also changes what Native ownership means. A right-of-way or permit leaves the United States as owner and regulator. A patent does not. ANCSA rejected the reservation and trust model in favor of fee ownership, and Congress said that including Native lands within conservation unit boundaries was not meant to restrict Native owners' use of them. H.R. Rep. No. 96-97, pt. 1, at 179. Conditioning the passage of title on federal approval of the owner's intended use treats Native corporation land as if it were held in trust. Exchanged lands do not escape regulation. They remain subject to the Clean Water Act and other generally applicable law, as the pending challenges to the Corps of Engineers permit for this road show, U.S. Br. 33–34 & n.4, and the exchange itself is reviewed under § 810. But that is the

regulation every private landowner faces, not federal supervision of the owner's purposes.

The Refuge Act ruling adds a second, undefined test for every exchange involving an Alaska refuge, and the district court left open whether failing it is fatal. 1-ER-81–82. Native Corporations cannot plan, finance, or negotiate around a condition whose content and consequence are unknown. And because the court understood the inquiry as one made "in light of" the lands' refuge status, 1-ER-77, it invites the conservation-only analysis the court correctly held ANILCA does not require. 1-ER-25–31.

**IV. The upheld § 810 analysis addresses the subsistence concerns presented here.**

The tribal plaintiffs raised important concerns about migratory birds used for subsistence in the Yukon-Kuskokwim Delta. Amici's shareholders also depend on subsistence, while King Cove residents described the importance of access to their own community's continued life. 1-ER-34–36. Section 810 required an evaluation of subsistence effects and alternatives and, where triggered, notice, hearings, and findings. 16 U.S.C. § 3120. The Service evaluated effects on nearby and Yukon-Kuskokwim communities and completed the additional process for potential cumulative restrictions identified for five nearby communities. *See* 2-ER-167–273. The district court upheld that analysis and its treatment of alternatives. 1-ER-47–55.

That is the framework within which competing Native interests should be resolved. Title XI and the Refuge Act's suitability clause were not designed for that purpose.

## V. The Title XI and Refuge Act holdings are also wrong as a matter of statutory text.

Amici join the statutory arguments of the Federal Appellants, King Cove Corporation, and the State and do not repeat them. U.S. Br. 24–42; KCC Br. 12–25; State Br. 18–28. They add points that bear directly on Native Corporations and that the parties' briefs do not develop.

### A. Title XI requires a qualifying system authorization, not merely a project-related conveyance.

Title XI applies to agency action "under applicable law with respect to the approval or disapproval of the authorization" of a transportation or utility system, and "applicable law" means a law under which an agency has jurisdiction to grant such an authorization. 16 U.S.C. §§ 3162(1), 3164(a). The parties explain why § 1302(h), which authorizes the Secretary only "to exchange lands," is not such a law, why its notwithstanding clause confirms as much, and why a road on conveyed land will not be "within" a conservation system unit. U.S. Br. 26–33; KCC Br. 16–24; State Br. 18–19. Amici add four points.

First, Title XI's machinery confirms that it regulates permits, not patents. An applicant seeking approval of a transportation or utility system must use the prescribed consolidated application form. 16 U.S.C. § 3164(b)–(c) . The implementing regulations prescribe Standard Form 299. 43 C.F.R. § 36.4(a). Here,

the Secretary approved a land exchange under § 1302(h) , not a transportation or utility system right-of-way application. He expressly acknowledged that "[t]he Department does not have a pending application for a TUS before it." Secretary's Decision at 51; 1-ER-41 n.132.

A bilateral, equal-value exchange negotiated under § 1302(h) has no applicant and no application, as the Secretary found. 1-ER-41 n.132. The district court's suggestion that KCC's exchange proposal "could be considered an application," *id.*, shows how far the statute must be stretched to fit. The district court acknowledged the absence of a pending application but nevertheless treated the exchange as a partial transportation authorization. 1-ER-41 n.132. The question is not which form was filed. It is whether the Secretary authorized a conveyance of land or the construction or operation of a transportation system. Section 1302(h) authorizes the former, not the latter. 16 U.S.C. § 3192(h)(1) ; see id. §§ 3162(1) , 3164(a) .

Second, the district court thought it inconsistent for the Secretary to rely on the road's benefits under § 1302(h) while denying that he had authorized a road. 1-ER-87 n.307. There is no inconsistency. Section 1302(h) asks whether an exchange is "for the purposes of this Act," so the Secretary must consider what the exchange will make possible. Title XI asks a different question: what authority the agency exercised and what permission it granted. Considering an exchange's consequences

does not turn the power to acquire and convey land into jurisdiction to approve a transportation system.

Third, Title XI's own text points away from § 1302(h). KCC explains that § 1302(h) is not a "law of general applicability" as *Sturgeon* understood that phrase. KCC Br. 16–17, *Sturgeon v. Frost,* 139 S. Ct. 1066 (2019). Title XI adds confirmation. It defines applicable law as a law "other than this subchapter," and it separately addresses the case in which no applicable law exists for a system. 16 U.S.C. §§ 3162(1), 3165. Those provisions describe external permitting statutes, the laws under which an agency issues a right-of-way or permit. A land-acquisition power in ANILCA's own administrative title is not naturally described that way.

Fourth, amici's reading leaves both provisions fully effective. Section 1302(h) performs its ownership-transfer function, and Title XI applies whenever an agency grants a qualifying authorization for a system on conservation system unit land. As the parties explain, § 1302(h) applies "[n]otwithstanding any other provision of law," while Title XI's clause reaches only "applicable law." U.S. Br. 29–31; KCC Br. 22–24. Nothing in that reading exempts an exchange from § 1302(h)'s own purpose, counterparty, and value requirements, from judicial review, or from § 810. The district court's test, by contrast, turns on the recipient's anticipated use, which is what makes it unworkable for Native landowners. *See* Part III, *supra*.

**B. The Refuge Act's suitability clause conditions only the exchange power that Act confers.**

The Refuge Act authorizes an exchange for lands under the Secretary's jurisdiction "which he finds to be suitable for disposition." 16 U.S.C. § 668dd(b)(3)(A). That condition appears within the Refuge Act's exchange grant, not a freestanding prohibition on every federal conveyance of refuge property. Section 1302(h) separately authorizes exchanges, expressly including lands within conservation system units, subject to its own purposes, counterparty, and value requirements. *Id.* § 3192(h)(1). The question is whether Congress made a condition attached to the Refuge Act's grant a condition on that separate ANILCA authority.

The district court relied on ANILCA § 304(a)'s direction to administer Alaska refuges under both refuge-system law and ANILCA. 1-ER-79–80; ANILCA § 304(a), Pub. L. No. 96-487, title III, 16 U.*S.C.* § 668dd note. Amici's reading preserves that direction: refuge management remains governed by applicable refuge law, and Refuge Act exchanges retain the suitability condition. But § 304(a) also preserves ANILCA, including its express grant to exchange unit lands. The provisions can coexist by applying each grant's conditions to exchanges made under that grant, rather than importing the condition from one into the other. *See Morton v. Mancari*, 417 U.S. 535, 550–51 (1974).

If the two statutes did conflict, Congress said twice which controls. Section 1302(h) applies "[n]otwithstanding any other provision of law," and a clause of that

kind overrides conflicting provisions. *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). And when Congress amended the Refuge Act in 1997, it provided that if any provision of that Act conflicts with ANILCA, ANILCA "shall prevail." National Wildlife Refuge System Improvement Act of 1997, Pub. L. No. 105-57, § 9(b), 111 Stat. 1252, 1260.

The district court avoided the conflict only by declining to say what its required determination would do. 1-ER-81–82. If an adverse suitability finding could block an exchange that satisfies § 1302(h), the Refuge Act would limit authority Congress granted notwithstanding other law, and ANILCA prevails. If it could not, its omission cannot justify setting the exchange aside. And as the Federal Appellants and the State explain, the Secretary found the lands "suitable for disposition pursuant to ANILCA" after weighing the conservation values at stake, so any omission was harmless and, at most, curable on remand without vacatur. 2-ER-149; U.S. Br. 40–42; State Br. 36–37.

**VI. With those holdings reversed, the Court should direct remand without vacatur.**

The district court vacated the Secretary's decision because three violations together went to the "fundamental illegality" of the exchange and "cannot be cured through further explanation on remand," and because Title XI deprives a noncompliant authorization of "force and effect." 1-ER-87. If this Court reverses the Title XI and Refuge Act holdings, those premises fall away. The Federal Appellants

have not appealed the Endangered Species Act ruling, and they and the State explain that the defects the district court identified (a missing incidental take statement and calculation errors) can be corrected on remand. U.S. Br. 43–44; State Br. 37–38. Amici take no position on the biological opinion. They agree that what remains is governed by this Court's test for remand without vacatur, which weighs the seriousness of the agency's errors against the disruptive consequences of vacatur. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1015 (9th Cir. 2025); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).

The disruption here is substantial. The United States has issued a patent, and KCC has delivered a warranty deed. 1-ER-14. The district court's order vacates the Secretary's approval but does not address either instrument. 1-ER-90. Vacating the decision that underlies a completed conveyance clouds title to Native-owned land and to land now held as part of the Refuge. Stable title is what allows a Native corporation to plan, borrow, and build. And the district court itself acknowledged the "serious concerns" of King Cove residents who have sought this road for decades. 1-ER-89. Those considerations weigh heavily against vacatur once the principal grounds for it are removed.

## CONCLUSION

The Court should affirm the district court's construction of ANILCA's purposes and, to the extent they are challenged on cross-appeal, its rulings that §

1302(h) is not confined to condemnation-threatened inholdings, that § 910 applies to this conveyance, and that the Secretary complied with § 810 and adequately explained his change in position. The Court should reverse the holdings that Title XI and the Refuge Act's suitability clause govern an exchange under § 1302(h), vacate the order setting aside the Secretary's decision, and remand with instructions to remand to the Department of the Interior without vacatur.

Respectfully submitted,

19 November 2026

/s/ Christopher J. Slottee

Christopher J. Slottee, AK Bar No. 0211055
Robert Misulich, AK Bar No. 1111083
Samuel Schimmel, AK Bar No. 2511122
Schwabe, Williamson & Wyatt, P.C.
420 L Street, Suite 400
Anchorage, Alaska 99501
Telephone: (907) 339-7130
CSlottee@schwabe.com
Counsel for Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief contains 5,303 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), and complies with the applicable type-volume limit under Rule 29(a)(5), subject to any case-specific order. It is prepared in a proportionally spaced typeface, Times New Roman, 14 point. Fed. R. App. P. 32(a)(5)–(6),(g).

19 November 2026

/s/ Christopher J. Slottee

Christopher J. Slottee

## CERTIFICATE OF SERVICE

I certify that on 19 November 2026, I electronically filed this motion and the proposed amicus brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the ACMS system.

/s/ Christopher J. Slottee

Christopher J. Slottee